1

                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA


BRENDA THOMAS                    CIVIL ACTION NO. 18-01264

VERSUS                           SECTION: A

KFC CORPORATION, YUM        JUDGE: JAY C. ZAINEY

BRANDS, INC., YUM

RESTAURANT SERVICES GROUP,

INC., KFC FRANCHISEE

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


        Deposition of BRENDA G. THOMAS, 12990

North Lake Carmel Drive, New Orleans, Louisiana

70128, taken in the law offices of SOILEAU &

ASSOCIATES, LLC, 1010 Common Street, Suite 2910,

New Orleans, Louisiana 70112, on Thursday, the 8th

day of November, 2018.




REPORTED BY:


    PATRICIA L. SCHONEKAS, CCR

    CERTIFIED COURT REPORTER

BRENDA THOMAS                                    November 8, 2018

2

APPEARANCES:


        SOILEAUX & ASSOCIATES, LLC

        BY: RYAN A. JURKOVIC, ESQUIRE

        1010 Common Street

        Suite 2910

        New Orleans, Louisiana   70112

             ATTORNEYS FOR THE PLAINTIFF




        LAW OFFICES OF ROBERT E. BIRTEL

        BY: JAMES J. KOKEMOR, ESQUIRE

        3850 North Causeway Boulevard

        Suite 220

        Metairie, Louisiana   70002

             ATTORNEYS FOR THE DEFENDANTS

BRENDA THOMAS                                    November 8, 2018

3

E X A M I N A T I O N     I N D E X

EXAMINATION BY:                              PAGE

MR. KOKEMOR                                     5

E X H I B I T     I N D E X

EXHIBIT NO.                                  PAGE

EXHIBIT NO. 1                                   14

EXHIBIT NO. 2                                   38

EXHIBIT NO. 3                                   39

BRENDA THOMAS                                    November 8, 2018

4

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

*    *    *    *

PATRICIA L. SCHONEKAS, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

BRENDA THOMAS                                           November 8, 2018

5

                    BRENDA G. THOMAS,

after having been first duly sworn by the

above-mentioned Certified Court Reporter, did

testify as follows:

EXAMINATION BY MR. KOKEMOR:

    Q.    Good morning, Ms. Thomas.  How are you
this morning?

    A.    Not so well.

    Q.    Sorry to hear that.  Before we get
started, are you taking any kind of medication
today that might prevent you from being clear and
alert and understanding my questions?

    A.    No.

    Q.    My name is Jim Kokemor.  I'm an attorney.
I represent West Quality Food Services.  They are
the operator of the KFC restaurant out on Bullard
Avenue in New Orleans East, and we are here today
to take your deposition in connection with the
lawsuit that you have filed against them.  You
understand that?

    A.    Yes.

    Q.    I'm sure you met with your counsel and
he's explained what a deposition is, but let me
take a couple of moments to tell you what you may
expect.  Okay?  This is your opponent's one

BRENDA THOMAS                                        November 8, 2018

6

opportunity to question you under oath about the facts of your case.  You understand that?

A.   Yes.

Q.   And you also understand that you are under oath today in these proceedings?

A.   Yes.

Q.   The court reporter is an officer of the court, she is empowered to administer that oath and she has asked you to raise your right hand, tell the truth, the whole truth, and nothing but the truth just as though you were testifying in a court of law.  You understand that?

A.   Yes.

Q.   And the court reporter, as you can see, is taking everything down that we say here in the room today and will prepare a transcript of today's deposition.  You understand that?

A.   Yes.

Q.   You are going to have a right to read and sign that deposition transcript, should you choose to do so, okay, and usually your attorney will let the court reporter know at some point or at the end of the deposition if you choose to read and sign it or if you are going to waive that right.  Okay?

In any event, in order to make sure that

7

everything is taken down accurately, we have a few rules to tell you about.  First of all, I would ask you to wait until I finish asking the question before you begin to speak your answer because that makes it very difficult when two people are talking over one another for the court reporter to record everything properly.  Okay?

A.    Yes.

Q.    Also, I need to remind you that you need to verbalize all of your responses so that the court reporter can hear them and take them down in written form.  Understand that?

A.    Yes.

Q.    If I ask you a question that you don't understand or if you don't hear my question, please stop me right then and there and tell me you didn't hear or understand it and I'll be happy to repeat it or rephrase it until you do.  Okay?

A.    Okay.

Q.    If I ask you a question and you give me an answer to it, I have to assume that you understood my question and that the answer you have given is the truth, the whole truth, and nothing but the truth in accordance with your oath.  Is that fair enough?

A.    Yes.

Q.    If you are ready, then let's give us your full name and your current home address for the record.

A.    Brenda G. Thomas, 12990 North Lake Carmel Drive, New Orleans, Louisiana 70128.

Q.    And how long have you lived at that address?

A.    Thirty years.

Q.    Is that a single family home located there?

A.    Yes.

Q.    And are you the owner of the home?

A.    Yes.

Q.    And who do you presently live with?

A.    My daughter, Chanel Thomas, and my grandchildren, her children.

Q.    How does Chanel spell her first name?

A.    C-H-A-N-E-L.

Q.    How old is Chanel?

A.    She's 34.

Q.    And how many children does she have?

A.    She has two.

Q.    And they both live with you-all?

A.    Yes.

BRENDA THOMAS                                        November 8, 2018

9

Q.   What are their names and ages?

A.   Dasia Thomas.

Q.   Please say that name again.

A.   Dasia Thomas.

Q.   How do you spell Dasia?

A.   D-A-S-I-A.

Q.   And is that a little girl or a boy?

A.   Girl.

Q.   And what is her age?

A.   She's 16.

Q.   And the other child?

A.   Donnell.

Q.   How do you spell Donnell?

A.   D-O-N-N-E-L-L.

Q.   Thomas?

A.   Yes.

Q.   And is that a boy?

A.   Yes.

Q.   What is his age?

A.   He's 15.

Q.   Any other folks live with you at the house?

A.   No.

Q.   What is your date of birth?

A.   November 22nd, 1949.

BRENDA THOMAS                                  November 8, 2018

10

Q.    Where were you born?

A.    Los Angeles, California.

Q.    How old were you when you came to the New Orleans, Louisiana area?

A.    I don't remember.  I was a child.

Q.    You were a child?

A.    Uh-huh (affirmatively).

Q.    You lived in New Orleans most of your life then?

A.    Yes.

Q.    What is your marital status?

A.    Widow.

Q.    And to whom were you previously married?

A.    Joseph Thomas.

Q.    When did you marry Mr. Thomas?

A.    In August, August the 20th, 1966.

Q.    And when did he pass?

A.    March 6th, 2013.

Q.    You've never been married to anyone else?

A.    No.

Q.    Other than your daughter Chanel Thomas, do you have any other children?

A.    Yes.

Q.    What are the other children's names and ages?

11

A.    Joseph Thomas, Jr.

Q.    How old is he?

A.    He born December -- February 25th, '66. I believe he's 51.

Q.    '61?

A.    No, he's born in '66.  I believe he's 51.

Q.    Fifty-one years of age.

A.    I don't know the ages.  I don't know the ages.  I know the year he was born.

Q.    And your next child?

A.    Dietrich Thomas.

Q.    How do you spell that?

A.    D-I-E-T -- D-I-E-T -- wait a minute.  I'm sorry.  D-I-E-T-R-I-C-H.

Q.    And what was his birth year?

A.    That's a girl.

Q.    That's a female.  Okay.  When was she born?

A.    February the 5th, '68.

Q.    Your next child?

A.    Tamla, Tamla Pierre.

Q.    Tamla, how do you spell that?

A.    T-A-M-L-A.

Q.    And her last name is Pierre?

A.    Yes.

12

Q.   When was she born?

A.   She was born October the 1st, '72.

Q.   Any other children?

A.   Yeah.  Courtney Thomas.

Q.   Is that male or female?

A.   Male.

Q.   And what year was he born?

A.   November 2nd, '71.

Q.   Any others?

A.   I have a son that's deceased.

Q.   So you had a total of six children?

A.   Uh-huh (affirmatively).

Q.   And the only child that currently still lives with you is Chanel?

A.   Yes.

Q.   What's your Social Security number?

A.   1479.

Q.   And we'll ask the court reporter to redact all but the last four digits on the record.

Do you have a driver's license?

A.   Yes.

Q.   May I take a look at it, please?

We'll let the record reflect that Ms. Thomas has handed me her Louisiana Personal Driver's License, No. 003852813 and it's a Class E

BRENDA THOMAS                                    November 8, 2018

13

license, expiring -- actually it's expired, on November 22 of 2017.  And you have no restrictions on your driver's license.  Have you applied for a new license?

A.    Yeah.  I probably got it mixed up in here in my purse.

Q.    Do you have the new one?

A.    Yeah.

Q.    Thank you.  Also let the record reflect that Ms. Thomas has handed me her new driver's license which was issued on 11/22 of 2017.  It bears the same number, 003852813.

On this one your home address is listed as 6240 Eastover Drive in New Orleans.  Do you know why there's a different address than the one you gave me?

A.    When I purchased a home in Eastover and then had -- my driver's license number is on that one.

Q.    So you own a home at 2640 Eastover Drive?

A.    Yeah, but I don't live there.  My son lives there.

Q.    When did you purchase the home at 6240 Eastover Drive?

A.    I think -- I'm not sure, 2013, I believe,

BRENDA THOMAS                                    November 8, 2018

14

or -- 2013.

Q.   And you purchased it just as an investment?

A.   Uh-huh (affirmatively).

Q.   So your son lives there?

A.   My son lives there.

Q.   He pays you rent?

A.   No.  He just lives there.

Q.   Which son is that?

A.   Courtney Thomas.

Q.   We'll ask to make a photocopy of the new driver's license and attach it as Exhibit 1 to the deposition.

(Document marked for identification as Exhibit No. 1.)

MR. JURKOVIC:

Do you want a recess for a moment while I do that?

MR. KOKEMOR:

We can just move on, if you don't mind, do it later.

MR. JURKOVIC:

That's fine.

EXAMINATION BY MR. KOKEMOR:

Q.   We're here today to ask you some

15

questions about an incident that occurred, according to your petition, on October 1 of 2016 in which you purchased a chicken sandwich from the KFC restaurant located at 6009 Bullard Avenue in New Orleans East.  First of all, is that the correct date that this incident occurred?

A.   Yes.

Q.   Had you ever been a customer of that KFC store at any time before October 1 of 2016?

A.   Yes.

Q.   About how many times would you say you were a customer there before the date of the incident?

A.   I don't recall.

Q.   One or two or a hundred or 200?

A.   I don't recall how many.  Not that many times.

Q.   Did you ever have any kind of incident as a customer on the occasions you went there before October 1 of 2016?

A.   No.

Q.   And by that I mean did you ever have any kind of an argument with a store employee?

A.   No.

Q.   Did you ever have any kind of a slip and

16

fall on the floor of the restaurant?

A.   No.

Q.   And did you ever have any kind of an incident in which you purchased an item, a food item that you believe to have been spoiled or in some manner defective, before the incident that is the subject of this suit?

A.   No.  No.

Q.   On October 1st of 2016, according to your petition, you went through the drive-through at that restaurant on Bullard Avenue and you purchased a chicken sandwich; is that correct?

A.   Yes.

Q.   And do you have a receipt for the purchase?

A.   I've given it to the people at Kentucky.

Q.   At present you don't have in your possession a copy of the receipt of your purchase on October 1?

A.   I paid it with my debit card and the information is on my debit card, the time of purchase and the transaction and the amount that it was.

MR. KOKEMOR:

Have you-all produced a copy of the

17

            debit card records?

            MR. JURKOVIC:

                  I don't recall.  We can get that to

            you.

EXAMINATION BY MR. KOKEMOR:

      Q.   Yes, if you wouldn't mind giving your

attorney a copy of your debit card record showing

your purchase on October 1 of 2016 so he can

provide that to me.  Okay?

      A.   Okay.

      Q.   Now, do you recall approximately what

time you made that purchase on October 1 of 2016?

      A.   It was 10:52.

      Q.   And was that in the morning or at night?

      A.   At night.

      Q.   Was anyone present with you in your

automobile when you went through the drive-through

at that time?

      A.   My grandson.

      Q.   And which grandson was that?

      A.   Donnell.

      Q.   He was the only other occupant of your

car?

      A.   Yes.

      Q.   What do you recall having done that day

BRENDA THOMAS                                    November 8, 2018

18

before 10:52 p.m. that night?

     A.   Just spending time with my grandkids.

     Q.   Do you remember what day of the week it was?

     A.   Saturday.

     Q.   Were you employed at that time?

     A.   Yes.

     Q.   Do you know if that was a day that you had worked?

     A.   No, I didn't work that day.

     Q.   So you would have been off on that day?

     A.   Yes.

     Q.   Where were you employed at that time?

     A.   Lab Solutions.

     Q.   Absolutions?

     A.   Lab Solutions.

     Q.   Lab Solutions.  And where are they located?

     A.   Atlanta, Georgia.

     Q.   And did you work at a local office in the New Orleans area?

     A.   Yes -- no.  Worked in a doctor's office. They have contracts with doctors' offices.

     Q.   So in October at the time of the incident, did you work at one particular doctor's

BRENDA THOMAS                                        November 8, 2018

19

office or clinic?

A.  Yes.

Q.  Which one was that?

A.  A Woman's Place.

Q.  A Woman's Place?

A.  Yes.

Q.  What's the address there?

A.  9954 Lake Forest Boulevard.

Q.  9954?

A.  99 -- yeah, 9954 Lake Forest Boulevard.

Q.  And was that a gynecologist's office?

A.  Yes.

Q.  Who is the main owner or the main physician there at that office?

A.  Tamla Pierre.

Q.  Your daughter?

A.  Yes.

Q.  Does she have any partners in that business?

A.  No.

Q.  And your job duties included drawing of blood and other bodily samples for analysis?

A.  Specimen collector and phlebotomist.

Q.  And what type of training did you have as a phlebotomist?

20

A.    I've been a nurse, an R.N.

Q.    When did you become an R.N.?

A.    1993.

Q.    You graduated from LSU nursing school?

A.    Yes.

Q.    And take me through your work history after becoming a registered nurse.

A.    I worked at the hospital, first Methodist Hospital.

Q.    Methodist?

A.    Methodist.

Q.    In New Orleans East?

A.    Yes.

Q.    How many years were you there?

A.    I guess about six years I believe.  I'm sure about six years.

Q.    You worked as an R.N.?

A.    Yes.

Q.    Where did you go after that?

A.    Tulane.

Q.    Tulane University Medical Center?

A.    Yes.

Q.    And what years were you there?

A.    From '92 to 2005.

Q.    And your job duties included those of a

registered nurse?

