UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BRENDA THOMAS                    * CIVIL ACTION
                                 * NO. 18-1264(A)(4)
          Plaintiff             *
                                 *
VERSUS                           *
                                 *
                                 *
KFC CORPORATION, et al.         *
          Defendants            *
                                 *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


          The deposition of **MICHELE COOPER, M.D.**,

was taken at Crescent City Physicians, located

at 5646 Read Boulevard, Suite 280, New Orleans,

Louisiana 70127, on Monday, March 18, 2019,

commencing at 5:30 p.m.

APPEARANCES:


        SOILEAU & ASSOCIATES, LLC

        BY:  RYAN A. JURKOVIC, ESQUIRE

             1010 Common Street

             Suite 2910

             New Orleans, Louisiana 70112

        ATTORNEYS FOR PLAINTIFF


        LAW OFFICES OF ROBERT E. BIRTEL

        BY:  JAMES J. KOKEMOR, ESQUIRE

             3850 North Causeway Boulevard

             Suite 220

             Metairie, Louisiana 70002

        ATTORNEYS FOR DEFENDANTS




    REPORTED BY:

        MARLANE A. GAILLE, CCR-RPR

        CERTIFIED COURT REPORTER #21005

I N D E X

                                                        PAGE:

    Caption                                               1

    Appearances                                           2

    Stipulation                                           3

    Certificate Page                                     59


                    EXAMINATION INDEX:

    EXAMINATION BY:                              PAGE:

    Mr. Jurkovic                                 5, 53

    Mr. Kokemor                                     36

            Voir Dire                                9



                    EXHIBIT INDEX:

EXHIBIT NO.:                                     PAGE:

1 - CV                                             11

2 - Photo of open sandwich                         50

3 - Photo of sandwich                              50

                     S T I P U L A T I O N

              IT IS STIPULATED AND AGREED by
and between counsel for the parties hereto
that the deposition of the aforementioned
witness may be taken for all purposes
permitted within the Federal Rules of Civil
Procedure, in accordance with law, pursuant to
notice;

              That the formalities of reading
and signing are specifically waived;

              That the formalities of filing,
sealing, and certification are specifically
waived;

              That all objections, save those
as to the form of the question and the
responsiveness of the answer, are reserved
until such time as this deposition, or any
part thereof, is used or sought to be used in
evidence.

                     *   *   *


              MARLANE A. GAILLE, CCR-RPR,
Certified Court Reporter in and for the State
of Louisiana, officiated in administering the
oath to the witness.

MICHELE COOPER, M.D.,

Crescent City Physicians,

5646 Read Boulevard, Suite 280,

New Orleans, Louisiana 70127,

having been first duly sworn,

was examined and testified as follows:

EXAMINATION

By MR. JURKOVIC:

Q.    Good afternoon, Doctor.  My name is Ryan A. Jurkovic.  I represent Ms. Brenda Thomas in connection with her claim in federal court against KFC Corporation and other companies.  Thank you for appearing today.  I hope not to keep you too long.

Could you please state your full name and professional address?

A.    My name is Michele Maria Cooper, and my address is 5646 Read Boulevard, Suite 280, New Orleans, Louisiana 70127.

Q.    Thank you.  And so you are employed by?

A.    Crescent City Physicians, Incorporated, which is part of LCMC Health.

Q.    Is that Touro's physician group?

A.    Yes.  Touro Infirmary.

Q.   Doctor, have you been deposed before?

A.   One time.  Yes.

Q.   As a physician?

A.   Yes.

Q.   So just very briefly, not to take too much time, usually we try to answer fully on the record rather than nodding our heads or whatever just so the court reporter can get everything down.

Also I'll try not to talk over you. Please let me finish first, and I'll let you finish your answer before I start another question.

If you need a break, let us know. And, obviously, if I'm speaking poorly, please let me know, and I'll restate or rephrase so you can understand it.  Does that make sense?

A.   Yes.

Q.   I just want to get your credentials quickly before we get into the case itself.

Could you tell us your medical education?

A.   Medical education was at Louisiana State University of New Orleans Medical School.

Q.   When did you graduate?

A.   I graduated in 1997.  Yes.

Q.   And so --

A.   That was just -- I'm sorry.  That was just medical school, and then I had to do internship.

Q.   And so the rest was internship?

A.   And then internship and residency was also with Louisiana State University at New Orleans.  And I finished in 2000.

Q.   And so what did you study during your residency?

A.   Internal medicine.

Q.   And are you currently doing internal medicine as your --

A.   Yes, I am.

Q.   And so how long have you been working as an internal medicine physician?

A.   I started working as an internal medicine physician in 2001.

Q.   And who did you work for?

A.   I was self-employed with my partner Dr. Emile Labranche.  We were on Lake Forest Boulevard in New Orleans East.

Q.   How long did you guys have your own

shingle?

A.    We worked together until 2005 when Hurricane Katrina came.

Q.    And how long a hiatus did you have?

A.    And then I took off for a total of three years.  And then I returned and joined Crescent City Physicians in 2008.

Q.    And you've been working continuously?

A.    Continuously since 2008.

Q.    Understood.  And so do you do any teaching in medical schools anywhere?

A.    No, I don't.

Q.    And have you been a teacher, like, at any of the medical schools?

A.    No, I have not.

Q.    Where are your hospital privileges, if any?

A.    Touro Infirmary and New Orleans East Hospital.

Q.    Do you have any publications?

A.    No, I do not.

Q.    You said you were deposed before. Aside from being deposed, do you have any other testimony that you've given in, like, trials or in connection with any hearings or

anything?