A.   Yes.

Q.   Where did you go after 2005?

A.   Well, we located to Texas because of the hurricane.  We got displaced in Texas.

Q.   And how long did you live in the Texas area?

A.   About two -- I think about -- I'm not sure.  It was about two or three years.  I'm not really sure.

Q.   Did you work anywhere -- were you in Houston?

A.   Yes.

Q.   Did you work anywhere during the time that you were displaced by Katrina?

A.   Yes.

Q.   Do you remember where you worked during that period?

A.   I don't remember the name of the hospital, but it was still affiliated with the HCA hospitals.  It was Spring something.  I'm not sure of the name.

Q.   Did you say HCA?

A.   Yeah, HCA.  It's like all the hospitals, you know, in that same association.

22

Q.   And you were a registered nurse during that period?

A.   Yes.

Q.   You were working full time?

A.   Yes.

Q.   So when did you return to the New Orleans area after Katrina?

A.   About maybe a little after 2008, I believe.

Q.   And at that time you found employment again here in New Orleans?

A.   I wasn't working for -- I mean I stopped working for a while.  I mean since -- I started working at an Urgent Care I think it's 2008 I'm thinking.  I'm not sure, but -- and that was briefly.

Q.   And what Urgent Care facility did you work for?

A.   It was Bullard -- it was on Bullard Avenue, Bullard Avenue.

Q.   And was that a full-time job?

A.   Yes.

Q.   And you had the normal duties of a registered nurse at Urgent Care?

A.   Yes.

BRENDA THOMAS                                            November 8, 2018

23

Q.    And so when did you leave Urgent Care?

A.    Possibly -- I'm not sure.  2011, 2012, I believe.  I'm not sure.

Q.    Where did you go to work at that time?

A.    I wasn't working.

Q.    So you took a little time off around 2011, 2012?

A.    I was diagnosed with breast cancer.

Q.    The next job you had with your daughter, Dr. Tamla Pierre?

A.    Yes.

Q.    When did you start working for your daughter's medical office?

A.    I was working -- I don't know.  2015 I was working for Lab Solutions.  I believe Lab Solutions 2015.  I think that's right when I started.

Q.    And was it a full-time position?

A.    Yes.

Q.    Meaning 40 hours per week?

A.    Yes.

Q.    As a result of the incident we're here today to talk about, did you miss any time away from your employment at Lab Solutions?

A.    Yes.

24

Q.   Do you have any records to indicate how many days, weeks, or months you missed from work as a result of the incident?

A.   No.

Q.   Do you have a general recollection as you sit here today whether you missed a few days, a few weeks, or a few months of work?

A.   Might have been a few days.

Q.   And what was the reason you would have missed approximately two days of work?

A.   For the incident happening at Kentucky, eating a rat.

Q.   And would that have been --

A.   I was ill.

Q.   Illness such as upset stomach, diarrhea, things of that nature?

A.   I had pains, severe pains in my stomach, nausea, vomiting, diarrhea, sore throat.

Q.   And were you able after a couple of days to return to your position at Lab Solutions?

A.   I don't remember when I returned.  I really don't know when I returned.

Q.   Well, you told me that you missed the first couple of days immediately after the incident?

25

A.   Uh-huh (affirmatively).  Yes.

Q.   And so I'm assuming you went back to work at some point shortly thereafter?

A.   I don't recall when I went back.  I was under the doctor's care.

Q.   Are you working now?

A.   Yes.

Q.   Have you been working all of 2018, our current year?

A.   Yes.

Q.   And you are doing the same job you held before at Lab Solutions at your daughter's office?

A.   Yes.  It's another company called Accu Reference.  It's not -- no longer Lab Solutions.

Q.   But still working in your daughter's office?

A.   Yeah.  I couldn't keep the Lab Solutions job because I was messing up so much and having so many errors and stuff.  So I had to resign from Lab Solutions because of the problem.  So I had to resign.

Q.   When did you resign from Lab Solutions?

A.   I'm not sure what day it was.  I'm not sure what month.  I'm not sure.  It was February I believe.  I'm not sure.  February.

BRENDA THOMAS                                    November 8, 2018

26

Q.    Would that have been in 2017?

A.    Yes, '17.

Q.    Were you out of work for a period of time after you resigned from Lab Solutions?

A.    I started the other job I think like September of '17.

Q.    What is the name of the new company you work for?

A.    Accu Reference.

Q.    A-C-U --

A.    A-C-U [sic].

Q.    New word Reference?

A.    All this together.  Accu Reference, R-E-F-E-R-E-N-C-E.

Q.    That's the whole name, Accu Reference?

A.    Accu Reference Lab.

Q.    Who is your supervisor at that position?

A.    Gail Provost.

Q.    Gail Provost.  And is she local?

A.    The place the company is in -- she's local, but the company is in Jersey.  But she's the supervisor.  She's my supervisor.

Q.    Since September of 2017, you've been employed at Accu Reference Lab continuously until now?

27

A.    Yes.   But I've been working with difficulty, having problems.   I have my daughter -- she also -- Chanel works there for Accu Reference and she helps me with my work because I have difficulty performing duties and sometimes I mess up.   So she kind of assists me with my work.

Q.    Is she a paid employee?

A.    Yes.

Q.    On days that you do not work or have not been able to work, were you paid or were you not compensated?

A.    I took sick time off, sick time.

Q.    As we sit here today, though, you don't have any records of the number of days that you took sick time after October 1st of 2016 because of this incident?

A.    I don't have -- what you mean, days off, PTO time?

Q.    Yes.   Like a printout of the number of days or weeks that you missed?

A.    No.   I don't have that available.

Q.    How would I get that if I were to go to Lab Solutions and to Accu Reference, who would have the records?   Would it be the human resources department?

BRENDA THOMAS                                    November 8, 2018

28

A.    Yeah, I believe so.

Q.    And you told me Accu Reference is in New Jersey and Lab Solutions is in Atlanta?

A.    Uh-huh (affirmatively).

Q.    In October of 2016, what was your hourly pay rate?

A.    From Lab Solutions I was making $17 an hour.

Q.    And when you went to work for Accu Reference, what was your hourly rate?

A.    Fifteen dollars an hour.

Q.    We'll go back to the incident on October 1 of 2016.  You told me that you and your son, grandson, rather, went through the drive-through at the Bullard Avenue restaurant at approximately 10:52 p.m. that night.  You were there to purchase food for yourself and for your grandson?

A.    No, just for myself.

Q.    Just for yourself.  When was the last time you had eaten that day?

A.    That was the first time I'd eaten something.

Q.    The entire day?

A.    Uh-huh (affirmatively).

Q.    I asked you earlier basically what you

BRENDA THOMAS                                          November 8, 2018

29

did that day.  You don't have any specific
recollection of what you were doing that day?

        A.    I was with my grandson -- grandchildren,
hanging with my grandchildren.

        Q.    Were you at your house the whole day?

        A.    No.

        Q.    You were running errands and doing
different things outside the home?

        A.    No, not anything in particular, just, you
know, being with the children earlier that day and
stuff, and then at night I was hungry and I just
went to go get something to eat.  Left home around
ten-something, went to get something to eat.

        Q.    So you didn't have breakfast, lunch, or
dinner?

        A.    No.  I didn't eat anything.

        Q.    Do you remember drinking anything that
day?

        A.    No, I didn't have anything to drink.

        Q.    Do you drink alcohol?

        A.    No.

        Q.    Were you taking any kind of prescription
medication for any kind of medical ailment at that
time?

        A.    What you mean by prescription medication?

BRENDA THOMAS                                          November 8, 2018

                                                                    30

Q.    Well, like something for high blood pressure or high cholesterol, a daily kind of medication?

A.    Yeah, I do have daily medications I take.

Q.    So in October of 2016, can you tell me what daily medications you were taking at that time?

A.    I was taking high blood pressure medications.

Q.    All right.  Do you remember the brand of high blood pressure medicine?

A.    Losartan.

Q.    Losartan.  Any others that you recall?

A.    Cholesterol medicine, Pravastatin.

Q.    Anything else?

A.    Aspirin, daily aspirin.

Q.    Any other daily meds you can recall?

A.    Since that time, no.

Q.    So these would have been medications that you had been taking for some period of time before October of 2016?

A.    Yes.

Q.    And they would have been prescribed by your general practitioner?

A.    Yes.

BRENDA THOMAS                                    November 8, 2018

31

Q.   Who was your family practitioner at that time?

A.   Dr. Cooper, Michelle Cooper.

Q.   Where is she located?

A.   On Read Boulevard, Read Boulevard.  I don't know the address.

Q.   So you go through the drive-through, you purchase a meal called a chicken little meal; is that correct?

A.   Yes.

Q.   And you paid for it on your debit card?

A.   Yes.

Q.   What did you do after purchasing the chicken little meal?

A.   I went home.

Q.   Did you open the sandwich at all before you arrived at home?

A.   No.

Q.   So tell me, take it from there.  You got home, what did you do when you got home?

A.   I got home, I sat on the sofa, and I opened it up and started eating.  I started eating it and I was chewing it and it was hard.  It was stuff that was hard, and I kind of like looked -- opened it up to look at it and I saw a tail hanging

32

from the thing when I started eating and it was hard.  I bit it and I was chewing and I swallowed it and then I noticed that it had a tail hanging.

Q.   Take your time, whatever you need.

A.   And I stopped eating and I put it down and I saw like it had little legs or something on the thing.  And at that time I called the place up, the Kentucky place, I spoke to the manager and I told her what happened.  And she told me they were closing, she told me just bring it in the next day.

So I did.  I went there.  They opened up I guess around noontime and I brought it there and I asked to speak to the manager and I told them they sold me a rat and I had eaten it.  I asked for the manager and it was this tall black man, said he was the manager.  He was at the cash register at the time and so he went to the thing and opened it up and he saw the rat, and all he did was laugh, he just laughed like it was funny.  And then he asked me -- and he threw it in the trash and he said, "What else can I get you?  I can get you something else."  And I said, "No, I don't want nothing else."

And he didn't take no information from me or nothing, you know.  My grandkids was with me,

33

Dasia and Donnell, they was with me.  And then he looked toward them and said, "Well, what can I get you-all?"  And they didn't really want nothing, but then he handed them something, like something that say go cup.  I don't know what it was.  He handed it to them.  He handed it to them, give it to the kids, and I wouldn't allow them to eat it.

Q.    Let me take you back a couple of steps.  You said that when you got home you sat down on the couch?

A.    And started eating the sandwich.

Q.    And you started opening the sandwich?

A.    No.  I peeled back the top part of the thing and opened the thing and I started biting and chewing.

Q.    The sandwich was wrapped in a foil wrapper?

A.    Yes.  I had taken it out the foil wrapper and I had the bun.  It was on a bun.  I started chewing it.

Q.    How many bites did you take?

A.    I don't recall how many bites, but I was biting and chewing and swallowing.

Q.    How many bites did you swallow?

A.    I don't know.  I don't know.  I don't

BRENDA THOMAS                                          November 8, 2018

34

know.  And then that's when I noticed that it had a tail hanging because I seen a tail hanging from the bun.

Q.   Was anybody present with you as you started to -- as you unwrapped it and started to eat the sandwich?

A.   My daughter.

Q.   And which daughter was that?

A.   It was Chanel.

Q.   Were any of the grandchildren present?

A.   Dasia.

Q.   I'm sorry.  I didn't hear you.

A.   Dasia.

Q.   Dasia.  So at some point you said you felt that the consistency of it was hard?

A.   Yes.  When I was chewing it, it was hard. It was hard.  So I just kind of flipped to see, you know, why it was hard and that's when I seen the tail.

Q.   Had you eaten that same type of sandwich on previous occasions?

A.   It was chicken.  Chicken is what we call chicken little sandwiches.  Chicken strips is what it was supposed to have been.  In this case it wasn't.  It was a fried rat.

BRENDA THOMAS                                    November 8, 2018

35

Q.   But had you purchased the chicken little sandwich on prior occasions?

A.   Yes.

Q.   And you never encountered this feeling of a hard texture in the product?

A.   No.

Q.   On October 1st at your home when you started to eat it, did you taste any type of sensation or taste that was different than what you expected?

A.   No.  No.  It was hard and it wasn't the same as what I've eaten before.

Q.   Can you describe the taste of it?

A.   I can't describe it.  It was just hard.

Q.   And I assume then at that point when you saw that there was what appeared to be a tail hanging off of it, you put it down in disgust?

A.   I was ready to put it down on the table on the top of the wrapper.

Q.   And your daughter saw you do this?

A.   Yes.

Q.   Did your daughter come over and examine the product?

A.   It was right there in plain sight.

Q.   What was her reaction when she saw it?

BRENDA THOMAS                                    November 8, 2018

36

        A.    Shock I guess.  I don't know, you know.
I don't know how to explain her reaction.
        Q.    Did Chanel say anything to you when she
saw it?
            MR. JURKOVIC:
                Let him finish his question.
            THE WITNESS:
                I don't remember what she said.  If
            she said anything, I don't remember.  I
            don't know what happened.  I'd eaten a
            fried rat on a bun that caused me ill and
            unable to eat.
EXAMINATION BY MR. KOKEMOR:
        Q.    Your attorney has provided me with two
photographs.  I want to show these photographs to
you at this time and ask you if you can identify
them.  Take whatever time you need.  Okay?
        A.    I have to watch that again?  Why do I
have to see it again?  I can't do that.  I have to
see it?  I can't deal with it.
        Q.    Do you want to go off the record?
            MR. JURKOVIC:
                Let's maybe take a brief break.
            (Break taken.)
EXAMINATION BY MR. KOKEMOR:

37

Q.    Ms. Thomas, I want you to understand that I do not take any pleasure in making you upset or seeing you upset, but you need to understand that I have a job to do, which is to defend the operator of this restaurant, against whom you've filed this lawsuit.  And these two photographs are the only items of proof that you have to establish that you bought some defective product from them.  Okay?  So you are going to have to confront the photographs and answer my questions because this is the only opportunity I get to ask them.  Okay?