A. No, I have not.

Q. So your medical licensure, is it State of Louisiana?

A. State of Louisiana.

Q. And is it current?

A. Current.

Q. Any discipline or revocations? Suspensions?

A. No, there are not.

MR. JURKOVIC:

So we would tender her as an expert in internal medicine.

MR. KOKEMOR:

Just a couple of questions.

Doctor, I'm James Kokemor. I represent the operator of the local KFC restaurant.

VOIR DIRE EXAMINATION

By MR. KOKEMOR:

Q. Are you board certified?

A. No, I'm not.

Q. Are you board eligible?

A. Yes, I am.

Q. Have you not taken the oral or

written portion of the exam yet?

A.    No.  I did take the board one time right after I graduated, and then I did not take it again.

Q.    Have you ever been board certified?

A.    No, I have not.

Q.    What about certifications in any other subspecialties of medicine?

A.    No.

Q.    So you're just a general physician?

A.    Just general internal medicine.

MR. KOKEMOR:

Thank you.

No other questions on voir dire.

MR. JURKOVIC:

Understood.

By MR. JURKOVIC:

Q.    Do you have a copy of your CV at hand?

A.    It's somewhere in this drawer.  I'd have to search for it, but I do have one on this property somewhere.

Q.    Maybe after the deposition, if you can find it and have Mr. Eggleston or your

office manager, whoever -- and we'll add it as Exhibit 1.

(Exhibit 1 was marked.)

So, Doctor, in the course of your practice here have you come to know Brenda Thomas?

A.    Yes, I have.

Q.    Do you know how she came to you initially?

A.    I don't know.  She may have seen my partner for a few visits first, Dr. Emile Labranche.  I'm not really sure, though.

Q.    Do you know when she started coming to your clinic?

A.    I believe it was around 2012.

Q.    And so at that time, do you recall what you were treating her for?

A.    Just basic general things, probably. Diabetes, high blood pressure, those kinds of things.

Q.    You saw her in the capacity of a primary care physician?

A.    Yes.

Q.    So do you have a copy of her chart available to you?

A.   I have whatever is on the computer.

We didn't start using the computer until about 2015, so there's some things that are on paper that I don't have because they were put into storage.

Q.   Understood.  And we can obtain copies of the chart, and that's fine.

A.   Yes.

Q.   So as far as you can recall, prior to October of 2016, do you recall treating her for any type of, I guess, gastrological problems?

A.   I don't think so.  I don't recall that.

Q.   Do you recall treating her for any kind of psychological problems?

A.   I did not recall that.

You said prior to when?

Q.   October 2016.

A.   No, I don't recall anything before that.  No.

Q.   Did you ever treat her for -- do you recall anything infectious-disease related prior to October 2016?

A.   I don't recall anything like that.

No.

Q.   Is there anything in the chart that we'd be able to access?

A.   I could look.

Q.   The chart will speak for itself, in other words?

A.   Yes.

Q.   So in October 2016, do you recall any treatment when she came to the office at all?

A.   October 2016 was when she came in with the complaint about what happened. Right?  Was that the date?

I can't really remember the date. I'm sorry.

Q.   That's fine.  So let me ask it this way.

Did she ever come to you complaining about adulterated food problems?

A.   Prior to that?  Or that date?

Q.   In --

A.   She did come to me complaining about an incident that she said happened at Kentucky Fried Chicken on Bullard.

Q.   You don't recall the timing of that?

A.   I remember it was October.  I don't

remember if it was 2016 or 2017.

Q.   Understood.  Okay.

Well, can you tell me, then, that particular visit that you're recalling, can you tell me what she told you?

A.   What I remember is that she told me that she went to Kentucky Fried Chicken and she ordered a -- I believe she said a chicken tender sandwich.  And she said that when she bit into it, she pulled back, and she said there was a tail of a rat hanging from her mouth.  That was her words.

Q.   Understood.  And so how was, I guess, her affect or her demeanor?

A.   She was frantic.  She was very, very anxious.  That first visit, she was very anxious about it.  She was crying.  She was -- I mean, she was shaking.  That's how she presented herself.

Q.   And so did you examine her at all?

A.   I tried to calm her down, and I examined her.

MR. KOKEMOR:

What date was that, Doctor?

THE WITNESS:

I would really have to look.

MR. KOKEMOR:

We'd have to ask you to do so.

THE WITNESS:

Do you want me to look?

MR. KOKEMOR:

Please.

THE WITNESS:

Because we have two computer systems, and everything before April 2018 is on the old system. Let's see.

And so the date that that happened was 2016 -- October 2016.

MR. KOKEMOR:

October?

THE WITNESS:

October 12, 2016.

MR. KOKEMOR:

Is that the first date she reported to you an incident in which she believed she ate a rat?

THE WITNESS:

Yes.

MR. KOKEMOR:

October 12, 2016?

THE WITNESS:

Yes.

MR. KOKEMOR:

Can you print that chart out?

THE WITNESS:

I don't know if I can print it because it's on the old system. But if we can, I would. But I'm looking right at it right here.

MR. KOKEMOR:

Okay. Appreciate it.