A.    Okay.

Q.    So I'm going to show them to you one at a time and I'm going to ask you a few questions about who took the photographs, when they were taken, et cetera.  Okay?  And this is a procedure we need to do in order to authenticate this into evidence. Again, I'm not doing it to upset you.

MR. JURKOVIC:

And please understand you don't have to linger over the photographs, you don't have to stare at them, just enough to know that the photographs are what they are.

EXAMINATION BY MR. KOKEMOR:

38

Q.   So let's start with this one here.  Take a look at it and tell me and identify me what is shown in that photograph?

A.   The rat tail.

Q.   Is that the sandwich you purchased at 10:52 on October 1 of 2016 from the KFC restaurant on Bullard Avenue in New Orleans East?

A.   Yes.

Q.   I'm going to label it as Exhibit No. 2 and we're going to offer, introduce, and file that into evidence as Exhibit No. 2.

(Document marked for identification as Exhibit No. 2.)

The second photograph I'm going to ask you to do the same.  Can you take a look at this photograph and tell me what is shown in that photograph?

A.   The fried rat.

Q.   Is that the sandwich that you purchased at 10:52 on October 1 of 2016?

A.   Yes.

Q.   At the KFC on Bullard Avenue in New Orleans East?

A.   Yes.

Q.   And this photograph shows it to be open,

BRENDA THOMAS                                     November 8, 2018

                                                                  39

the sandwich is open; is that correct?

        A.    Yes.

        Q.    We're going to label that in accordance
with the witness's identification as Exhibit No. 3.

              (Document marked for identification as
Exhibit No. 3.)

              Again, I'm not going to ask you to dwell
too long on these photographs, but I need to
establish, first of all, who took the two
photographs.  Do you know who took the photographs?

        A.    My daughter, Chanel.

        Q.    And did Chanel take these photographs on
her cell phone?

              MR. JURKOVIC:

                    Object to the form.

              THE WITNESS:

                    I don't know if she took them on the

              cell phone.  I don't know if she took

              them on her cell phone.  Yes, on the cell

              phone.

EXAMINATION BY MR. KOKEMOR:

        Q.    On her own cell phone or someone else's
cell phone?

        A.    I don't know whether mine or hers.  I
don't know, but she took the pictures.

40

Q.    Could it have been any other camera other than your cell phone or your daughter Chanel's cell phone?

A.    No.

Q.    First of all then, let me get from you the name of your cell phone provider, the service that you were using back on October 1 of 2016. What company was that?

A.    I believe it was Sprint.  Sprint.

Q.    And do you know the phone number for your Sprint account in October of 2016?

A.    I believe it was -- I don't know.  It might be 300-3027 or either the Sprint number I have now.  I don't remember.

Q.    What number do you have at present?

A.    I have (504) 342-7134.

Q.    342-7134?

A.    Yes.

Q.    And that's also with Sprint?

A.    Yes.

Q.    Was your daughter Chanel on your same plan or did she have her own cell phone provider?

A.    This provider on Chanel's plan right here, the 7134 number.

Q.    Do you know Chanel's phone number?

41

A.    421-9947.

Q.    Can you tell me approximately what time Chanel took these two photographs?

A.    That same night.

Q.    Was it within a few moments of your discovering what you thought to be the rat in the product?

A.    Yes.

Q.    So sometime around 11:00 p.m., 11:30 p.m. that night she took these two photographs?

A.    Yes.

Q.    And do you know how she transmitted these photographs to your attorney?

A.    She sent them to him.  I'm not sure.  Or she brought them to him.  I don't know.

Q.    Do you maintain copies of these photographs in your cell phone camera?

A.    No.

Q.    Do you believe that your daughter Chanel still has these photographs in the digital format in her camera?

A.    Yes.

MR. KOKEMOR:

We're going to ask for the production of the actual camera so we can

BRENDA THOMAS                                          November 8, 2018

42

                    obtain the metadata from the camera as to

                    the time and GPS location the photographs

                    were taken.  Okay?

               MR. JURKOVIC:

                    We can arrange for that after.

EXAMINATION BY MR. KOKEMOR:

     Q.    And the photographs were taken in your

living room at your home on Lake Carmel?

     A.    I'm not -- I'm not sure.

     Q.    Well, do you recall going anywhere

between discovering what you thought was the rat in

your food and the photographs being taken?

     A.    No.

     Q.    So you believe they were taken in your

home?

     A.    Yes.

     Q.    If I were to tell you that when I

examined the photographs which are labeled Exhibits

2 and 3, that I don't see any missing parts of the

product where you would have bitten that off and

swallowed it, what would your comments be to that?

               MR. JURKOVIC:

                    Object to the form.

               THE WITNESS:

                    I ate the rat.  I ate the rat.

BRENDA THOMAS                                    November 8, 2018

43

EXAMINATION BY MR. KOKEMOR:

Q.    Can you show me then on these photographs what is missing that you would have bitten off and swallowed?

A.    I had eaten a rat.  The rat -- the chicken was supposed to have been -- it was bigger than the bun.  The bun was smaller and I bit, started chewing it.

Q.    So you only chewed the part of the tail that hangs out over the bun?

A.    No.  I chewed the portion of the -- it was supposed to have been the chicken.  It wasn't chicken.  It was a fried rat.  It was hard.  I bit into it and started chewing it and that's when I realized it was hard, as I was swallowing it, and that's when I started to try to examine it and that's when I saw the tail hanging from that and I realized what it was.

Q.    Did you swallow any part of the bread that made up the sandwich?

A.    The meat.  It just was the meat, the top part of the meat.  The meat was larger than the bread.

Q.    Did you do any kind of probing with a knife or a fork or anything to cut, to get the

BRENDA THOMAS                                      November 8, 2018

44

breading or the coating off of the product to see what was underneath it?

A.   No.

Q.   You said you then called the restaurant from which you had purchased it and you spoke to an employee there and told them what happened?

A.   Yes.

Q.   And that person you spoke to, that was the same night of the incident?

A.   Yes.

Q.   Was it a male or a female?

A.   Female.

Q.   Did you get her name?

A.   No.

Q.   And she told you that they were closing at that time, you can come and bring it tomorrow?

A.   Yes.

Q.   Did the item, the sandwich, leave your possession at all from 10:52 that night until you brought it back the following day?

A.   No.

Q.   Where did you store it overnight?

A.   It was still with me at my home.

Q.   Did you close the wrapping and put it in your refrigerator?

BRENDA THOMAS                                    November 8, 2018

45

A.    It was back in the bag.

Q.    But not in the refrigerator?

A.    No.

Q.    So the item never left your house until you drove it to the restaurant around noon the following day?

A.    Yes.

Q.    Tell me about who was with you when you drove it back to the restaurant the following day.

A.    My grandchildren.

Q.    Any of your daughters?

A.    Dasia and Donnell.

Q.    Just Dasia and Donnell?

A.    Yes.

Q.    So I assume you drove the car?

A.    Yes.

Q.    So we're talking about October 2nd of 2016 is when you brought it back to the restaurant?

A.    Yes.

Q.    And you told me when you got there you asked for the manager and a tall black gentleman came out and introduced himself as the manager?

A.    He was at the register.  He said he was the manager.

Q.    Did you get his name?

46

A.    No.

Q.    When you presented the item to him, did you open the packaging and show him what was inside?

A.    He opened it up.

Q.    He took it from you and opened it?

A.    I sat it on the counter and he opened it up.

Q.    Did he tell you anything at that point about what he thought it was?

A.    He looked at it and started laughing, like it was funny, then he took it and threw it in the trash.

Q.    Did he say anything that indicated to you he agreed it was a fried rat?

A.    He knew it was a rat.  He saw it, saw the rat.

Q.    But did he say anything verbally to you that led you to believe he agreed it was a rat?

A.    I'm not sure, but he did say something about it and then he asked, "Well, can I get you something else?  What else can I get you?"  After he did that he threw it away.

Q.    When he threw it away, did you tell him no, I need that item to file a lawsuit?

47

A.    I did not know anything about why I needed it.  I went to report it to them.  I wasn't thinking about no lawsuit.  I was bringing it to them as I was told to bring it to them and let them know what was going on and what was served to me and I didn't want it to happen to nobody else.

Q.    Did the manager take any type of photograph of the food item that you returned the following day?

A.    No.

Q.    Did he ask you to write up any kind of a report?

A.    No.

Q.    Did you ask him or tell him that you wanted to file a written report?

A.    Wait.  I need to go back a little bit.  Now I remember he did say I'm sorry about that, you know, when they started laughing like it was funny after he saw it was a rat.  He said, "I'm sorry about that."  And then he started laughing.  And then he asked me, "Well, let me get you something else."  And I told him no.  He didn't take my name, didn't take my information down or nothing.

Q.    But did you ask him to get out a formal report so you could fill it out and sign it?

48

A.   No, I didn't ask him that.

Q.   So he offered you and your grandchildren some additional food products and you declined; is that correct?

A.   Yes.

Q.   And then you left?

A.   Then he handed my grandchildren something that said go cup.  I don't know what it was.  And he gave it to them, but they didn't eat it.  They threw it in the trash.

Q.   And after that you left?

A.   Yes.

Q.   Where did you go after leaving the restaurant on October 2nd?

A.   I went back home and I was ill already. I was already having sore throat, nausea, vomiting that Sunday and went back home.  And then I was, you know, having problems, diarrhea, cramping in my stomach still.  They didn't take a report or nothing.

Q.   Did you go to an emergency room?

A.   I went to my doctor that next morning and she sent me to the emergency room.

Q.   You got an appointment to see Dr. Michelle Cooper?

49

A.    No.  I walked in.  I just walked in.

Q.    But that's who you saw the next day?

A.    I went to her office.  I didn't get to see her.  I was told to go to the emergency room.

Q.    And it would have been one of her nurses at the office told you to go to the ER?

A.    Somebody at the desk talked to the doctor.  She told the doctor and she came back and told me she wanted me to go to the emergency room.

Q.    So that wasn't on the same day that you returned the food item to the store, was it, that was the following day?

A.    The doctor's office didn't open until Monday.  So I went there Monday morning.

Q.    Do you remember if you told the person at the intake desk at Dr. Cooper's office that you had consumed what you thought was a rat?

A.    Yes.

Q.    But you never got to see Dr. Cooper that day?

A.    She couldn't see me and treat me for the problems I was having.  So she sent me to the ER.

Q.    What ER did you go to?

A.    New Orleans East Hospital.

Q.    So your attorney has provided me with the

50

medical records from New Orleans East Hospital on 5620 Read Boulevard in New Orleans.  Is that where you went for emergency care?

A.  Yes.

Q.  Had you ever been a patient at that hospital before?

A.  No.

Q.  According to the intake admission form, you arrived on October 3rd, 2016 at 11:29.  It doesn't say if that's a.m. or p.m.  Do you recall if it was in the morning?

A.  In the morning.

MR. JURKOVIC:

Allow him to finish the question before you answer.

EXAMINATION BY MR. KOKEMOR:

Q.  What did you tell the folks at New Orleans East Hospital about why you were there that day?

A.  I'd eaten a rat and I was sick, cramping and stomach pains in my stomach, throwing up, with nausea, vomiting, sore throat, and diarrhea, and hard pains in my stomach.

Q.  And what sort of treatment did they provide for you?

51

A.   Gave me medicine, I.V. fluids.

Q.   And being a registered nurse, that's the type of treatment you would have expected to receive; is that right?

A.   Yes.

Q.   Did they give you a diagnosis?

A.   What happened to me, infested -- something about something -- I don't know about the -- ingested something.  I don't know, something ingested.  I'm not sure what it was, ingestion something.  I don't know what it was.

Q.   Now, Ms. Thomas, I've read through the entire chart from your emergency room visit of 10/3/2016 and I don't find where you gave any history of having consumed a rat at the hospital.

A.   Yes, I did tell them.

MR. JURKOVIC:

Wait.  Is there a question?

EXAMINATION BY MR. KOKEMOR:

Q.   Yes.  The question is, do you know why there's no mention of your consuming a rat on the medical records of October 3, 2016 at New Orleans East emergency room?

MR. JURKOVIC:

Object to the form.

52

THE WITNESS:

I don't know why.

EXAMINATION BY MR. KOKEMOR:

Q.   But it's your testimony here today under oath that you told the admitting nurses and doctors in the emergency room on October 3 that you had consumed a rat and it had made you sick?

A.   Yes.

Q.   Did they take any analysis of stomach contents from you?

A.   I don't recall.

Q.   It appears they discharged you with a diagnosis of viral gastroenteritis.  Do you know what that is as a nurse?

A.   Yes.

Q.   Have you ever seen the medical records from your admission?

A.   No.

Q.   Do you remember how you paid for your services at the emergency room that day?

A.   With my insurance.

Q.   And who was your insurance carrier?

A.   Medicare.

Q.   So Medicare paid the bill or some portion of the bill for that day's service?

53

A.    I believe so.  I'm not sure.

Q.    Did you have any co-payment or any additional responsibility that you had to pay for some part of that bill?

A.    I don't know.

Q.    How long were you in the hospital at the emergency room?

A.    I don't know how long.

Q.    Where did you go after being released from the hospital?

A.    My home.

Q.    So we know that that was a Monday, October 3rd.  I assume you did not work that day?

A.    No.

Q.    That would be a correct statement?

A.    I think Monday I did.  I believe I did the Monday that I had the problem.  I went to the emergency room and I went home afterwards, I believe.  I'm not sure.

Q.    And you told me you think you missed a couple of days.  So is it fair to say you missed Monday and Tuesday of that week after the incident?

A.    I don't remember.  I don't remember.

Q.    Who was the next healthcare provider of any type that you went to see after the emergency

BRENDA THOMAS                                      November 8, 2018

54

room?