By MR. JURKOVIC:

Q. So as far as if she had come in on an earlier date in October of 2016 and wasn't able to see you, would that be reflected in the chart?

A. No.

Q. And so if she came in -- like, the front desk told her you don't have an appointment today, the doctor can't see you, who are the people that work that front desk?

A. Raynette and Irma.

Q. Do you know their last names?

A. Raynette Butler and Irma Jackson.

Q.   Understood.  And they've been working here since --

A.   A long time.

Q.   In October 2016, it's fair to say that one or both of them would have been working?

A.   Yes.

Q.   Is there anybody else that would have been working the front desk in that time period?

A.   There's another girl named Kanesha Baptiste.  I'm not sure if she would have been on the front desk.  I don't know if she would have been on intake, but she's up at the front.

Q.   Are there any circumstances where someone can just show up without an appointment and get through the door to see a physician here?

A.   Very rare.  No.  Usually no.

Q.   Understood.  So does the front desk generate any, like, sign-in sheets or anything like that that would not end up in the chart?  Like, any kind of a record of people who sign in but aren't seen by a physician?  Is that

something that the front desk keeps?

A.    That would probably be a question for the manager.  But our manager is new, so I don't know.  They don't always do everything perfectly, so I'm not going to say for sure.

But they, a lot of times, are supposed to keep records of things, and they don't always do that.

Q.    Understood.  And so based on that first visit, did you render any kind of diagnosis or assessment based on the complaints that she had and the history?

A.    Well, as far as I can remember, definitely anxiety was one diagnosis, and I basically felt post-traumatic stress disorder just from, you know, the presentation.

Q.    Did you recommend any treatment or make any referrals?

A.    I believe I recommended that she find a therapist or a psychologist or psychiatrist, and I'm pretty sure I gave her something for anxiety.  Let me see.

For some reason, it doesn't show the medication, but it says "start medication."  So I must have just neglected to write the

name of the medicine on the note.

Q.    Understood.  And so at that meeting, that first appointment in October of 2016 that you had with her regarding this, was she by herself or was there anybody with her?

A.    She was by herself.  I'm pretty sure she was by herself.

Q.    So fair to say she was the primary historian for the incident she alleges?

A.    Yes.  Oh, yes.

Q.    At that time, did you have any reason to doubt what she was telling you?

A.    I had no reason to doubt it.

Q.    According to your training, do you regard the complaints or the history that she gave you as consistent, you know, with I guess the exam and the findings you made?

A.    Explain what you mean?  Say that again?

Q.    And so was her affect and demeanor and the way she was acting, was that consistent with what she was telling you happened?

A.    Yes.  I would say yes.

Q.    Now prior to that meeting, had she

ever had that kind of, I guess, response before?  The anxiety or the franticness that you described?

A.   I had never seen her act like that.

Q.   And so how often did you see her going back to 2012?  Once a year?  Three times?

A.   Probably two to three times a year.

Q.   Your clinic, does it weigh patients when they come in?

A.   Yes.

Q.   So is that something you keep track of personally, or is that just something that ends up in the chart?

A.   I mean, I look at it.  You know, it ends up in the chart.  But yeah, I do check the weight usually but not every time.  I can usually look at them and tell.

Q.   Understood.  Now I ask a doctor -- I have looked at the chart, and if they -- if the clinic weighed Brenda Thomas on 14 September 2016 and then again on 16 January 2017 -- so approximately four months?

A.   Yes.

Q.   -- and there's a drop of 15 pounds,

is that -- would you consider that a significant weight loss?

A.   Yes.

Q.   Is that consistent with someone who has, like, a food anxiety problem?

A.   Yes.

Q.   Now in that period, did she continue to complain about the incident and the effects of the incident?

A.   Yes.

Q.   Do you recall anything in particular that she said in January of 2016?

A.   I can't say for sure.  You say January 2016?

Q.   I'm sorry.  January 2017.  I'm sorry.

A.   I don't recall by memory.

Just same thing.  Because it's been consistent that she's -- what I wrote, anyway, was that she was having flashbacks from the incident.  That she had thought of seeing a psychiatrist.

Q.   Now I saw in the chart, Doctor, that there was a neoplasm or some kind of malignancy at some point in her history?

A.   Yes.

Q.    Were you involved in the treatment of that at all?

A.    Not involved in the treatment, just referred her to -- you know, I think she was already seeing an oncologist.

Q.    At East Jeff?

A.    I think so.

Q.    Are you aware if that condition was, like, in remission or managed?

A.    Breast cancer, it was in remission, I assume.

Q.    Understood.  So as far as the -- I guess the visits prior to October 2016 -- and I think I asked you already whether she had ever had any of these kinds of symptoms before.  The franticness and all that.

But sticking on this point, was she changed in October 2016?  Her demeanor and all this?

A.    Her demeanor has definitely change ever since this.  It has.

She did at some time maybe have complaints of heart palpitations or some kind of anxiety-type symptoms, but it wouldn't present itself.  In other words, it would just

be her telling me "I have anxiety."

This, I could see it.  That's the only thing I could tell you.  I could see it.