A.   Dr. Michelle Cooper.

Q.   And about how many days after the emergency room did you get in to see Dr. Cooper?

A.   I don't know.

Q.   Did you tell her that you had consumed the rat in the food and got sick?

A.   Yes.

Q.   Did she provide any specific treatment to you for your complaints?

A.   I don't recall.

Q.   Did you continue to be treated by Dr. Cooper for the symptoms of upset stomach, diarrhea, sore throat that you complained about?  Did she continue to treat you?

A.   I remember going to her office.  I don't know what she treated me for.  I remember going back to her office several times.

Q.   Did she prescribe any kind of medication for you to take for the nausea, diarrhea?

A.   The emergency room had gave me medicine.

Q.   Do you remember what they gave you at the emergency room?

A.   It was some medicine for nausea.

Q.   Did you have it filled at a pharmacy?

55

A.    I don't know what pharmacy, yes.

Q.    But it was a medication in the prescription form that you had to get from a pharmacy?

A.    Yes.

Q.    And who did you normally get your pharmaceuticals from?

A.    Walgreens, CVS, different pharmacies.

Q.    All out in the New Orleans East area?

A.    Yes.

Q.    How long did your stomach pains last?

A.    I was sick for weeks, for weeks.

Q.    I want to break it down into the various complaints that you mentioned to me and get a time line for each of those.

A.    About three weeks, two or three weeks, two or three weeks.

Q.    So your stomach pains lasted two to three weeks?

A.    Yes.

Q.    How about your diarrhea, how long did that last?

A.    About the same thing.  I was having the same problems three to four weeks of that sort.

Q.    What about the nausea?

56

A.   Sore throat and nausea still.

Q.   Two to three weeks?

A.   Almost like close to four, four weeks I guess.  It was a long time I was sick.

Q.   The nausea lasted about four weeks?

A.   Yes.  I was sick for that period of time.

Q.   And what other specific complaints were you having at that time other than stomach pains, diarrhea, and nausea?

A.   And sore throat.

Q.   How long did the sore throat remain?

A.   I don't remember.  I don't recall how long, but it was there for a while.

Q.   Approximately four weeks?

A.   Yes.

Q.   After four weeks time did all of those physical complaints resolve?

A.   I guess so.  I'm not sure.

Q.   Well, you don't have stomach pains here today in November of 2018, do you?

A.   No.

Q.   You don't have diarrhea as you sit here today in November of 2018?

A.   No.

Q.   You don't have nausea and sore throat

57

today, do you?

    A.    No.

    Q.    So at some point all of those conditions resolved completely?

    A.    I don't know what you mean by completely.

    Q.    Well, did you return to your normal self from a physical standpoint in about four weeks after the incident?

    A.    No, I didn't return back to normal.

    Q.    In what manner were you still experiencing physical complaints, like stomach pain, diarrhea, nausea, and sore throat after a month?

    A.    I couldn't eat anything and I lost weight.

    Q.    Well, that would be part of your emotional reaction to it; correct?

    A.    I don't know.  I don't know.  All I know is I lost a lot of weight, couldn't eat because of it.

    Q.    So you had a period of time when you were reluctant to eat or you couldn't eat and you lost some weight?

    A.    I couldn't eat.  I couldn't eat.  I couldn't eat, just couldn't eat because of the rat.

58

Q.    How long did you have that feeling of being unable to eat anything?

A.    For months and months and still now, to even now.

Q.    Is it as bad now in November of 2018 as it was in January of 2017?

A.    Yes.  It's bad.  I can't eat since the incident.  I can't eat.

Q.    How much weight have you lost totally since October of 2016?

A.    Twenty pounds or maybe more than that, thirty.  I'm not sure.

Q.    And you started seeing a psychiatrist?

A.    Yes.

Q.    And who was it you went to see for psychological or psychiatric help?

A.    Ochsner's psychiatrist.

Q.    Did someone refer you to the psychiatrist at Ochsner Medical Center?

A.    Dr. Cooper.

Q.    Had you ever been seen by a psychiatrist or psychologist for any mental or emotional problems before this incident?

A.    No.

Q.    At no point in your life?

BRENDA THOMAS                                    November 8, 2018

59

A.   No.  No.

Q.   One of the psychiatrists you've seen, is it a Dr. Shilpa Amara?

A.   Yes.

Q.   And is that a female or male?

A.   Female.

Q.   Do you know if she is the first psychiatrist you saw for this incident?

A.   Yes.

Q.   And I also have some records signed by a Dr. H. Stavros?

A.   Yes.

Q.   Is he a psychiatrist as well or she?

A.   She, psychologist.

Q.   Do you remember specifically any other names in the psychiatry department at Ochsner who have rendered any treatment to you for this?

A.   No.

Q.   So do you remember when you began your psychiatric treatment at Ochsner?

A.   Immediately.  Dr. Cooper referred me to the psychiatrist I think sometime -- some available appointment was in December at the time I believe.

Q.   In looking at your charges, it appears that you received psychiatric treatment on December

BRENDA THOMAS                                          November 8, 2018

60

1st of 2016.  Does that sound about correct?

A.    Yes.

Q.    And you went through 2017.  The last date of treatment that I see in your records appears to be July 11 of 2017 and that may be because I don't have complete records.  Okay?  So do you know if you've continued to receive psychiatric treatment after July 11 of 2017?

A.    Yes.

Q.    Are you still receiving psychiatric treatment?

A.    Yes.

Q.    And is that still at the Ochsner department of psychiatry?

A.    Yes.

Q.    It's at the main campus on Jefferson Avenue?

A.    Yes.

Q.    Are you under the care of one particular psychiatrist at this time, at this present time?

A.    I'm seeing both psychiatrist and psychologist.

Q.    Who did you last see?

A.    A new psychiatrist.

Q.    When was that?  Was it like within the

BRENDA THOMAS                                          November 8, 2018

61

last week or two?

     A.    I think so.  I'm not sure of what date it was.  I don't know, 26.  I don't know, October 26. I'm not sure when.  September, October.  I don't know.

     Q.    And you saw the psychiatrist?

     A.    Yes.  I see the psychiatrist.

     Q.    Do you recall the name of the psychiatrist?

     A.    Rula or something like that.  Rula I believe it was.

     Q.    A male or a female?

     A.    Female.

     Q.    And you also have therapy visits with a psychologist?

     A.    Yes.

     Q.    Do you know the name of the last psychologist you saw?

     A.    Dr. Stavros.

     Q.    Has the psychiatrist prescribed any kind of psychiatric medication for you at Ochsner?

     A.    Yes.

     Q.    Do you know what you take?

     A.    Yes.

     Q.    What is that?

62

A.    Prozac.

Q.    Do you know what the dose is?

A.    Forty milligrams.

Q.    How many times a day?

A.    Once.

Q.    Any other psychiatric medications?

A.    Risperidone.

Q.    Risperidone?

A.    Yes.

Q.    And what is the dosage?

A.    I think it's something .25, I believe.

Q.    And how many times a day?

A.    Once.

Q.    Any other psychotropic medications that you take?

A.    I take Xanax.

Q.    What dose?

A.    Zero point five.

Q.    And what's the schedule for the Xanax, how many times a day?

A.    I take it every day and as needed.

Q.    Is it prescribed to take every four hours, every six hours?

A.    Every day.

Q.    One a day.  Okay.

63

A.   No.  It's not one a day.  I take one and if I need it I could take another one.  So it's up to two, two a day.

Q.   Any other meds?

A.   That's all they prescribed.

Q.   Before October of 2016, had you ever taken Prozac at any time in your life?

A.   No.

Q.   Had you ever taken Risperidone at any time in your life before this?

A.   No.

Q.   Had you ever taken Xanax at any time before this?

A.   No.

MR. JURKOVIC:

Let him finish asking the question.

EXAMINATION BY MR. KOKEMOR:

Q.   And your current medications, I asked you at the very beginning of the deposition today if you took anything at all today that would prevent you from being clear-headed and able to understand my questions.  You told me no.  So as you think again, did you take your Prozac this morning?

A.   I take everything in the evenings.

Q.   Only in the evenings?

64

A.    It all was prescribed in the evenings.

Q.    So you haven't had any Xanax this morning?

A.    No.

Q.    You take them at bedtime?

A.    I take them at 7:30 every day.

MR. JURKOVIC:

I don't know whether to object to the question about have you taken medicines that will impair your ability to answer the question because if it doesn't impair your ability, then how can you answer the question.

EXAMINATION BY MR. KOKEMOR:

Q.    Let me just put it a different way.  Do you have any sort of drowsiness or anything today that prevents you from following what I'm asking you?

A.    No.

Q.    Are you comfortable that your testimony thus far in the deposition is based upon your understanding my questions and you giving me the most truthful response you can?

A.    Yes.

Q.    You told me that you had been diagnosed

65

awhile back with breast cancer?

A.   Yes.

Q.   Was that before the incident at KFC?

A.   Yes.

Q.   And how are you doing with respect to that?  Are you cancer-free?

A.   Yes.

Q.   Do you remember when your doctors pronounced you to be cancer-free from the breast cancer?

A.   It's been more than five years.  Five years.

Q.   So you were cancer-free before the incident took place, the incident of October 1, 2016?

A.   I'm still taking cancer medicine, but I'm not -- I don't know when you say cancer-free, but --

Q.   Did you have surgery?

A.   Yes.

Q.   Was it a lumpectomy?

A.   Yes.

Q.   And when was that performed?

A.   2012.

Q.   What hospital?

BRENDA THOMAS                                          November 8, 2018

66

A.    East Jefferson.

Q.    And do you remember who was your surgeon?

A.    I don't remember his name.

Q.    So after surgery, did you have radiation or any other aggressive type of therapies for your breast cancer?

A.    Yes.

Q.    And at some point I assume your doctors told you that they had beaten it and that you had beaten it and they had gotten all the cancer out?

A.    I don't understand what you're asking. Can you explain what you are asking?

Q.    I'm just wondering if you ever were told by any of your doctors that your cancer had been in remission and you no longer had any cancer in your body?

A.    I won't know that until -- I'm still taking tests.  I wouldn't know that.

Q.    So they still take tests on a regular basis?

A.    Yes.

Q.    A CAT scan?

A.    Mammogram and bone scans.

Q.    On your last mammogram, did they tell you they found any sign of cancer?

BRENDA THOMAS                                    November 8, 2018

                                                                67

        A.   No.

        Q.   What do you take for the cancer?

        A.   Anasazole.

        Q.   Say again?

        A.   Anasazole.

        Q.   Do you know how to spell it?

        A.   A-N-A-S-A-Z-O-L-E.

        Q.   And that's sort of a preventative
medication?

        A.   Yes.

        Q.   Have you been on that for a number of
years?

        A.   Yes.

        Q.   Do you experience any side effects at all
from that?

        A.   No.

        Q.   We had asked you in some interrogatories
which are written questions some of the same things
we've asked you here today, but we asked you in
Interrogatory No. 5 if you had been involved in any
previous accidents of any kind.  And in your answer
to Interrogatory No. 5, you told us you suffered a
fall in either 2011 or 2012 which resulted in an
arm and a back injury?

        A.   Yes.

68

Q.    And you treated at Ochsner Medical Center for that; is that correct?

A.    Yes.

Q.    You also said that you filed a civil lawsuit in the Orleans Parish Civil District Courthouse for those injuries?

A.    Yes.

Q.    Has that lawsuit been resolved?

A.    Yes.

Q.    Did you go to trial on that or did it settle out of court?

A.    Settled.

Q.    Other than that incident in which you fell, did you ever file any other complaints or any other damage lawsuits against anybody else at any other time?

A.    I mean when you say any other time, like previous years?

Q.    Yes.

A.    In previous years, yes.

Q.    What types of other accidents had you been involved in that caused you to file the previous lawsuits?

A.    The auto accident.

Q.    Do you remember when was the first time

69

you filed a lawsuit from a motor vehicle accident?

A.   No, I don't remember.

Q.   Did you make damage claims for a number of different motor vehicle accidents or just one?

A.   Over the years maybe -- you know, over the years -- I don't know how many over the years.

Q.   Would you say several?

A.   Maybe two, one or two.  I'm not sure. Two.  I'm not sure how many.

Q.   In any of your prior claims arising out of motor vehicle accidents, did you ever complain of psychiatric or emotional illness?

A.   No.

Q.   Had you ever been a patient for any mental or emotional healthcare?

A.   No.

Q.   Had you ever received any outpatient treatment for emotional or psychological issues?

A.   No.

Q.   In answer to Interrogatory No. 3, you told us that you had a previous malignant breast neoplasm, hypertension, hyperlipidemia, stroke syndrome, diabetes, and insomnia.  By stroke syndrome, what do you mean by that?

A.   I had a stroke.

BRENDA THOMAS                                        November 8, 2018

70

Q.   You did have a stroke.  When was that?

A.   I don't remember the year.  It was years ago.

Q.   So definitely before the incident at KFC?

A.   Yes.

Q.   What sort of complaints did you have as a result of the stroke?  Did you have any paralysis?

A.   No.

Q.   Did you have any cognitive impairment?

A.   No.

Q.   How did you know you had a stroke?

A.   I was diagnosed.

Q.   Usually it's accompanied by slurred speech or paralysis.  Did you have any?

A.   No.

Q.   The doctors just told you out of the blue you had a stroke?

A.   No.  It was -- I had been diagnosed in the hospital -- I had a stroke.

Q.   So something happened to you that you had to go to a hospital and when you were in the hospital they told you you had a stroke?

A.   Yes.

Q.   So what were the symptoms that you had that caused you to go to the hospital where you got

71

diagnosed with a stroke?

    A.    Weakness on one side of my body, couldn't talk.

    Q.    Do you remember what hospital treated you for the stroke?

    A.    I think Touro.  I'm not sure.  I think Touro.

    Q.    So they treated you and you got -- the weakness went away and your ability to speak came back okay?

    A.    Yes.

    Q.    You didn't have any psychiatric illness as part of the stroke?

    A.    No.

    Q.    How old are you at present?

    A.    Sixty-eight.

    Q.    And you're still working?

    A.    Yes.

    Q.    Do you have any plans for retiring?

    A.    I don't know how to answer that.

    Q.    So you are not going to quit work next month?

    A.    Well, I'm not saying I'm going to quit work, but eventually I'm going to have to quit when I can't do anything, I can't work no more.