Q.    So in the past, every once in a while at some appointments she would tell you "I have some anxiety"?

A.    Yes.

Q.    Did she tell you what the reason for it was?

A.    I believe it was one time some death in the family or something.  She was stressed about that.

Q.    Is that something that resolved through a normal grieving process?

A.    Yes.

Q.    Whereas the chart I have I think cuts off sometime in 2017.  Have you continued to see her in 2018?

A.    Yes.

Q.    And so have you seen her in 2019 also?

A.    No.  We just -- no.

Q.    How many times did you see her in 2018?

A.    2018, she came regularly.

I could tell you if you want me to pull it up.

Q. If you don't mind telling us the treatment dates?

A. Okay. In 2018 -- in April of 2018 is when we started the new computer system. But I do see she had February 20, 2018; and then she had June 20, 2018; and July 9, 2018; and then December 12, 2018.

Q. So four visit dates in 2018?

A. Yes.

Q. And so these were regular, like, wellness visits?

A. Three were, and one looks like it was for a rash where she saw the nurse practitioner.

Q. Is that the July one?

A. Yes. July 9.

Q. It seemed like kind of an oddball in terms of the spacing.

A. Right.

Q. So the other three that are four months or so apart -- 2, and 6, and 12 -- I guess February, June, and December -- regular wellness visits that she actually saw you?

A.    Yes.

Q.    So taking one at a time, in February of 2018, do you recall what she told you?  Or is the chart --

A.    Okay.  I have it.  Hold on.

In February 2018 my note says that her chief complaint was cramping in her legs since she started a new blood pressure medicine, increased use of nitroglycerin due to chest pain related to anxiety -- this is what the medical assistant wrote -- "Patient seeing psyche regularly.  Next appointment February 22, 2018."

And then I wrote that she was still going to psychotherapy since the fast food incident, and that her pressure was elevated and she was having occasional chest pain, and that she was still dealing with severe anxiety and was crying again that day.  That she goes to psychiatry at Ochsner.  She's taking Prozac, Xanax, and Propanolol.  And she was having chest tightness.  And that she had been avoiding social interaction, avoiding family gatherings, staying home alone and isolating herself.

Q.    Understood.  And so she had been treating for hypertension with you for years. Right?

A.    Yes.

Q.    And so is she having like an uptick in the hypertension, or is it becoming uncontrolled?

A.    I have to look at that.

So it was high that day.  February 2018 it was high.

If I go back to February 2017, it was not as bad.  And in July 2017, it was okay that day.

So it looks like it had increased over the past few months.  It looked like it was increasing.

Q.    Understood.  Is that one, I guess, increase in the blood pressure, is that one way to, I guess, track mental health in terms of, like, increased anxiety?  That kind of thing?

A.    Well, of course, if you're anxious, you could definitely have higher blood pressure.  Stress can definitely do that.

Q.    How was at that meeting, that

appointment on February of 2018, how was she in terms of her affect or her demeanor?

A.   She was -- she was crying.

When she comes in, she would be okay. But the minute she would start to talk about that, she would cry again.  And that's what she had done consistently at every visit.

Q.   And so by "that" you mean --

A.   The incident.

Q.   With the fast food restaurant?

A.   Yes.

Q.   And that's every visit?

A.   Every visit.

Q.   And so, Doctor, just to be clear, you have referred to the notes -- your office notes on occasion during this deposition?

A.   I definitely have.  Yes.

Q.   But do you have an independent memory of Brenda Thomas?

A.   I definitely do.

Q.   And as far as the crying at every appointment since October of 2016, you actually remember that?

A.   I remember that.

Q.   Understood.  Was she, like, that

demonstrative or that weepy before October of 2016?

A.   No, she was not.

Q.   For instance, when she said she had anxiety related to, like, the death in the family, was there any -- like, that kind of response at that time?

A.   I don't remember anything like that. No.  She wasn't crying at that time.  She just told me about it.

Q.   Understood.  As far as -- I guess if you could skip to the June 2018 note -- I'm sorry.

First of all, the February of 2018 note, did you have any diagnoses that would be relevant to what we're discussing?

A.   Probably just -- I most likely just put the same thing.  She had been having anxiety.  You know, her usual things. Hypertension, cholesterol, diabetes, history of breast cancer, anxiety.

Q.   I assume that as far as a mental health diagnosis and treatment of mental health, you would defer to the psychiatrist?

A.   Definitely.  Yes.

Q.   So I'm sorry.  I was asking about June of 2018.

A.   Okay.  June of 2018.

On that note, it looks like it may have been a somewhat incomplete note.  It's not completely filled out.

We started a new computer system in April 2018, and we were still struggling by this time.

So it really doesn't say too much.  So that really doesn't say much at all.

Q.   Understood.  You said that the July 2018 note was about a rash?

A.   July 2018 -- let me go back again -- was a -- she saw the nurse practitioner for a rash along the brow line, and that was all.

Q.   And then December 2018 you said was another appointment?

A.   Okay.  And then last appointment was December 2018.  December 12, 2018.  Okay.

Q.   So what did she have to tell you at that time?

A.   I just wrote on that one that she was still very anxious and crying about the incident at KFC.  That she had a cough and

runny nose and occasional chest tightness.

Q. Now the last office note I have in my chart that I got from the medical records facility is from July of 2017. Do you have any in late 2017?

A. Okay. So 2017 -- after July 2017?

Q. After July 3, 2017.

A. We have just October 3.

Q. And so what happened on October 3, 2017?

A. October 3, 2017. Okay. I wrote that -- that's the one where I wrote that she was dealing with severe anxiety, crying, going to Ochsner psychiatry. And I wrote the medicine she was on: Prozac, Xanax, and Propanolol. And her pressure was high, and she was feeling chest tightness.