72

Q.    But you're not at that point yet?

A.    Retired.

Q.    You are not ready to retire yet?

A.    Right now I'm -- I guess I don't know what's going to happen now, because the way I am right now, I can't really work, continue to work like I'm working now.  I'm messing up everything. So I don't know how to answer that.  Like I said, I can't function.  So I'm not going to be able to work.

Q.    Have you been involved in any other accidental injuries since this incident in October of 2016?

A.    No.

Q.    No other automobile accidents of any kind?

A.    No.

Q.    No slip and falls?

A.    No.

Q.    And you haven't filed any other lawsuits against any other party other than this one against KFC?

A.    No, nobody.

Q.    You receive Social Security retirement pay?

73

A.   Yes.   Yes.

Q.   At any time in your life have you ever made a claim for Social Security disability benefits?

A.   Yes.

Q.   When was that?

A.   November 2011 -- I'm not sure.   I'm not sure.

Q.   And was that a claim that you were disabled due to the breast cancer?

A.   Yes.

Q.   Was your claim rejected or did you start receiving Social Security disability benefits?

A.   I was receiving disability.

Q.   You did start receiving it?

A.   Yes.

Q.   So you actually get a check for your age for retirement benefits and you get a check for disability benefits?

A.   No, just retirement.

Q.   Just retirement.   Well, back in 2011 when you made a disability claim you said they accepted it?

A.   I think -- I'm not sure of the year that I was disabled, but I know in 2011 I had disability

74

insurance since I had my surgery and stuff.  I don't know.  Maybe a couple years earlier.  I'm not sure.

Q.  Do you know the difference between Social Security retirement and Social Security disability?

A.  Yes.

Q.  At any point in time were you receiving both?

A.  No.

Q.  But you did get disability because of breast cancer?

A.  No, not because of breast cancer, because I already had the problems with heart problems during the time with the stroke I believe.  That's when I got the disability.  I don't know what year, but with the breast cancer I had disability that time too.

Q.  And then you reached retirement age which for you is what, 66?

A.  Yes.  Yes.

Q.  And then you went on retirement benefits?

A.  Yes.

Q.  And you are getting that now?

A.  Yes.

Q.  I have a couple of questions.  Again, I'm

75

not doing this to offend you, but I have to ask everybody.  Have you ever been convicted of a felony --

A.   No.

Q.   -- at any time in your life?

A.   No.

Q.   Have you ever been -- I think I already asked you -- an in-patient in a mental facility?

A.   No.

MR. KOKEMOR:

All right.  That's all I've got.  Thank you very much.

MR. JURKOVIC:

We have no questions.  We'll read and sign.

(Deposition concluded.)

BRENDA THOMAS                                          November 8, 2018

76

WITNESS' CERTIFICATE


          I, BRENDA G. THOMAS, do hereby certify

that the foregoing testimony was given by me, and

that the transcription of said testimony, with

corrections and/or changes, if any, is true and

correct as given by me on the aforementioned date.


_____          _____

(Date Signed)            (BRENDA G. THOMAS)



WITNESS ALSO INITIAL ONE:

_____ Signed with no corrections.

_____ Signed with corrections noted.



Date Taken:  November 8, 2018

77

REPORTER'S CERTIFICATE

          This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

          I, PATRICIA L. SCHONEKAS, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that BRENDA G. THOMAS, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinabove set forth in the foregoing 75 pages;

          That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

          That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services;

          That I have acted in compliance with the

78

prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

        That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter.  I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.


                    _____
                    PATRICIA L. SCHONEKAS, CCR
                    CERTIFIED COURT REPORTER

BRENDA THOMAS

November 8, 2018

## A

**A-C-U** 26:10,11
**A-N-A-S-A-Z-O-...** 67:7
**a.m** 50:10
**ability** 64:10,12 71:9 77:17
**able** 24:19 27:10 63:21 72:9
**above-mentioned** 5:3
**Absolutions** 18:15
**accepted** 73:22
**accident** 68:24 69:1
**accidental** 72:12
**accidents** 67:21 68:21 69:4,11 72:15
**accompanied** 70:13 77:4
**account** 40:11
**Accu** 25:13 26:9,13 26:15,16,24 27:3 27:23 28:2,9
**accurately** 7:1
**acted** 77:25
**ACTION** 1:5
**actual** 41:25 78:5
**additional** 48:3 53:3
**address** 8:3,8 13:13 13:15 19:7 31:6
**administer** 6:8
**administering** 4:22
**admission** 50:8 52:17
**admitting** 52:5
**advisory** 78:3
**affiliated** 21:20
**affirmatively** 10:7 12:12 14:4 25:1 28:4,24
**aforementioned** 4:5 76:8
**age** 9:9,19 11:7 73:17 74:18
**ages** 9:1 10:25 11:8 11:9
**aggressive** 66:5
**ago** 70:3
**agreed** 4:3 46:15,19
**ailment** 29:23

**alcohol** 29:20
**alert** 5:12
**allow** 33:7 50:14
**Amara** 59:3
**amount** 16:22
**analysis** 19:22 52:9
**Anasazole** 67:3,5
**and/or** 76:7
**Angeles** 10:2
**answer** 4:14 7:4,21 7:22 37:10 50:15 64:11,13 67:21 69:20 71:20 72:8
**anybody** 34:4 68:15
**APPEARANCES** 2:1
**appeared** 35:16
**appears** 52:12 59:24 60:4
**applied** 13:3
**appointment** 48:24 59:23
**approximately** 17:11 24:10 28:15 41:2 56:14
**area** 10:4 18:21 21:7 22:7 55:9
**argument** 15:23
**arising** 69:10
**arm** 67:24
**arrange** 42:5
**arrangement** 77:22
**arrangements** 77:24
**arrived** 31:17 50:9
**Article** 78:3
**asked** 6:9 28:25 32:13,14,19 45:21 46:21 47:21 63:18 67:17,19,19 75:8
**asking** 7:3 63:16 64:17 66:11,12
**aspirin** 30:16,16
**assists** 27:6
**ASSOCIATES** 1:14 2:3
**association** 21:25
**assume** 7:21 35:15 45:15 53:13 66:8
**assuming** 25:2
**ate** 42:25,25
**Atlanta** 18:19 28:3
**attach** 14:12

**attorney** 5:14 6:21 17:7 36:14 41:13 49:25
**ATTORNEYS** 2:8 2:16
**August** 10:16,16
**authenticate** 37:17
**authority** 77:10
**auto** 68:24
**automobile** 17:17 72:15
**available** 27:21 59:22
**Avenue** 5:17 15:4 16:11 22:20,20 28:15 38:7,22 60:17
**awhile** 65:1

## B

**B** 3:8
**back** 25:2,4 28:12 33:8,13 40:7 44:20 45:1,9,18 47:16 48:15,17 49:8 54:18 57:9 65:1 67:24 71:10 73:21
**bad** 58:5,7
**bag** 45:1
**based** 64:21
**basically** 28:25
**basis** 66:20
**bears** 13:12
**beaten** 66:9,10
**becoming** 20:7
**bedtime** 64:5
**began** 59:19
**beginning** 63:19
**believe** 11:4,6 13:25 16:5 20:15 22:9 23:3,15 25:25 28:1 40:9,12 41:19 42:14 46:19 53:1 53:16,19 59:23 61:11 62:11 74:14
**benefits** 73:4,13,18 73:19 74:21
**best** 77:17
**bigger** 43:6
**bill** 52:24,25 53:4
**BIRTEL** 2:11
**birth** 9:24 11:15

**bit** 32:2 43:7,13 47:16
**bites** 33:21,22,24
**biting** 33:14,23
**bitten** 42:20 43:3
**black** 32:15 45:21
**blood** 19:22 30:1,8 30:11
**blue** 70:16
**board** 77:21 78:4
**bodily** 19:22
**body** 66:16 71:2
**bone** 66:23
**born** 10:1 11:3,6,9 11:18 12:1,2,7
**bought** 37:8
**Boulevard** 2:13 19:8 19:10 31:5,5 50:2
**boy** 9:7,17
**brand** 30:10
**BRANDS** 1:7
**bread** 43:19,23
**breading** 44:1
**break** 36:23,24 55:13
**breakfast** 29:14
**breast** 23:8 65:1,9 66:6 69:21 73:10 74:11,12,16
**Brenda** 1:5,11 5:1 8:5 76:4,11 77:9
**brief** 36:23
**briefly** 22:16
**bring** 32:10 44:16 47:4
**bringing** 47:3
**brought** 32:12 41:15 44:20 45:18
**Bullard** 5:16 15:4 16:11 22:19,19,20 28:15 38:7,22
**bun** 33:19,19 34:3 36:11 43:7,7,10
**business** 19:19

## C

**C** 1:7
**C-H-A-N-E-L** 8:19
**California** 10:2
**call** 34:22
**called** 25:13 31:8 32:7 44:4

**camera** 40:1 41:17 41:21,25 42:1
**campus** 60:16
**cancer** 23:8 65:1,10 65:16 66:6,10,14 66:15,25 67:2 73:10 74:11,12,16
**cancer-free** 65:6,9 65:13,17
**car** 17:23 45:15
**card** 16:20,21 17:1,7 31:11
**care** 22:14,17,24 23:1 25:5 50:3 60:19
**Carmel** 1:12 8:5 42:8
**carrier** 52:22
**case** 6:2 34:24
**cash** 32:16
**CAT** 66:22
**caused** 36:11 68:22 70:25
**Causeway** 2:13
**CCR** 1:22 78:15
**cell** 39:13,18,19,19 39:22,23 40:2,2,6 40:22 41:17
**Center** 20:21 58:19 68:1
**CERTIFICATE** 76:1 77:1
**certification** 4:10 77:3
**Certified** 1:23 4:20 5:3 77:6 78:16
**certify** 76:4 77:9
**cetera** 37:16
**Chanel** 8:16,18,20 10:21 12:14 27:3 34:9 36:3 39:11,12 40:21 41:3,19
**Chanel's** 40:2,23,25
**changes** 76:7
**charges** 59:24
**chart** 51:13
**check** 73:17,18
**chewed** 43:9,11
**chewing** 31:23 32:2 33:15,20,23 34:16 43:8,14
**chicken** 15:3 16:12

BRENDA THOMAS

November 8, 2018

80

31:8,14 34:22,22 34:23,23 35:1 43:6 43:12,13
**child** 9:11 10:5,6 11:10,20 12:13
**children** 8:17,22 10:22 12:3,11 29:10
**children's** 10:24
**cholesterol** 30:2,14
**choose** 6:20,23
**civil** 1:5 4:6 68:4,5 78:2
**claim** 73:3,9,12,22
**claims** 69:3,10
**Class** 12:25
**clear** 5:11
**clear-headed** 63:21
**clinic** 19:1
**close** 44:24 56:3
**closing** 32:10 44:15
**co-payment** 53:2
**coating** 44:1
**Code** 78:2
**cognitive** 70:9
**collector** 19:23
**come** 35:22 44:16
**comfortable** 64:20
**comments** 42:21
**Common** 1:14 2:5
**company** 25:13 26:7 26:20,21 40:8
**compensated** 27:11
**complain** 69:11
**complained** 54:14
**complaints** 54:10 55:14 56:7,17 57:11 68:14 70:6
**complete** 60:6 77:22
**completely** 57:4,5
**compliance** 77:20 77:25
**concluded** 75:16
**conditions** 57:3
**confront** 37:9
**connection** 5:18
**consistency** 34:15
**consumed** 49:17 51:15 52:7 54:6
**consuming** 51:21
**contents** 52:10
**continue** 54:12,15

72:6
**continued** 60:7
**continuously** 26:24
**contracts** 18:23
**contractual** 78:1,6
**convicted** 75:2
**Cooper** 31:3,3 48:25 49:19 54:2,4,13 58:20 59:21
**Cooper's** 49:16
**copies** 41:16
**copy** 16:18,25 17:7
**CORPORATION** 1:7
**correct** 15:5 16:12 31:9 39:1 48:4 53:15 57:17 60:1 68:2 76:8 77:16
**corrections** 76:7,15 76:16
**couch** 33:10
**counsel** 4:4 5:22 78:11
**counter** 46:7
**couple** 5:24 24:19 24:24 33:8 53:21 74:2,25
**court** 1:1,23 4:20 5:3 6:7,8,11,14,22 7:6,11 12:18 68:11 77:6 78:7,16
**Courthouse** 68:6
**Courtney** 12:4 14:10
**cramping** 48:18 50:20
**cup** 33:5 48:8
**current** 8:3 25:9 63:18
**currently** 12:13
**customer** 15:8,12,19
**cut** 43:25
**CVS** 55:8

_____

**D**

**D** 3:1,8
**D-A-S-I-A** 9:6
**D-I-E-T** 11:13,13
**D-I-E-T-R-I-C-H** 11:14
**D-O-N-N-E-L-L** 9:14

**daily** 30:2,4,6,16,17
**damage** 68:15 69:3
**Dasia** 9:2,4,5 33:1 34:11,13,14 45:12 45:13
**date** 9:24 15:6,12 60:3 61:2 76:8,11 76:19
**daughter** 8:16 10:21 19:16 23:9 27:2 34:7,8 35:20,22 39:11 40:2,21 41:19
**daughter's** 23:13 25:12,15
**daughters** 45:11
**day** 1:16 17:25 18:3 18:8,10,11 25:23 28:20,23 29:1,2,5 29:10,18 32:10 44:20 45:6,9 47:9 49:2,10,12,20 50:19 52:20 53:13 62:4,12,20,21,24 62:25 63:1,3 64:6
**day's** 52:25
**days** 24:2,6,8,10,19 24:24 27:9,14,17 27:20 53:21 54:3
**deal** 36:20
**debit** 16:20,21 17:1 17:7 31:11
**deceased** 12:10
**December** 11:3 59:23,25
**declined** 48:3
**defective** 16:6 37:8
**defend** 37:4
**DEFENDANTS** 2:16
**defined** 78:2
**definitely** 70:4
**department** 27:25 59:16 60:14
**deposition** 1:11 4:4 4:15 5:18,23 6:17 6:20,23 14:13 63:19 64:21 75:16 77:24
**describe** 35:13,14
**desk** 49:7,16
**diabetes** 69:23