Q. So those three medications, what exactly are those?

A. Prozac is antidepressant. Xanax is anxiolytic or benzodiazepine for anxiety, and Propanolol is a blood pressure medicine that we use sometimes for palpitations and things like that.

Q. Did your office prescribe or did you

prescribe any of those to her?

A.    I may have given her the Xanax.  The Prozac, I think she got that from -- yeah.  It's showing as a reported med, so she must have gotten that from the psychiatrist.

Xanax is also showing as a reported med, but I may have handwritten it and given it to her at some point.  But I'd have to search for that if that is the case.

Q.    Understood.  I appreciate that, Doctor.  We may get a chart update of the chart that we already have.

Do you know if you have any appointments scheduled with her?

A.    I can tell you.  April 18, 2019, at 9:15 is her next appointment.

Q.    Understood.

A.    And she also sees a cardiologist too.

Q.    She sees a cardiologist in the system also?

A.    Yes.

Q.    Do you know the doctor's name?

A.    Dr. Yount, Y-O-U-N-T.  Royce Yount.

Q.    Is that -- she's been seeing that doctor or treating cardiological issues for a

while?

A.   I really don't know.  I'd have to look it up.  I really don't know.

Q.   That's all right.

So what are the conditions that you regard yourself as handling for her directly?

A.   Well, definitely high blood pressure, cholesterol, and diabetes.  Those are the three things I handle the most for most patients.

And until this incident, I don't really consider that I'm handling the anxiety.  She comes in, and once we start to talk about it, I see her reaction to it.  But I'm leaving everything to the psychiatrist.

Q.   Understood.  Has there been any type of exacerbation of the hypertension or the hyperlipidemia or the diabetes since October 2016?

A.   I just could see that her blood pressure had increased, but that was all.

Q.   So the diabetes hasn't gotten worse?

A.   I don't remember that.  I'd have to look at her blood tests.

Q.   How would you determine something

like that?  Would have you to look at a --

A.    There's a test that we do.

Q.    Blood sugar?

A.    There's the hemoglobin A1C is the test we usually use to check to see how someone is doing.  So just, for example -- and she's been stable.  She's been stable with that.

I'm going back to 2016 and then January 2017, and then it looks like that was the last one we had -- well, July 2017 was the last one -- wait.  Wait.  Let me look on the other computer system.  It's back and forth all day.  I do this all day back and forth.

Yes.  It looks like we haven't checked that test since July of 2017, and it was stable.

Q.    Would she be due for another one?

A.    Yes.  She is probably overdue.  Yes.

Q.    Is that something that anxiety can afflict?

A.    Diabetes?  Well, stress can affect diabetes.

Q.    But her tests have been stable?

A.    They've been stables.

Q.    So that means it's kind of a controlled diabetes situation at this point?

A.    Yes.

But, again, the last one I'm seeing on her is July 2017, and it's been stable.

Q.    What would be considered a significant -- sufficiently significant change in that test to suggest an exacerbation of the condition?

A.    If it increased to something of over 8.  It's just a number we use to determine how well she is doing.

And as long as she is 6.5 or close to that, she's doing good.  If it jumps up to something over 8, I'd have to figure out what changed.

Q.    And so what are the things that can cause that kind of change?

A.    Of course not watching -- not monitoring diet and not exercising, or change in the diet and eating more carbs and sweets and things like that.  And then stress and surgery can increase it.  Infection can increase it.  Stress.  Any kind of stress.

Q.    Understood.  And then we talked about

blood pressure.

And as far as, like, the cholesterol treatment, is that a matter of medication regimen?

A.    That's usually just medication.

And, of course, we want diet and exercise for that too.  But for the most part, as long as they take the medication, it's usually regulated.

Q.    Have her numbers been stable on that, as far as you can tell, since October of 2016?

A.    It's not bad.  I mean, her total cholesterol, it's been pretty stable.  I don't see anything change much since, you know.

No.  It's fine.

Q.    Is that nevertheless something that mental stress or anxiety can exacerbate?

A.    Cholesterol?  I don't think so.

Q.    Understood.  Aside from hypertension, high cholesterol, and the diabetes, is there anything else that you regard yourself as the main physician of her for her diagnosis?

A.    I mean, no.  We just treat those three things mainly.  And then whatever small things come up -- like a rash or respiratory

infection or those kinds of things -- but that's it.

Q. Understood.

MR. JURKOVIC:

Okay, Doctor. I appreciate your time. I may have some follow-up questions after Mr. Kokemor asks you questions. I appreciate it.

MR. KOKEMOR:

Doctor, again, I represent the local operator of the KFC restaurant on Bullard Road here in New Orleans East.

EXAMINATION

By MR. KOKEMOR:

Q. I want you to assume for purposes of your testimony today that Ms. Thomas has alleged in her complaint that she purchased a chicken sandwich from the local KFC restaurant at about 10:30 or so on the evening of October 1, 2016.

A. Okay.

Q. I also want you to assume that she indicated in her testimony under oath that she

came to your office the following Monday, or two days after the event, which would have been around October 3.

A. Okay.

Q. And that she entered your office and wanted to be seen for the incident of illness -- physical illness that was taking place over the weekend after eating -- allegedly eating the sandwich that she purchased on October 1.