**diagnosed** 23:8 64:25 70:12,18 71:1
**diagnosis** 51:6 52:13
**diarrhea** 24:15,18 48:18 50:22 54:13 54:20 55:21 56:9 56:22 57:12
**Dietrich** 11:11
**difference** 74:4
**different** 13:15 29:8 35:9 55:8 64:15 69:4
**difficult** 7:5
**difficulty** 27:2,5
**digital** 41:20
**digits** 12:19
**dinner** 29:15
**direct** 78:7
**direction** 77:15
**disability** 73:3,13,14 73:19,22,25 74:5 74:10,15,16
**disabled** 73:10,25
**discharged** 52:12
**discovering** 41:6 42:11
**disgust** 35:17
**displaced** 21:5,15
**District** 1:1,2 68:5
**doctor** 48:22 49:8,8
**doctor's** 18:22,25 25:5 49:13
**doctors** 52:5 65:8 66:8,14 70:16
**doctors'** 18:23
**Document** 14:14 38:12 39:5
**doing** 25:11 29:2,7 37:18 65:5 75:1
**dollars** 28:11
**Donnell** 9:12,13 17:21 33:1 45:12 45:13
**dosage** 62:10
**dose** 62:2,17
**Dr** 23:10 31:3 48:24 49:16,19 54:2,4,12 58:20 59:3,11,21 61:19
**drawing** 19:21
**drink** 29:19,20

**drinking** 29:17
**Drive** 1:12 8:6 13:14 13:20,24
**drive-through** 16:10 17:17 28:14 31:7
**driver's** 12:20,25 13:3,10,18 14:12
**drove** 45:5,9,15
**drowsiness** 64:16
**due** 73:10
**duly** 5:2 77:10
**duties** 19:21 20:25 22:23 27:5
**dwell** 39:7

_____

**E**

**E** 2:11 3:1,1,8,8 12:25
**earlier** 28:25 29:10 74:2
**East** 5:17 15:5 20:12 38:7,23 49:24 50:1 50:18 51:23 55:9 66:1
**EASTERN** 1:2
**Eastover** 13:14,17 13:20,24
**eat** 29:12,13,16 33:7 34:6 35:8 36:12 48:9 57:14,19,22 57:22,24,24,25,25 58:2,7,8
**eaten** 28:20,21 32:14 34:20 35:12 36:10 43:5 50:20
**eating** 24:12 31:22 31:22 32:1,5 33:11
**effects** 67:14
**either** 40:13 67:23
**else's** 39:22
**emergency** 48:21,23 49:4,9 50:3 51:13 51:23 52:6,20 53:7 53:18,25 54:4,21 54:23
**emotional** 57:17 58:22 69:12,15,18
**employed** 18:6,13 26:24
**employee** 15:23 27:7 44:6
**employment** 22:10

23:24 78:6
**empowered** 6:8
**encountered** 35:4
**entire** 28:23 51:13
**entity** 77:23
**ER** 49:6,22,23
**errands** 29:7
**errors** 25:19
**ESQUIRE** 2:4,12
**establish** 37:7 39:9
**et** 37:15
**evenings** 63:24,25
  64:1
**event** 6:25
**eventually** 71:24
**everybody** 75:2
**evidence** 4:16 37:17
  38:11
**EXAMINATION**
  3:3 5:5 14:24 17:5
  36:13,25 37:25
  39:21 42:6 43:1
  50:16 51:19 52:3
  63:17 64:14
**examine** 35:22
  43:16
**examined** 42:18
**Exhibit** 3:10,12,13
  3:14 14:12,15 38:9
  38:11,13 39:4,6
**Exhibits** 42:18
**expect** 5:25
**expected** 35:10 51:3
**experience** 67:14
**experiencing** 57:11
**expired** 13:1
**expiring** 13:1
**explain** 36:2 66:12
**explained** 5:23

---

**F**

**facility** 22:17 75:8
**facts** 6:2
**fair** 7:25 53:21
**fall** 16:1 67:23
**falls** 72:18
**family** 8:10 31:1
**far** 64:21
**February** 11:3,19
  25:24,25
**Federal** 4:6
**feeling** 35:4 58:1

**fell** 68:14
**felony** 75:3
**felt** 34:15
**female** 11:17 12:5
  44:11,12 59:5,6
  61:12,13
**Fifteen** 28:11
**Fifty-one** 11:7
**file** 38:10 46:25
  47:15 68:14,22
**filed** 5:19 37:5 68:4
  69:1 72:20
**filing** 4:11
**fill** 47:25
**filled** 54:25
**financial** 77:23
**find** 51:14
**fine** 14:23
**finish** 7:3 36:6 50:14
  63:16
**firm** 78:7
**first** 5:2 7:2 8:18
  15:5 20:8 24:24
  28:21 39:9 40:5
  59:7 68:25
**five** 62:18 65:11,11
**flipped** 34:17
**floor** 16:1
**fluids** 51:1
**foil** 33:16,18
**folks** 9:21 50:17
**following** 44:20 45:6
  45:9 47:9 49:12
  64:17
**follows** 5:4
**food** 5:15 16:4 28:17
  42:12 47:8 48:3
  49:11 54:7
**foregoing** 76:5
  77:12
**Forest** 19:8,10
**fork** 43:25
**form** 4:13 7:12
  39:15 42:23 50:8
  51:25 55:3
**formal** 47:24
**formalities** 4:8,10
**format** 41:20 77:20
**forth** 77:11
**Forty** 62:3
**found** 22:10 66:25
**four** 12:19 55:24

56:3,3,5,14,16
  57:7 62:22
**FRANCHISEE** 1:8
**fried** 34:25 36:11
  38:18 43:13 46:15
**full** 8:3 22:4
**full-time** 22:21
  23:18
**function** 72:9
**funny** 32:19 46:12
  47:18

---

**G**

**G** 1:11 5:1 8:5 76:4
  76:11 77:9
**Gail** 26:18,19
**gastroenteritis**
  52:13
**general** 24:5 30:24
**gentleman** 45:21
**Georgia** 18:19
**getting** 74:23
**girl** 9:7,8 11:16
**give** 7:20 8:2 33:6
  51:6
**given** 7:23 16:16
  76:5,8
**giving** 17:6 64:22
**go** 20:19 21:3 23:4
  27:22 28:12 29:12
  31:7 33:5 36:21
  47:16 48:8,13,21
  49:4,6,9,23 53:9
  68:10 70:21,25
**going** 6:19,24 37:9
  37:13,14 38:9,10
  38:14 39:3,7 41:24
  42:10 47:5 54:16
  54:17 71:21,23,24
  72:5,9
**Good** 5:6
**gotten** 66:10
**GPS** 42:2
**graduated** 20:4
**grandchildren** 8:17
  29:3,4 34:10 45:10
  48:2,7
**grandkids** 18:2
  32:25
**grandson** 17:19,20
  28:14,17 29:3
**GROUP** 1:8

**guess** 20:15 32:12
  36:1 56:4,18 72:4
**guidelines** 77:20
**gynecologist's** 19:11

---

**H**

**H** 3:8 59:11
**hand** 6:9
**handed** 12:24 13:10
  33:4,5,6 48:7
**hanging** 29:4 31:25
  32:3 34:2,2 35:17
  43:17
**hangs** 43:10
**happen** 47:6 72:5
**happened** 32:9
  36:10 44:6 51:7
  70:20
**happening** 24:11
**happy** 7:17
**hard** 31:23,24 32:2
  34:15,16,17,18
  35:5,11,14 43:13
  43:15 50:23
**HCA** 21:20,23,24
**healthcare** 53:24
  69:15
**hear** 5:9 7:11,15,17
  34:12
**heart** 74:13
**held** 25:11
**help** 58:16
**helps** 27:4
**hereinabove** 77:11
**hereto** 4:4
**high** 30:1,2,8,11
**history** 20:6 51:15
**home** 8:3,10,13
  13:13,17,20,23
  29:8,12 31:15,17
  31:20,20,21 33:9
  35:7 42:8,15 44:23
  48:15,17 53:11,18
**hospital** 20:8,9
  21:20 49:24 50:1,6
  50:18 51:15 53:6
  53:10 65:25 70:19
  70:21,22,25 71:4
**hospitals** 21:21,24
**hour** 28:8,11
**hourly** 28:5,10
**hours** 23:20 62:23

62:23
**house** 9:22 29:5 45:4
**Houston** 21:12
**human** 27:24
**hundred** 15:15
**hungry** 29:11
**hurricane** 21:5
**hyperlipidemia**
  69:22
**hypertension** 69:22

---

**I**

**I.V** 51:1
**identification** 14:14
  38:12 39:4,5
**identify** 36:16 38:2
**ill** 24:14 36:11 48:15
**illness** 24:15 69:12
  71:12
**immediately** 24:24
  59:21
**impair** 64:10,12
**impairment** 70:9
**in-patient** 75:8
**incident** 15:1,6,13
  15:18 16:4,6 18:25
  23:22 24:3,11,25
  27:16 28:12 44:9
  53:22 57:8 58:8,23
  59:8 65:3,14,14
  68:13 70:4 72:12
**included** 19:21
  20:25
**indicate** 24:1
**indicated** 46:14
**indirect** 78:7
**infested** 51:7
**information** 16:21
  32:24 47:23
**informed** 77:22
**ingested** 51:9,10
**ingestion** 51:10
**INITIAL** 76:14
**injuries** 68:6 72:12
**injury** 67:24
**inside** 46:4
**insomnia** 69:23
**insurance** 52:21,22
  74:1
**intake** 49:16 50:8
**interested** 78:12
**interrogatories**

67:17
**Interrogatory** 67:20
  67:22 69:20
**introduce** 38:10
**introduced** 45:22
**investment** 14:3
**involved** 67:20
  68:22 72:11
**issued** 13:11
**issues** 69:18
**item** 16:4,5 44:18
  45:4 46:2,25 47:8
  49:11
**items** 37:7

_____

**J**

**J** 2:12
**JAMES** 2:12
**January** 58:6
**JAY** 1:7
**Jefferson** 60:16 66:1
**Jersey** 26:21 28:3
**Jim** 5:14
**job** 19:21 20:25
  22:21 23:9 25:11
  25:18 26:5 37:4
**Joseph** 10:14 11:1
**Jr** 11:1
**JUDGE** 1:7
**July** 60:5,8
**JURKOVIC** 2:4
  14:16,22 17:2 36:5
  36:22 37:19 39:14
  42:4,22 50:13
  51:17,24 63:15
  64:7 75:13

_____

**K**

**Katrina** 21:15 22:7
**keep** 25:17
**Kentucky** 16:16
  24:11 32:8
**KFC** 1:7,8 5:16 15:3
  15:8 38:6,22 65:3
  70:4 72:22
**kids** 33:7
**kind** 5:10 15:18,23
  15:25 16:3 27:6
  29:22,23 30:2
  31:24 34:17 43:24
  47:11 54:19 61:20
  67:21 72:16

**knew** 46:16
**knife** 43:25
**know** 6:22 11:8,8,9
  13:14 18:8 21:25
  23:14 24:22 29:10
  31:6 32:25 33:5,25
  33:25 34:1,18 36:1
  36:1,2,10 37:23
  39:10,17,18,24,25
  40:10,12,25 41:12
  41:15 47:1,5,18
  48:8,18 51:8,9,11
  51:20 52:2,13 53:5
  53:8,12 54:5,17
  55:1 57:5,18,18,18
  59:7 60:6 61:3,3,5
  61:17,23 62:2 64:8
  65:17 66:17,18
  67:6 69:5,6 70:11
  71:20 72:4,8 73:25
  74:2,4,15
**knowledge** 78:5
**Kokemor** 2:12 3:5
  5:5,14 14:19,24
  16:24 17:5 36:13
  36:25 37:25 39:21
  41:23 42:6 43:1
  50:16 51:19 52:3
  63:17 64:14 75:10

_____

**L**

**L** 1:22 4:1,20 77:6
  78:15
**Lab** 18:14,16,17
  23:15,15,24 24:20
  25:12,14,17,19,22
  26:4,16,24 27:23
  28:3,7
**label** 38:9 39:3
**labeled** 42:18
**Lake** 1:12 8:5 19:8
  19:10 42:8
**larger** 43:22
**lasted** 55:18 56:5
**laugh** 32:18
**laughed** 32:19
**laughing** 46:11
  47:18,20
**law** 1:13 2:11 4:7
  6:12
**lawsuit** 5:19 37:6
  46:25 47:3 68:5,8

69:1
**lawsuits** 68:15,23
  72:20
**leave** 23:1 44:18
**leaving** 48:13
**led** 46:19
**left** 29:12 45:4 48:6
  48:11
**legs** 32:6
**let's** 8:2 36:23 38:1
**license** 12:20,25
  13:1,3,4,11,18
  14:12
**life** 10:9 58:25 63:7
  63:10 73:2 75:5
**line** 55:15
**linger** 37:21
**listed** 13:13
**litigant** 78:8,10
**little** 9:7 22:8 23:6
  31:8,14 32:6 34:23
  35:1 47:16
**live** 8:15,24 9:21
  13:21 21:6
**lived** 8:7 10:8
**lives** 12:14 13:22
  14:5,6,8
**living** 42:8
**LLC** 1:14 2:3
**local** 18:20 26:19,21
**located** 8:10 15:4
  18:18 21:4 31:4
**location** 42:2
**long** 8:7 21:6 39:8
  53:6,8 55:11,21
  56:4,11,13 58:1
**longer** 25:14 66:15
**look** 12:22 31:25
  38:2,15
**looked** 31:24 33:2
  46:11
**looking** 59:24
**Los** 10:2
**Losartan** 30:12,13
**lost** 57:14,19,22
  58:9
**lot** 57:19
**Louisiana** 1:2,12,15
  2:7,15 4:21 8:6
  10:4 12:24 77:7
  78:2
**LSU** 20:4