A. Okay.

Q. So my question is do you have any report dated October 3 or any date in October until October 12 in which she reports consuming what she thought to be a rat?

A. No -- this is 2016? Right?

Q. Yes, ma'am.

A. No.

Q. So the first report of any illness that she attributed to her alleged consumption of a rat was noted in your chart on October 12 of 2016.

A. Yes.

Q. Now we have asked for and have obtained what we thought was your entire chart

in this litigation, and I don't have a report from you of October 12, 2016.  So can you print it out so I can follow along and ask you some reasonable questions about that?

A.   Hold on.  Okay.  So I have the document open.  Now as far as printing it out, I can't promise that because this is an older system and we are on a whole new system now.  But I'm going to try.

It says it's seven pages, so we have to go up front to the printer to get -- to see if the document printed.

Q.   All righty.

(Mr. Jurkovic presents his copy of the document.)

MR. KOKEMOR:

Did you just get this today?

MR. JURKOVIC:

No.

MR. KOKEMOR:

I went through all the records before I came here, and I do not have this.

By MR. KOKEMOR:

Q.   Doctor, since I can't see your

screen, I'm going to show you what counsel for Ms. Thomas has handed me and ask you if this is a printed version of your chart note of October 12, 2016.

A.   Yes.

Q.   And it consists of how many pages?

A.   When I printed it, it said seven pages.

Q.   Would this be Page 7 of that note of October 12?

A.   Yes.

Q.   And the previous note would have been on 9/14 of 2016?

A.   Yes.

Q.   So give me a moment to refer to these notes of 10/12/16 (reviews document).

Doctor, on the note of 10/12/16, you reported as a chief complaint "Hospital followup.  Patient accidentally ate a piece of fried rat from KFC 10/1/2016.  NOEH diagnosed patient with gastroenteritis."

A.   That was entered by the medical assistant.  Yes.

Q.   In other words, that's what Ms. Thomas told your medical assistant on

10/12?

A.   Yes.  That's the way it usually would go.

Q.   Have you ever seen the records from NOEH?

A.   No.

Q.   New Orleans East Hospital?

A.   I have not.

Q.   If I told you that I have seen those records and that Ms. Thomas did not say anything to the physicians or staff at NOEH on or about October 3, 2016, about having consumed a rat, would you have any basis to dispute their records?

MR. JURKOVIC:

Object to the form.

THE WITNESS:

Am I supposed to answer?

MR. JURKOVIC:

You can answer.

MR. KOKEMOR:

Yes.

THE WITNESS:

I'm sorry.  Can you restate that for me?

MR. KOKEMOR:

Can you read it back so I don't botch it up?

(The question was read as follows:

"Q.    If I told you that I have seen those records and that Ms. Thomas did not say anything to the physicians or staff at NOEH on or about October 3, 2016, about having consumed a rat, would you have any basis to dispute their records?")

THE WITNESS:

I cannot dispute their records.

By MR. KOKEMOR:

Q.    As a physician, you work at New Orleans East Hospital?

A.    No.  I am considered on staff, but I don't work there.

Q.    Would you expect that a patient who ate a fried rat and whose first visit to any health care provider was an emergency room would not tell the emergency room about having consumed a rat?

MR. JURKOVIC:

Object to the form.

THE WITNESS:

I would expect that they would bring that up.  I can't say for sure what she would do, but I would think most people would.

By MR. KOKEMOR:

Q.    You agree with me, though, that she went to NOEH before she came to you with the complaint about a rat?

A.    That is what she told us.

Q.    Okay.  Then you said in your report, you have a column for History of Present Illness.  Would you read what's contained in that section?

A.    "Patient is very upset.  States she bit into a fried rat while eating a fried chicken sandwich from KFC.  States while eating the sandwich, she ate one chicken tender.  Then on the second tender, she bit into something hard.  And when she pulled back, she had something long and black hanging out of her mouth.  States it was the tail of a rat.  At the appointment she is crying and nervous.  States she is afraid to eat

anything.  Reports she has been very panicky and anxious because she is having flashbacks of biting into the rat.  She states when she returned to KFC to tell them what happened, the manager laughed at her and threw it away.  Her blood pressure has been elevated at home."

Q.   Now that history that you recorded, did she give that directly to you?

A.   Yes.

Q.   So Ms. Thomas told you that she ate one of the chicken tenders.  And then on the second tender, she bit into something hard, pulled it back, and she -- pulled it out of her mouth and said she believed it was the tail of a rat.

A.   That's what she told me.

Q.   That's what she told you?

A.   Yes.

Q.   On October 12, did she tell you that she had been suffering with any physical ailments such as nausea?  Diarrhea? Et cetera?

A.   I did not -- I don't remember, but I didn't write anything about that because she was crying so much.

Q.   So you didn't record any history of continuing physical complaints such as nausea? Diarrhea?  Upset stomach?

A.   I did not.  No, I did not.

Q.   Did you tell her at any time to go to the emergency room?

A.   I did not.  No.

Q.   Do you believe -- do you have any knowledge as to whether or not any of your employees told her to go to the emergency room?

A.   I have no personal knowledge of it.

Q.   If she was still suffering with gastrointestinal problems on October 12 -- complaints such as nausea, diarrhea, upset stomach -- would you have expected the patient to report that to you on October 12?