**lumpectomy** 65:21
**lunch** 29:14

_____

**M**

**M** 3:1
**main** 19:13,13 60:16
**maintain** 41:16
**making** 28:7 37:2
  77:24
**male** 12:5,6 44:11
  59:5 61:12
**malignant** 69:21
**mammogram** 66:23
  66:24
**man** 32:15
**manager** 32:8,13,15
  32:16 45:21,22,24
  47:7
**manner** 16:6 57:10
**March** 10:18
**marital** 10:11
**marked** 14:14 38:12
  39:5
**married** 10:13,19
**marry** 10:15
**matter** 78:8,10,12
**meal** 31:8,8,14
**mean** 15:22 22:12
  22:13 27:17 29:25
  57:5 68:17 69:24
**Meaning** 23:20
**meat** 43:21,21,22,22
**medical** 20:21 23:13
  29:23 50:1 51:22
  52:16 58:19 68:1
**Medicare** 52:23,24
**medication** 5:10
  29:23,25 30:3
  54:19 55:2 61:21
  67:9
**medications** 30:4,6
  30:9,19 62:6,14
  63:18
**medicine** 30:11,14
  51:1 54:21,24
  65:16
**medicines** 64:10
**meds** 30:17 63:4
**mental** 58:22 69:15
  75:8
**mention** 51:21
**mentioned** 55:14

**mess** 27:5
**messing** 25:18 72:7
**met** 5:22
**metadata** 42:1
**Metairie** 2:15
**method** 77:14
**Methodist** 20:8,10
  20:11
**Michelle** 31:3 48:25
  54:2
**milligrams** 62:3
**mind** 14:21 17:6
**mine** 39:24
**minute** 11:13
**missed** 24:2,6,10,23
  27:20 53:20,21
**missing** 42:19 43:3
**mixed** 13:5
**moment** 14:17
**moments** 5:24 41:5
**Monday** 49:14,14
  53:12,16,17,22
**month** 25:24 57:13
  71:22
**months** 24:2,7 58:3
  58:3
**morning** 5:6,7 17:14
  48:22 49:14 50:11
  50:12 63:23 64:3
**motor** 69:1,4,11
**move** 14:20

_____

**N**

**N** 3:1,1,1,8 4:1
**name** 5:14 8:3,18
  9:3 11:24 21:19,22
  26:7,15 40:6 44:13
  45:25 47:22 61:8
  61:17 66:3
**names** 9:1 10:24
  59:16
**nature** 24:16
**nausea** 24:18 48:16
  50:22 54:20,24
  55:25 56:1,5,9,25
  57:12
**need** 7:9,9 32:4
  36:17 37:3,16 39:8
  46:25 47:16 63:2
**needed** 47:2 62:21
**neoplasm** 69:22
**never** 10:19 35:4

BRENDA THOMAS                                          November 8, 2018

83

**new** 1:12,15 2:7
  5:17 8:6 10:3,8
  13:4,7,10,14 14:11
  15:4 18:21 20:12
  22:6,11 26:7,12
  28:2 38:7,22 49:24
  50:1,2,17 51:22
  55:9 60:24
**night** 17:14,15 18:1
  28:16 29:11 41:4
  41:10 44:9,19
**noon** 45:5
**noontime** 32:12
**normal** 22:23 57:6,9
**normally** 55:6
**North** 1:12 2:13 8:5
**noted** 76:16
**noticed** 32:3 34:1
**November** 1:16 9:25
  12:8 13:2 56:20,23
  58:5 73:7 76:19
**number** 12:16 13:12
  13:18 27:14,19
  40:10,13,15,24,25
  67:11 69:3
**nurse** 20:1,7 21:1
  22:1,24 51:2 52:14
**nurses** 49:5 52:5
**nursing** 20:4

_____ O _____

**O** 3:1 4:1
**oath** 4:22 6:1,5,8
  7:24 52:5
**object** 39:15 42:23
  51:25 64:8
**objections** 4:12
**obtain** 42:1
**occasions** 15:19
  34:21 35:2
**occupant** 17:22
**occurred** 15:1,6
**Ochsner** 58:19
  59:16,20 60:13
  61:21 68:1
**Ochsner's** 58:17
**October** 12:2 15:2,9
  15:20 16:9,19 17:8
  17:12 18:24 27:15
  28:5,12 30:5,21
  35:7 38:6,20 40:7
  40:11 45:17 48:14

  50:9 51:22 52:6
  53:13 58:10 61:3,4
  63:6 65:14 72:12
**offend** 75:1
**offer** 38:10
**offered** 48:2
**office** 18:20,22 19:1
  19:11,14 23:13
  25:12,16 49:3,6,13
  49:16 54:16,18
**officer** 6:7 77:8
**offices** 1:13 2:11
  18:23
**officiated** 4:22
**okay** 5:25 6:21,24
  7:7,18,19 11:17
  17:9,10 36:17 37:8
  37:11,12,16 42:3
  60:6 62:25 71:10
**old** 8:20 10:3 11:2
  71:15
**Once** 62:5,13
**open** 31:16 38:25
  39:1 46:3 49:13
**opened** 31:22,25
  32:11,17 33:14
  46:5,6,7
**opening** 33:12
**operator** 5:16 37:4
**opinions** 78:3
**opponent's** 5:25
**opportunity** 6:1
  37:11
**order** 6:25 37:17
**original** 77:4,5
**Orleans** 1:12,15 2:7
  5:17 8:6 10:4,8
  13:14 15:5 18:21
  20:12 22:6,11 38:7
  38:23 49:24 50:1,2
  50:18 51:22 55:9
  68:5
**outcome** 78:12
**outpatient** 69:17
**outside** 29:8
**overnight** 44:22
**owner** 8:13 19:13

_____ P _____

**P** 4:1
**p.m** 18:1 28:16 41:9
  41:9 50:10

**packaging** 46:3
**page** 3:3,10 77:5
**pages** 77:12
**paid** 16:20 27:7,10
  31:11 52:19,24
**pain** 57:12
**pains** 24:17,17
  50:21,23 55:11,18
  56:8,19
**paralysis** 70:7,14
**Parish** 68:5
**part** 4:15 33:13 43:9
  43:19,22 53:4
  57:16 71:13
**particular** 18:25
  29:9 60:19
**parties** 4:4 78:11
**partners** 19:18
**parts** 42:19
**party** 72:21 78:8,9
**pass** 10:17
**patient** 50:5 69:14
**PATRICIA** 1:22
  4:20 77:6 78:15
**pay** 28:6 53:3 72:25
**pays** 14:7
**peeled** 33:13
**people** 7:5 16:16
**performed** 65:23
**performing** 27:5
**period** 21:18 22:2
  26:3 30:20 56:6
  57:21
**person** 44:8 49:15
  77:23
**personal** 12:24
  77:15
**petition** 15:2 16:10
**pharmaceuticals**
  55:7
**pharmacies** 55:8
**pharmacy** 54:25
  55:1,4
**phlebotomist** 19:23
  19:25
**phone** 39:13,18,19
  39:20,22,23 40:2,3
  40:6,10,22,25
  41:17
**photocopy** 14:11
**photograph** 38:3,14
  38:16,17,25 47:8

**photographs** 36:15
  36:15 37:6,9,15,21
  37:23 39:8,10,10
  39:12 41:3,10,13
  41:17,20 42:2,7,12
  42:18 43:2
**physical** 56:17 57:7
  57:11
**physician** 19:14
**pictures** 39:25
**Pierre** 11:21,24
  19:15 23:10
**place** 19:4,5 26:20
  32:7,8 65:14
**plain** 35:24
**PLAINTIFF** 2:8
**plan** 40:22,23
**plans** 71:19
**please** 7:15 9:3
  12:22 37:20
**pleasure** 37:2
**point** 6:22 25:3
  34:14 35:15 46:9
  57:3 58:25 62:18
  66:8 72:1 74:7
**portion** 43:11 52:24
**position** 23:18 24:20
  26:17
**possession** 16:18
  44:19
**Possibly** 23:2
**pounds** 58:11
**practitioner** 30:24
  31:1
**Pravastatin** 30:14
**prepare** 6:16
**prepared** 77:14,19
**prescribe** 54:19
**prescribed** 30:23
  61:20 62:22 63:5
  64:1
**prescription** 29:22
  29:25 55:3
**present** 16:17 17:16
  34:4,10 40:15
  60:20 71:15
**presented** 46:2
**presently** 8:15
**pressure** 30:2,8,11
**prevent** 5:11 63:20
**preventative** 67:8
**prevents** 64:17

**previous** 34:21
  67:21 68:18,20,23
  69:21
**previously** 10:13
**printout** 27:19
**prior** 35:2 69:10
**probably** 13:5
**probing** 43:24
**problem** 25:20
  53:17
**problems** 27:2 48:18
  49:22 55:24 58:23
  74:13,13
**procedure** 4:6 37:16
  78:2
**proceedings** 6:5
**produced** 16:25
**product** 35:5,23
  37:8 41:7 42:20
  44:1
**production** 41:25
**products** 48:3
**prohibited** 78:6
**prohibition** 78:1
**pronounced** 65:9
**proof** 37:7
**properly** 7:7
**provide** 17:9 50:25
  54:9
**provided** 36:14
  49:25
**provider** 40:6,22,23
  53:24
**Provost** 26:18,19
**Prozac** 62:1 63:7,23
**psychiatric** 58:16
  59:20,25 60:7,10
  61:21 62:6 69:12
  71:12
**psychiatrist** 58:13
  58:17,18,21 59:8
  59:13,22 60:20,21
  60:24 61:6,7,9,20
**psychiatrists** 59:2
**psychiatry** 59:16
  60:14
**psychological** 58:16
  69:18
**psychologist** 58:22
  59:14 60:22 61:15
  61:18
**psychotropic** 62:14

**PTO** 27:18
**purchase** 13:23 16:15,18,22 17:8 17:12 28:16 31:8
**purchased** 13:17 14:2 15:3 16:4,11 35:1 38:5,19 44:5
**purchasing** 31:13
**purposes** 4:7
**purse** 13:6
**put** 32:5 35:17,18 44:24 64:15

_____ **Q** _____

**Quality** 5:15
**question** 4:13 6:1 7:3,14,15,20,22 36:6 50:14 51:18 51:20 63:16 64:9 64:11,13
**questions** 5:12 15:1 37:10,14 63:22 64:22 67:18 74:25 75:14
**quit** 71:21,23,24

_____ **R** _____

**R-E-F-E-R-E-N-C...** 26:14
**R.N** 20:1,2,17
**R.S** 77:10
**radiation** 66:4
**raise** 6:9
**rat** 24:12 32:14,18 34:25 36:11 38:4 38:18 41:6 42:11 42:25,25 43:5,5,13 46:15,16,17,19 47:19 49:17 50:20 51:15,21 52:7 54:7 57:25
**rate** 28:6,10
**reached** 74:18
**reaction** 35:25 36:2 57:17
**read** 6:19,23 31:5,5 50:2 51:12 75:14
**reading** 4:8
**ready** 8:2 35:18 72:3
**realized** 43:15,18
**really** 21:10 24:22

33:3 72:6
**reason** 24:9
**recall** 15:14,16 17:3 17:11,25 25:4 30:13,17 33:22 42:10 50:10 52:11 54:11 56:12 61:8
**receipt** 16:14,18
**receive** 51:4 60:7 72:24
**received** 59:25 69:17
**receiving** 60:10 73:13,14,15 74:7
**recess** 14:17
**recollection** 24:5 29:2
**record** 7:6 8:4 12:19 12:23 13:9 17:7 36:21
**records** 17:1 24:1 27:14,24 50:1 51:22 52:16 59:10 60:4,6
**redact** 12:19
**refer** 58:18
**Reference** 25:14 26:9,12,13,15,16 26:24 27:3,23 28:2 28:10
**referred** 59:21
**reflect** 12:23 13:9
**refrigerator** 44:25 45:2
**register** 32:16 45:23
**registered** 20:7 21:1 22:1,24 51:2
**regular** 66:19
**rejected** 73:12
**related** 78:10
**relationship** 78:6,9
**relationships** 78:1
**released** 53:9
**reluctant** 57:22
**remain** 56:11
**remember** 10:5 18:3 21:17,19 24:21 29:17 30:10 36:8,9 40:14 47:17 49:15 52:19 53:23,23 54:16,17,22 56:12 59:15,19 65:8 66:2

66:3 68:25 69:2 70:2 71:4
**remind** 7:9
**remission** 66:15
**rendered** 59:17
**rent** 14:7
**repeat** 7:17
**rephrase** 7:18
**report** 47:2,12,15,25 48:19
**reported** 1:20 77:13
**reporter** 1:23 4:21 5:3 6:7,14,22 7:6 7:11 12:18 77:7 78:16
**REPORTER'S** 77:1
**reporting** 77:14 78:7
**represent** 5:15
**required** 77:5,21
**reserved** 4:14
**resign** 25:19,21,22
**resigned** 26:4
**resolve** 56:17
**resolved** 57:4 68:8
**resources** 27:24
**respect** 65:5
**response** 64:23
**responses** 7:10
**responsibility** 53:3
**responsiveness** 4:13
**restaurant** 1:8 5:16 15:4 16:1,11 28:15 37:5 38:6 44:4 45:5,9,18 48:14
**restrictions** 13:2
**result** 23:22 24:3 70:7
**resulted** 67:23
**retire** 72:3
**Retired** 72:2
**retirement** 72:24 73:18,20,21 74:5 74:18,21
**retiring** 71:19
**return** 22:6 24:20 57:6,9
**returned** 24:21,22 47:8 49:11
**right** 6:9,19,24 7:16 23:16 30:10 35:24 40:23 51:4 72:4,6

75:11
**Risperidone** 62:7,8 63:9
**ROBERT** 2:11
**room** 6:16 42:8 48:21,23 49:4,9 51:13,23 52:6,20 53:7,18 54:1,4,21 54:23
**Rula** 61:10,10
**rules** 4:6 7:2 77:21 78:3
**running** 29:7
**RYAN** 2:4