A.   If she was still having those issues, I would expect her to tell me that.

Q.   But you didn't record any such ongoing complaints on October 12?

A.   I did not.

Q.   When was the next visit that you had with her after October 12?

A.   January 16, 2017.

Q.   Did she have any physical complaints of nausea, diarrhea, or anything that you associate with gastroenteritis on January 16, 2017?

A.   No.

Q.   And when was the next visit?

A.   July 2017.

Q.   Same question.  Did she report any complaints associated with gastroenteritis to you on July 20, 2017?

A.   No.  Just right flank pain.

Q.   Did you examine her for right flank pain?

A.   Yes.

Q.   What did your exam consist of and what were your findings, if any?

A.   Just physical examination as far as palpation of her abdomen and flank area.  And I didn't find anything on physical exam.  We ordered tests.

Q.   Your notes have a visit of 7/3/2017?

A.   Yes.  That's the one we're on.  Right?

Q.   Was that the one you were just referring to?

A.   Yes.

Q.   All right.  I made a note July 20. It was July 3?

A.   Yes.

Q.   And, again, no continuing complaints or ongoing complaints associated with gastroenteritis on that occasion?

A.   No.

Q.   And I think you testified that you had four visits in 2017 -- I'm sorry -- 2018. In February, June, July and lastly in December -- on December 12 of 2018.  Is that right?

A.   Yes.

Q.   On any of those visits, did she ever complain of any symptoms relative to gastroenteritis?

A.   No -- wait.  No.

Q.   You previously testified that on every occasion you've seen her since October 12 of 2016 she has come in and presented in a state of anxiety or neurosis. Is that right?

A.   She presents -- not necessarily when we first get in the room as neurotic or having

neurosis.  We would talk about that incident, then I would see her start to present that way.

Q.    Does that tell you anything about a patient's truth or veracity of complaints when they only seem nervous or anxious when talking about an event involved in litigation?

A.    No.  Because she did not -- it was only talking about the event is, you know --

Restate that question for me?

Q.    Well, what I'm wondering is if a patient only gets upset and anxious when talking about an event involved in litigation and not otherwise, does that tell you anything about their potential for truth and veracity?

A.    No.

Q.    Doesn't tell you anything?

A.    No.

Q.    Do you have any sort of tests to determine whether a patient is telling you the truth?

A.    No.

Q.    And you're not a mind reader?

A.    I'm not.

Q.    Are you taught in medical school to

be suspicious when a patient tells you that they're having complaints associated with an event in litigation?  Are you suspicious of secondary gain?

A.   I don't remember being taught that about litigation.

Q.   And, again, going back to the start of your deposition, you are not an expert in the field of psychiatry?

A.   I am not.

Q.   Or in neurology?

A.   No, I'm not.

Q.   You've never testified as an expert in the field of psychiatry?

A.   I have not.

Q.   And you referred the patient to a psychiatrist because of her exhibiting signs of anxiety in your appointments with her?

A.   Yes.

Q.   But you also defer to any treating psychiatrist as to whether or not any conditions for which she is being treated or caused by the event that she alleges occurred on October 1 of 2016 at the KFC?

A.   I defer to the psychiatrist for

treatment.  I can only say that she does present to me as a patient with anxiety that she reports is due to that incident.

Q.   So by her subjective history to you, you believe she has anxiety related to the event that we're talking about?

A.   I believe that if she had any type of anxiety before, that it definitely has been exacerbated, and that there's something with that incident that she appears to me to be -- whenever we discuss it, it's like she relives it again and she gets anxious.  That's just all I see.

Q.   But an opinion on whether PTSD, anxiety is caused by any certain event, you defer to the psychiatrist on that?

A.   Yes.

Q.   That's beyond the realm of your expertise?

A.   Yes, it is.

Q.   I'm going to show you a couple of photographs that have been introduced into evidence in this case.  And I'll tell you that these are photographs that were allegedly taken by Brenda Thomas's daughter, one on the

evening of the alleged consumption, and one taken the following morning. Okay? I'm going to show you these two photographs.

First of all, have you ever seen them?

A. I can't recall for sure. She may have pulled up something like this on her phone to try to show me, but I can't -- I mean, I can't say for sure if that's what it was. I really don't know.

Q. You didn't attempt to record whatever she was showing you on her cell phone camera --

A. In her chart?

Q. -- to your records?

A. No.

Q. First of all, I'm going to label these just for the record as Exhibit No. 2 and Exhibit No. 3.

(Exhibits 2 and 3 were marked.)

And based upon her statement to you on October 12, considering her history that she gave to you on October 12, 2016, that she ate one of the chicken tenders and then bit

into something hard, I'd like you to take a look at these two photographs and ask you if you see any human bite marks found on any part of that sandwich depicted therein.

A.    From what I can tell, I don't see any bite marks from what I can tell.

Q.    Thank you.

Now you told me you did not see the records from the emergency room at New Orleans East Hospital.

A.    No, I did not.

Q.    If I asked you to assume that they diagnosed gastroenteritis on October 3, 2016, I would ask you what sort of foodborne allergens would cause gastroenteritis?

A.    Well, of course, bacteria like salmonella, campylobacter, and different things like that would cause gastroenteritis.

Q.    Do you know what the incubation period is for salmonella after the consumption of it?

A.    I don't remember what it is for salmonella.  I know campylobacter is about six hours.

Q.    How do you spell that?

"Campylobacter"?