_____ **S** _____

**S** 4:1
**samples** 19:22
**sandwich** 15:3 16:12 31:16 33:11,12,16 34:6,20 35:2 38:5 38:19 39:1 43:20 44:18
**sandwiches** 34:23
**sat** 31:21 33:9 46:7
**Saturday** 18:5
**save** 4:12
**saw** 31:25 32:6,18 35:16,20,25 36:4 43:17 46:16,16 47:19 49:2 59:8 61:6,18
**saying** 71:23
**scan** 66:22
**scans** 66:23
**schedule** 62:19
**SCHONEKAS** 1:22 4:20 77:6 78:15
**school** 20:4
**seal** 77:5
**sealing** 4:10
**second** 38:14
**SECTION** 1:6
**Security** 12:16 72:24 73:3,13 74:5 74:5
**see** 6:14 34:17 36:19 36:20 42:19 44:1 48:24 49:4,19,21 53:25 54:4 58:15 60:4,23 61:7
**seeing** 37:3 58:13

60:21
**seen** 34:2,18 52:16 58:21 59:2
**self** 57:6
**sensation** 35:9
**sent** 41:14 48:23 49:22
**September** 26:6,23 61:4
**served** 47:5
**service** 40:6 52:25
**services** 1:8 5:15 52:20 77:24
**set** 77:11
**settle** 68:11
**Settled** 68:12
**severe** 24:17
**Shilpa** 59:3
**Shock** 36:1
**shortly** 25:3
**show** 36:15 37:13 43:2 46:3
**showing** 17:7
**shown** 38:3,16
**shows** 38:25
**sic** 26:11
**sick** 27:12,12,15 50:20 52:7 54:7 55:12 56:4,6
**side** 67:14 71:2
**sight** 35:24
**sign** 6:20,23 47:25 66:25 75:15
**signature** 77:4
**signed** 59:10 76:11 76:15,16
**signing** 4:9
**single** 8:10
**sit** 24:6 27:13 56:22
**six** 12:11 20:15,16 62:23
**Sixty-eight** 71:16
**slip** 15:25 72:18
**slurred** 70:13
**smaller** 43:7
**Social** 12:16 72:24 73:3,13 74:4,5
**sofa** 31:21
**SOILEAU** 1:13
**SOILEAUX** 2:3
**sold** 32:14
**Solutions** 18:14,16

18:17 23:15,16,24
24:20 25:12,14,17
25:20,22 26:4
27:23 28:3,7
**Somebody** 49:7
**son** 12:10 13:21
14:5,6,9 28:13
**sore** 24:18 48:16
50:22 54:14 56:1
56:10,11,25 57:12
**sorry** 5:9 11:14
34:12 47:17,19
**sort** 50:24 55:24
64:16 67:8 70:6
**sought** 4:16
**sound** 60:1
**speak** 7:4 32:13 71:9
**specific** 29:1 54:9
56:7
**specifically** 4:9,11
59:15
**Specimen** 19:23
**speech** 70:14
**spell** 8:18 9:5,13
11:12,22 67:6
**spending** 18:2
**spoiled** 16:5
**spoke** 32:8 44:5,8
**Spring** 21:21
**Sprint** 40:9,9,11,13
40:19
**standpoint** 57:7
**stare** 37:22
**start** 23:12 38:1
73:12,15
**started** 5:10 22:13
23:17 26:5 31:22
31:22 32:1 33:11
33:12,14,19 34:5,5
35:8 43:8,14,16
46:11 47:18,20
58:13
**State** 4:21 77:7
**statement** 53:15
**STATES** 1:1
**status** 10:11
**statute** 77:21
**Stavros** 59:11 61:19
**stenotype** 77:14
**steps** 33:8
**STIPULATED** 4:3
**stomach** 24:15,17

48:19 50:21,21,23
52:9 54:13 55:11
55:18 56:8,19
57:11
**stop** 7:16
**stopped** 22:12 32:5
**store** 15:9,23 44:22
49:11
**Street** 1:14 2:5
**strips** 34:23
**stroke** 69:22,23,25
70:1,7,11,17,19,22
71:1,5,13 74:14
**stuff** 25:19 29:11
31:24 74:1
**subject** 16:7
**suffered** 67:22
**suit** 16:7
**Suite** 1:14 2:6,14
**Sunday** 48:17
**supervision** 77:16
**supervisor** 26:17,22
26:22
**supposed** 34:24 43:6
43:12
**sure** 5:22 6:25 13:25
20:16 21:9,10,21
22:15 23:2,3 25:23
25:24,24,25 41:14
42:9 46:20 51:10
53:1,19 56:18
58:12 61:2,4 69:8
69:9 71:6 73:7,8
73:24 74:3
**surgeon** 66:2
**surgery** 65:19 66:4
74:1
**swallow** 33:24 43:19
**swallowed** 32:2
42:21 43:4
**swallowing** 33:23
43:15
**sworn** 5:2 77:10
**symptoms** 54:13
70:24
**syndrome** 69:23,24

---
**T**

**T** 3:1,8 4:1,1
**T-A-M-L-A** 11:23
**table** 35:18
**tail** 31:25 32:3 34:2

34:2,19 35:16 38:4
43:9,17
**take** 5:18,24 7:11
12:22 20:6 30:4
31:19 32:4,24 33:8
33:21 36:17,23
37:2 38:1,15 39:12
47:7,22,23 48:19
52:9 54:20 61:23
62:15,16,21,22
63:1,2,23,24 64:5
64:6 66:19 67:2
**taken** 1:13 4:5 7:1
33:18 36:24 37:15
42:3,7,12,14 63:7
63:9,12 64:9 76:19
77:8
**talk** 23:23 71:3
**talked** 49:7
**talking** 7:5 45:17
**tall** 32:15 45:21
**Tamla** 11:21,21,22
19:15 23:10
**taste** 35:8,9,13
**tell** 5:24 6:9 7:2,16
30:5 31:19 38:2,16
41:2 42:17 45:8
46:9,24 47:14
50:17 51:16 54:6
66:24
**ten-something** 29:13
**testify** 5:4 77:11
**testifying** 6:11
**testimony** 52:4
64:20 76:5,6 77:8
77:13
**tests** 66:18,19
**Texas** 21:4,5,6
**texture** 35:5
**Thank** 13:9 75:12
**therapies** 66:5
**therapy** 61:14
**thereof** 4:15
**thing** 32:1,7,17
33:14,14 55:23
**things** 24:16 29:8
67:18
**think** 13:25 21:8
22:14 23:16 26:5
53:16,20 59:22
61:2 62:11 63:22
71:6,6 73:24 75:7

**thinking** 22:15 47:3
**thirty** 8:9 58:12
**Thomas** 1:5,11 5:1,6
8:5,16 9:2,4,15
10:14,15,21 11:1
11:11 12:4,24
13:10 14:10 37:1
51:12 76:4,11 77:9
**thought** 41:6 42:11
46:10 49:17
**three** 21:9 55:16,16
55:17,18,24 56:2
**threw** 32:20 46:12
46:23,24 48:10
**throat** 24:18 48:16
50:22 54:14 56:1
56:10,11,25 57:12
**throwing** 50:21
**Thursday** 1:15
**time** 4:14 15:9 16:21
17:12,18 18:2,6,13
18:24 21:14 22:4
22:10 23:4,6,23
26:3 27:12,12,15
27:18 28:20,21
29:24 30:7,18,20
31:2 32:4,7,17
36:16,17 37:14
41:2 42:2 44:16
55:14 56:4,6,8,16
57:21 59:23 60:20
60:20 63:7,10,12
68:16,17,25 73:2
74:7,14,17 75:5
**times** 15:11,17
54:18 62:4,12,20
**today** 5:11,17 6:5,16
14:25 23:23 24:6
27:13 52:4 56:20
56:23 57:1 63:19
63:20 64:16 67:19
**today's** 6:16
**told** 24:23 28:2,13
32:9,9,10,13 44:6
44:15 45:20 47:4
47:22 49:4,6,8,9
49:15 52:5 53:20
63:22 64:25 66:9
66:13 67:22 69:21
70:16,22
**tomorrow** 44:16
**top** 33:13 35:19

43:21
**total** 12:11
**totally** 58:9
**Touro** 71:6,7
**training** 19:24
**transaction** 16:22
**transcribed** 77:15
**transcript** 6:16,20
77:4,17,19,20
**transcription** 76:6
**transmitted** 41:12
**trash** 32:20 46:13
48:10
**treat** 49:21 54:15
**treated** 54:12,17
68:1 71:4,8
**treatment** 50:24
51:3 54:9 59:17,20
59:25 60:4,7,11
69:18
**trial** 68:10
**true** 76:7 77:16
**truth** 6:10,10,11
7:23,23,24
**truthful** 64:23
**try** 43:16
**Tuesday** 53:22
**Tulane** 20:20,21
**Twenty** 58:11
**two** 7:5 8:23 15:15
21:8,9 24:10 36:14
37:6 39:9 41:3,10
55:16,17,18 56:2
61:1 63:3,3 69:8,8
69:9
**type** 19:24 34:20
35:8 47:7 51:3
53:25 66:5
**types** 68:21

---
**U**

**U** 4:1
**Uh-huh** 10:7 12:12
14:4 25:1 28:4,24
**unable** 36:12 58:2
**underneath** 44:2
**understand** 5:20 6:2
6:4,12,17 7:12,15
7:17 37:1,3,20
63:21 66:11
**understanding** 5:12
64:22 77:18

understood 7:22
UNITED 1:1
University 20:21
unwrapped 34:5
upset 24:15 37:2,3
  37:18 54:13
Urgent 22:14,17,24
  23:1
usually 6:21 70:13

**V**

valid 77:3
various 55:13
vehicle 69:1,4,11
verbalize 7:10
verbally 46:18
VERSUS 1:6
viral 52:13
visit 51:13
visits 61:14
vomiting 24:18
  48:16 50:22

**W**

wait 7:3 11:13 47:16
  51:18
waive 6:24
waived 4:9,11
Walgreens 55:8
walked 49:1,1
want 14:17 32:22
  33:3 36:15,21 37:1
  47:6 55:13
wanted 47:15 49:9
wasn't 22:12 23:5
  34:25 35:11 43:12
  47:2 49:10
watch 36:18
way 64:15 72:5
we'll 12:18,23 14:11
  28:12 75:14
we're 14:25 23:22
  38:10 39:3 41:24
  45:17
we've 67:19
weakness 71:2,9
week 18:3 23:20
  53:22 61:1
weeks 24:2,7 27:20
  55:12,12,16,16,17
  55:19,24 56:2,3,5
  56:14,16 57:7

weight 57:15,19,23
  58:9
went 15:19 16:10
  17:17 25:2,4 28:9
  28:14 29:12,13
  31:15 32:11,17
  47:2 48:15,17,22
  49:3,14 50:3 53:17
  53:18,25 58:15
  60:3 71:9 74:21
West 5:15
Widow 10:12
witness 4:5,23 36:7
  39:16 42:24 52:1
  76:14
WITNESS' 76:1
witness's 39:4
Woman's 19:4,5
wondering 66:13
word 26:12
work 18:10,20,25
  20:6 21:11,14
  22:18 23:4 24:2,7
  24:10 25:2 26:3,8
  27:4,6,9,10 28:9
  53:13 71:21,24,25
  72:6,6,10
worked 18:9,22 20:8
  20:17 21:17
working 22:4,12,13
  22:14 23:5,12,14
  23:15 25:6,8,15
  27:1 71:17 72:7
works 27:3
wouldn't 17:6 33:7
  66:18
wrapped 33:16
wrapper 33:17,18
  35:19
wrapping 44:24
write 47:11
written 7:12 47:15
  67:18

**X**

X 3:1,1,8,8
Xanax 62:16,19
  63:12 64:2

**Y**

yeah 12:4 13:5,8,21
  19:10 21:24 25:17

  28:1 30:4
year 11:9,15 12:7
  25:9 70:2 73:24
  74:15
years 8:9 11:7 20:14
  20:15,16,23 21:9
  65:11,12 67:12
  68:18,20 69:5,6,6
  70:2 74:2
you-all 8:24 16:25
  33:3
YUM 1:7,7

**Z**

ZAINEY 1:7
Zero 62:18

**0**

003852813 12:25
  13:12

**1**

1 3:12 14:12,15 15:2
  15:9,20 16:19 17:8
  17:12 28:13 38:6
  38:20 40:7 65:14
10/3/2016 51:14
10:52 17:13 18:1
  28:16 38:6,20
  44:19
1010 1:14 2:5
11 60:5,8
11/22 13:11
11:00 41:9
11:29 50:9
11:30 41:9
12990 1:11 8:5
14 3:12
1434 78:3
1479 12:17
15 9:20
16 9:10
17 26:2,6 28:7
18-01264 1:5
1949 9:25
1966 10:16
1993 20:3
1st 12:2 16:9 27:15
  35:7 60:1

**2**

2 3:13 38:9,11,13

  42:19
200 15:15
2005 20:24 21:3
2008 22:8,14
2011 23:2,7 67:23
  73:7,21,25
2012 23:2,7 65:24
  67:23
2013 10:18 13:25
  14:1
2015 23:14,16
2016 15:2,9,20 16:9
  17:8,12 27:15 28:5
  28:13 30:5,21 38:6
  38:20 40:7,11
  45:18 50:9 51:22
  58:10 60:1 63:6
  65:15 72:13
2017 13:2,11 26:1
  26:23 58:6 60:3,5
  60:8
2018 1:16 25:8
  56:20,23 58:5
  76:19
20th 10:16
22 13:2
220 2:14
22nd 9:25
25 62:11
25th 11:3
26 61:3,3
2640 13:20
2910 1:14 2:6
2nd 12:8 45:17
  48:14

**3**

3 3:14 39:4,6 42:19
  51:22 52:6 69:20
300-3027 40:13
34 8:21
342-7134 40:16,17
37:2554 77:11
38 3:13
3850 2:13
39 3:14
3rd 50:9 53:13

**4**

40 23:20
421-9947 41:1

**5**

5 3:5 67:20,22
504 40:16
51 11:4,6
5620 50:2
5th 11:19

**6**

6009 15:4
61 11:5
6240 13:14,23
66 11:3,6 74:19
68 11:19
6th 10:18

**7**

7:30 64:6
70002 2:15
70112 1:15 2:7
70128 1:13 8:6
71 12:8
7134 40:24
72 12:2
75 77:12

**8**

8 76:19
8th 1:15

**9**

92 20:24
99 19:10
9954 19:8,9,10