A.    Camp -- Y-L-O-B-A-C-T-E-R.

Q.    And you believe that would be about six hours?

A.    I believe it is around six hours.

Q.    But you don't know what the incubation period is for salmonella?

A.    I can't recall what that is.

Q.    If she testified that she began throwing up and having diarrhea and stomach pains and cramps within a three-hour period prior to or subsequent to the alleged consumption of the items shown in Exhibits 2 and 3, would you believe that there would be a sufficient incubation period for her to begin to become symptomatic within three hours?

A.    I don't know for all bacteria, but the most common ones do usually take a little more than three hours.

Q.    In other words, you wouldn't expect from a scientific standpoint to see nausea, diarrhea, and upset stomach appear within three hours of consuming some item that has been adulterated with some sort of form of foodborne bacteria?

A.    Doesn't usually happen that fast.

Q.    And you really haven't provided any treatment of her for gastroenteritis following the event on October 1, 2016.  Is that right?

A.    That's correct.

Q.    So you don't have any opinion, then, on whether or not her gastroenteritis was caused by the consumption of the items shown in Exhibits 2 and 3?

A.    I don't.

MR. KOKEMOR:

I think that's all I have.

Thank you, Doctor.

MR. JURKOVIC:

I just have a couple of quick followups to what counsel has asked you.

FURTHER EXAMINATION

By MR. JURKOVIC:

Q.    You were asked about no note dated 3 October 2016 I think by Mr. Kokemor.  And I just wanted to ask if someone shows up in the clinic and they are not seen, is it anybody's job to tell you that someone showed up and they weren't on the calendar that day?

A.   No.

Q.   Understood.  And the same thing regarding whether employees up front told someone to go to the ER.  Is it ever their job to tell physicians in the back that we sent one of the patients to the ER today?

A.   No.

Q.   Understood.  And you were asked about whether you would expect her to -- Ms. Thomas to report gastrological symptoms I think on 12 October 2016 when you saw her.  And I think you answered that you didn't record any of those gastrological complaints.

With the greatest respect, is that something that you would not have recorded even though she mentioned it?  Is it possible it could have been missed?

A.   It's a possibility it could have been missed.  I really don't recall if she said that or not.

Q.   I understood your testimony earlier that she was crying a lot that day?

A.   She was definitely crying.

Q.   In an appointment where there may be multiple complaints, are there triage

principals at stake where you kind of, like, pick the thing most important, and that's what you're managing?

A.    Yes.  That's what we do.

Q.    You were asked about gastrological symptoms in January 2017 and July 2017 and then throughout 2018.  I understood there weren't any recorded -- or in your notes there weren't any recorded gastrological symptoms at those times.  That's what I understood.

But would you expect the infectious complaints to resolve that far out?  Or gastrological complaints?

A.    I would have expected that would have resolved.

Q.    So nothing surprising four months or eight months down the road if the gastrological complaints are not there?

A.    Not surprising.

Q.    You were asked some questions about anxiety and discussing an event that's being litigated.  Just to be perfectly clear, in October 2016 and thereafter when she would present to -- normally and then have like an anxiety moment or -- I don't know.  Would you

characterize them as, like, attacks?  Anxiety attacks or panic attacks?  Something like that?

A.    I would call it sort of -- like an anxiety attack.  Because it would just be in discussing it, I would see the way she would get more worked up every time.

Q.    So it's not just a subjective reportage or history to you.  Does it have an objective component where you're, like, taking into account her affect and demeanor and everything?

A.    Yes.

Q.    Is it difficult to mistake that?

A.    It's difficult to mistake that.

Q.    And then I guess on the other side of it, have you seen people try to fake things before in your practice?

A.    I see people trying to fake back pain all the time.  I see people trying to fake -- mostly people that are searching for pain medication.  We see that every day.

Q.    Teenagers trying to get out of school.  Ferris Bueller type stuff?  You ever see that?

A.    Not too much.  No, I don't treat too many teenagers.

Q.    More drug seeking?

A.    More drug seeking.

Q.    Were you able to distinguish her conduct from that conduct?

A.    Definitely.

Q.    You did not mark her out as a drug-seeking person?

A.    No, she was not a drug seeker.

Q.    Or, I guess, secondary gain?  Money seeking?

A.    No.  I don't think she was any person doing that kind of thing.

Q.    Okay.  I understand.  Thank you, Doctor.

So the last thing I wanted to ask is you were asked some questions about the onset of any types of foodborne illnesses and whatnot.  And irrespective of the incubation times and all that, is nausea something that can have a mental health original as opposed to bacteriological origin?

MR. KOKEMOR:

I'll object to the form of the

question.  I think it's --

MR. JURKOVIC:

Outside the scope?

MR. KOKEMOR:

-- beyond the scope of her expertise as a general physician.

But if you wish to offer an answer, please go ahead.

THE WITNESS:

No, I don't really know.  I don't recall nausea being associated with.

MR. JURKOVIC:

Thank you, Doctor.  I appreciate your time.

(The deposition concluded at 6:35 p.m.)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, MARLANE GAILLE, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MICHELE COOPER, M.D., after having been duly sworn by me upon authority of R.S.37:2554, did testify as hereinbefore set forth in the foregoing 58 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter.  I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

_____
MARLANE A. GAILLE, CCR-RPR
CERTIFIED COURT REPORTER #21005