UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

BRENDA THOMAS,                    *
                                  *
                Plaintiff     *
                                  *
                              *    CIVIL ACTION
                              *      NO. 18-1264 (A)(4)
V.                            *
                              *
                              *
KFC CORPORATION, ET AL.   *
                Defendants     *
                              *
**************************

* * * * * *

Deposition of HILARY M. BLACK, the designated Corporate Representative of West Quality Food Service, Inc., 220 North 16th Street, P.O. Box 2906, Laurel Mississippi 39442, taken on Monday, March 11, 2019, at the Law Offices of Robert E. Birtel, 3850 North Causeway Boulevard, Lakeway Two, Suite 220, Metairie, Louisiana 70002, commencing at 1:12 p.m.

* * * * * *

REPORTED BY:
Terri Weber Wenning, RPR, CCR
Certified Court Reporter

2

A P P E A R A N C E S


REPRESENTING THE PLAINTIFF, BRENDA THOMAS

    SOILEAU & ASSOCIATES, LLC
    (BY:  RYAN A. JURKOVIC, ESQUIRE)
    rjurkovic@soileaulegal.com
    1010 Common Street
    Suite 2910
    New Orleans, Louisiana  70112



REPRESENTING THE DEFENDANT,
WEST QUALITY FOOD SERVICE, INC.

    LAW OFFICES OF ROBERT E. BIRTEL
    (BY:  JAMES J. KOKEMOR, ESQUIRE)
    james.kokemor@libertymutual.com
    3850 North Causeway Boulevard
    Lakeway II - Suite 220
    Metairie, Louisiana  70002

3

                    I N D E X


Caption                                          1

Appearance                                       2

Stipulation                                      4

Reporter's Page                                148

Reporter's Certificate                         149




        Examination by:

            Mr. Ryan A. Jurkovic                 5




            E X H I B I T   I N D E X


    (None offered.)

S T I P U L A T I O N

It is stipulated and agreed by and among counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes, under the applicable Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * * *

TERRI WEBER WENNING, RPR, CCR, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

5

HILARY M. BLACK, after having been first duly sworn by an authorized court reporter, was examined and testified on the oath as follows:

EXAMINATION BY MR. JURKOVIC:

Q. Afternoon, ma'am. My name's Ryan Jurkovic. I represent Brenda Thomas in connection with her claim that she's filed against West Quality Food Service. And so I'm here to ask you some questions about -- about the company.

Okay. Have you ever had your deposition taken before?

A. I have not.

Q. Okay. And so a few basic things for any deposition, I guess. I'm going to ask questions. I'm going to ask you to let me finish the question before you start answering. The natural inclination is to just jump at a question, right?

A. (Nods head.)

Q. And so she needs to take down everything. And so if we talk over each other it's very difficult.

A. I understand.

Q. I'm sure the attorney for the company

has explained a lot of this stuff to you, but we always go through everything.

And so, on the other hand, I'll try to let you finish before I start talking over you, and so on.  All right?

A.   Yes, sir.

Q.   And if you need a break at any time, please, by all means, just say so.  And as long as there's no question pending on the table it shouldn't be a problem.  I would just ask that you answer whatever question was asked before we take a break.

As far as my speaking is concerned, if you don't understand something I'm saying ask me to rephrase or restate.  If I -- I talk low sometimes.  So I apologize to you if I'm -- if I -- if I am not heard.

MR. KOKEMORE:

I was going to ask you if you could speak a little bit louder cause I'm having a little trouble hearing you.

MR. JURKOVIC:

Not at problem.  Not a problem.

EXAMINATION BY MR. JURKOVIC:

Q.   But, by all means, just ask.

A.   Yes, sir.

Q.   And I'll try to restate.

We also ask that answers be fully enunciated, rather than nodding a head or shaking a head, so that the court reporter can take it down.  Rather, you know, I think a lot of people just nod "yes" sometimes instead of saying "yes".  So we need to get a clear answer.

Is all this fair enough?  Make sense?

A.   Yes, sir.

Q.   Okay, understood.  Now, additionally this was noticed as a corporate deposition.  So, I guess, when I'm asking a question I'll say words like "you" and "your," but that's to refer to the company rather than to you personally.

With the exception, I am going to ask you your name and what your position is with the company, but other than that everything is about the company.  Does that make sense?

A.   Yes, sir.

Q.   I'll try to, like, to be very specific, though, so to avoid these kind of confusions, but.

All right.  And, then, also, I guess, you know, so the first part of the deposition will be questions just about you personally and then

the rest shouldn't be.

So could you please state your name and professional address for the record?

A.   Hilary Black and I'm the chief people officer.

Q.   The chief who?

A.   Chief people officer.

Q.   Okay.

A.   For West Quality Food Services.

Q.   Is that -- a people officer is what exactly?

A.   It would be human resources.

Q.   Okay.  And your -- your place of work is in Mississippi?

A.   Laurel, Mississippi.

Q.   Laurel, Mississippi.  Okay, understood.  Now, have -- how long have you had that position as chief people officer?

A.   Since 2014.

Q.   Okay.  All right.  And the -- I guess the -- is that coextensive of like a human resources, you know, type job or are there other things aside from traditional human resources?

A.   I don't understand what you're asking.

Q.   Sorry.  So is that -- is that just a

human resources job, titled differently, or does it include other things other than, you know, employee management?

A.   Employee management, --

Q.   Okay.

A.   -- primarily.

Q.   Okay.  And if -- anything else that would be, like, within your authority?

A.   No, sir.  On occasion, possibly, but not as a rule.

Q.   Okay.  Understood.  And so the -- how big is your department with the -- the people?

A.   I'm a department of one.

Q.   Department of one.  Okay.  All right. And so are there -- are you personally under the influence of any medication today that would affect your ability to understand or answer questions?

A.   No, sir.

Q.   Understood.  Okay.  Yeah, all right. Okay.  So I -- I don't think there should be anything else about you.  I think it should be -- the rest should be about the company from here on out.  But -- all right.  So I've -- oh, in -- I'm sorry.  A couple others things.  So have you

reviewed any documents related to the case in preparation for this deposition?

A.   Just the -- the questions related to the corporate deposition.

Q.   Oh, the notice?

A.   The notice.

Q.   Okay.  Understood.  And aside from the company's attorneys, have you consulted with any persons in order to prepare for the deposition?

A.   No, sir.

Q.   Understood.  Okay.  Thank you for that. All right.  And, so I think one way to handle this is the notice has a list of topics on it, and so I think one way to handle it is to, like, go through the topics and to ask questions about that.  I think that might be more of a way to go through it.

And so on the amended notice the first item is the identities and personnel files of all employees at work on the 1st and 2nd November -- 1st and 2nd October 2016.  So do you -- do you have the identities of those persons?

A.   Yes, sir.

Q.   All right.  So do we know who -- how many were on duty, you know, on October 1st, 2016

and, I guess, the evening shift?

MR. KOKEMOR:

To make it go smoothly, Ms. Black has prepared a response to question number one on the Notice of Deposition. And she can provide you with a copy of the list of employees at this time.

MR. JURKOVIC:

Fantastic thinking, ma'am.  Thank you, sir.  Okay great.

MR. KOKEMOR:

One thing I -- off the record.

(Whereupon an off-the-record discussion was held.)

MR. JURKOVIC:

Back on.

All right.  And so I -- I don't think we need to make an exhibit of this, huh?  I mean, if you want to we can, but I wasn't going to plan on having everything in.

EXAMINATION BY MR. JURKOVIC:

Q.   All right.  And, so are these -- this document that you handed me is the company answer to quest -- or topic number one of the corporate deposition is a list of the employees.  Is there

anyway to tell, looking at this list, who is still working there now?

A.   Yes, sir.  On that list, the third column --

Q.   Yeah.

A.   -- would be the status.

Q.   Okay.

A.   Which would include a "T" for terminated employees and "A" for those who are still active.

Q.   Active, okay.  Understood.  Thank you.

And so just to -- so I can understand the document.  The first column, company number; is that what that is?

A.   That would be the company, correct, West Quality.

Q.   Okay.  And so the -- so they're all for the same company in other words?

A.   Yes, sir.

Q.   And then cost center, number 61, it looks like for all of them also, is that --

A.   That would be the restaurant number.

Q.   That's the specific restaurant over in New Orleans East?

A.   Yes, sir.

Q.   Does that meant there's at least 61 restaurants that West Quality manages?

A.   Yes, sir.  No, sir.

Q.   No.  That --

A.   Sorry.

Q.   -- that they don't run continuously one through 61, in other words, is that --

A.   No, sir.  At time -- no, sir.

Q.   All right.  Do you guys start over, like, Mississippi restaurants are like 10 through 19 and Louisiana is 60 through 69 or something like that or how does that work?

A.   They're assigned based on the date in which they were opened but there are some that have been closed.

Q.   Closed.  Understood.  So that means at least 61 have been opened, in other words, but some of them may have been closed down by now, is that --

A.   Yes, sir.

Q.   Understood, okay.  Third column is the name of the employees; is that correct?

A.   Yes, sir.

Q.   And then their personal address is the fourth column; is that correct?

A.    Yes, sir, the address on file.

Q.    Some of them have two addresses apparently?

A.    That -- yes, sir.  That was what was in their personnel file.

Q.    Okay.  And, then, city, state, zip code, telephone number.  And, okay, some of them didn't have telephone numbers on file, apparently; is that --

A.    Yes, --

Q.    -- correct?

A.    -- sir.

Q.    Okay.  And, then, title.  So there's different titles.  Team member for the -- is one it looks like.  Is that shift manager?  What's -- okay, the third person down, it looks like A-U-M, hourly; what does that mean?

A.    Assistant unit manager.

Q.    Okay.  Manager team, team member, team member.  Okay.  Sorry.  I'm just looking through this.

Toward the bottom, R-G-M, salary, is that --

A.    Restaurant general manager.

Q.    Okay, understood.  And so, then,

thereafter the page, these are the actual time cards that -- on the first --

A.    Yes, sir.

Q.    -- and on the second?

A.    Yes, sir.

Q.    Understood.  Okay.  And so the first one looks like Ms. Analiss (spelled phonetically), on, I guess, the third page.  She clocked in at 16:25 and clocked out at 19:30?

A.    That's correct.

Q.    And, then, it looks like that's a lunch break cause she clocks back in at 20 aught three and works until 1:46 the next day it looks like?

A.    That's correct.

Q.    Okay.  All right.  And so what are the -- this particular restaurant in -- on this time period, what are the -- its normal hours of operation?

A.    Uh, --

Q.    I can clarify if it -- the hours it would be open to the public, I guess.  Rather than -- I mean, obviously, they're working until almost two in the morning.  I assume they clean and whatnot.  But are they -- I guess they close at ten or eleven or something like that?

A.   I'm not a hundred percent sure of the exact hours of operation.  So I wouldn't want to give you some information that's not correct.

Q.   Understood.  And so the -- does West Quality keep track, centrally, of the hours of operation of all the stores or is that kind of up to, like, the local store itself to figure that out?

A.   Not the local store.  West Quality keeps track of it.  But the market coach has some flexibility, operations has flexibility, and the hours that they operate.

Q.   Understood.  All right.  Now, from this document can we tell who was doing what tasks at the restaurant on the first of October in 2016?

A.   No, sir.

Q.   And so, I guess, on a -- on a regular shift at this particular restaurant how many people are on duty at one time usually?

A.   It would depend on the -- the sales forecast or projection.

Q.   Okay.  So if it's going to be a busy time of day or a busy day, for instance, you have one type staff and on a slow day a different type of staff; is that kind of how that --

A.    I'm not sure what you mean by "type".

Q.    Like smaller or larger staffs, I guess, depending.

A.    Correct.  It would depend on the -- the sales volume.

Q.    Okay.  And so is there anyway to know, I mean, looking back at the first of October, like, what the -- well, I guess we could just count up the people going through here, working, what, the night shift.  The night shift starts around four o'clock.  Is that kind of how we should read this?

A.    Typically.

Q.    Typically, okay.  Is that running two shifts, eight in the morning till four-ish, four o'clock till midnight-ish, something like that?

A.    Typically, there is overlap in -- in hours at -- at certain points.

Q.    Understood, Okay.  All right.  You have someone, it looks like -- I'm just looking at this and -- do you know, without us going through this line by line, do you know how many were on duty on the night shift on October 1st?

A.    I don't.

Q.    Okay.  So we have a name on this form

and there's no hours for October 1st, so that means they're an employee of the restaurant but they were off that day?

A.   That is correct.

Q.   Okay.  So I'm just looking through this and it looks -- on October 1st it looks like there is eight people who are clocking in, you know, to be there 4 p.m. and after.  Does -- I mean, I may be wrong about that, but is eight people, like, does that sound about right, the right number of people to be in a restaurant on -- on a week -- I think it's a weekend night?

A.   Yes, sir.

Q.   So normally what would that staff, you know, what would be the different types of positions that are being filled by, you know, eight people on an evening shift?

A.   Manager, cook -- cook or cooks, cashiers and line people.

Q.   Okay.  And so --

A.   Possibly a cleaning captain.

Q.   Okay.  And so cashiers, are they just interacting with customers directly and don't actually get involved too much with, like, the cooking end of it; is that what that means?

A.   They would not cook, that is correct.

Q.   Okay.  And so -- and then the third one you said "line"?

A.   A line person.

Q.   So what -- what do those people do?

A.   They would actually pack the food after it's been prepared.

Q.   Oh, it has to be put in containers, for instance, or -- or boxes, bags, that kind of thing?

A.   Correct.

Q.   Understood.  Okay.

A.   Or assemble a product.

Q.   And so the -- and then the last thing you said was the cleaning?

A.   Cleaning captain.

Q.   Okay.  That's the -- what is their -- is that like a kitchen cleaning or like restaurant space cleaning where the people are like eating or what?

A.   Typically that would be the exterior of the building or deep cleaning or taking out trash.

Q.   Okay.  So do -- so is there -- this document doesn't say what the individual people were doing, is what I understood you to say.  But

is there a separate document for October 1st that say, like, who had which job?

A.   Not to my knowledge.  There could be, but not to my knowledge.

Q.   Is that something that the -- the store's manager for the night would create rather than West Quality centrally?

A.   Typically.

Q.   I assume that each -- like each franchise location kind of handles its own, like, scheduling with its employees and whatnot?

A.   That is correct.

Q.   Okay.  And so do we know, looking at this, who the actual, I guess, person in charge that night would have been?

MR. KOKEMOR:

That would be October 1st?

MR. JURKOVIC:

Yes.  I'm sorry.

THE WITNESS:

It appears that Michelle Forest Brown would be the manager in charge.

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  All right.  So she clocks in at 18:50 and is there until 2:46 on the first.  Well,

I guess that would be the morning of the second when she left.  Is that -- is she still with the company?  Let's see.

Okay.  So she was at -- according to the second page, she's got a "T" so has terminated employment over there; is that --

A.   From that location, that would be correct.

Q.   Okay.  Does she still work for the company at a different location; is that --

A.   She does.

Q.   Okay.  Do you know where she's at now?

A.   Yes, sir.  She's at our Westwego location.

Q.   Okay.  Now, the plaintiff has alleged that she purchased something through the drive-thru lane on the evening of the 1st.  And so if she's purchasing something from the drive-thru at the restaurant is that interacting with one of the cashiers?  Usually, is that how you purchase through the drive-thru at the restaurant?

A.   I'm not understanding.

Q.   And so does -- okay.  Let me back it up.  This restaurant have a drive-thru?

A.   It does.

Q.   Okay.  And so when someone orders through the drive-thru are they talking to someone, like, through an intercom; is that how that works?

A.   That is correct.

Q.   And so is -- so the person who -- that -- the person who you speak to through the intercom, does that person count as one of the cashier clerks or is that someone else?

A.   Typically, yes.

Q.   Typically.  Okay.  Is there any -- is there anyway that we can identify, sitting here, who would've been, I guess, taking orders over the drive-thru that night?

A.   No, sir, not with this document.

Q.   Is that more a question for however Ms. Forest Brown staffed the restaurant that night?

A.   Yes, sir.

Q.   Okay.  All right.  Now, as far as the 2nd, October 2nd is concerned, I don't want to go through everything for October 2nd like we did for October 1st, but I assume the notations are consistent on this document for the 1st and the 2nd, it's the same type of --

A.   Yes, sir.

Q. Okay. So Michelle Forest Brown is the -- looks like on the 2nd she's also the night manager again -- or, no. She -- is she? She's in at 10:47 and out at 22:29; does that mean she worked all day?

A. No, sir. It appears that she worked the mid shift there.

Q. Okay. Is that normal opening time, around ten o'clock? Oh, no, there's people coming in at eight.

A. (No response.)

Q. Okay. So one of the things in this that the plaintiff has alleged is that she returned the next day at -- she alleged that she purchased something on October 1st, 2016, and -- and that she returned on October 2nd and went into the restaurant to speak to somebody.

And so is -- is there any -- I don't think she got her name. And so does -- does the company have any idea who she would've talked to at the desk, like if someone comes in and wants to talk about a complaint? You know, I bought something here, I want to complain about it.

Is that -- I mean, is there someone that's designated to handle that kind of complaint

at the front desk of the restaurant or the cashier?

A.  Can you ask that again?  I'm not --

Q.  Sure.  I'm sorry.  That was a bad question.

So she's alleged that she returned to the restaurant on October 2nd, 2016 to, like, make a complaint, essentially, to someone in the restaurant.  And so does -- is -- does the restaurant have, like, a designated person who has to interact with, you know, a disgruntled customer?

A.  Relating to their order or --

Q.  Right.  Right.

A.  -- relating to -- relating to their order, it would typically be the manager in charge.

Q.  Okay.  All right.  And so the -- so as far as the manager is in charge on the morning of the second, so it looks like Ms. Brown was on again at ten in morning or 10:47 in the morning she came in?

A.  Correct.

Q.  So looking at this on the second are there any other managers there that morning?

A.   There are.  Clayton, Clayton Brown appears to have opened the restaurant.

Q.   Okay.

A.   Ms. Burton.

Q.   Came in later that day at --

A.   Yes, sir.

Q.   -- after 7 p.m.?

A.   (Nods head.)

Q.   Okay.

A.   Ms. Forest Brown, Ms. Rainey, and I believe that would be everyone that I can identify as a manager --

Q.   Thank you for that.

A.   -- during that day.

Q.   Okay, understood.  And so is it normal to have an assistant manager and, I guess, a full manager on duty at all times or most times to have like a pair of managers there?

A.   You're saying is it -- I'm sorry.  Can you re --

Q.   Yeah.

A.   -- rephrase it?

Q.   I apologize to you.  So, I'm just looking.  And so -- so, it looks like Clayton Brown is a shift manager.

**A.**    Correct.

**Q.**    Whereas, Ms. Burton is, looks like assistant manager?  I think -- is that A-U-M, is that what you said that is?

**A.**    Ms. Burton is a shift supervisor.

**Q.**    Okay.

**A.**    Ms. Clayton Brown is a shift supervisor as well.

**Q.**    All right.  Okay.  Now, I see that Clayton Brown is also terminated from this location?

**A.**    That is correct.

**Q.**    Transferred to another location or?

**A.**    Not to my knowledge.

**Q.**    So no longer employed by the company at all, correct?

**A.**    Not to my knowledge.

**Q.**    And also Ms. Burton terminated from this location, apparently, according to the form. Transfer anywhere else?

**A.**    Not to my knowledge.

**Q.**    Okay.  And these addresses are -- these are the last known addresses, is that --

**A.**    That's correct.

**Q.**    I ask because we may have to -- if

they're no longer controlled -- if they're no longer controlled by the company, that's what I'm saying, then we have to like issue subpoenas, I guess, if we want to talk to them.

Okay.  Now, are the other -- the non-manager employees are they all trained to all of the tasks in the restaurant; like the cleaning tasks, the line tasks, the cooking tasks, the cashier tasks or is each person kind of channeled into, like, one thing?

A.   They're trained for their job-specific tasks.

Q.   Okay.  So that means?

A.   If they are specifically a cook then they would be trained for the specific duties assigned to them.

Q.   Okay.  All right.  So they -- so, then, does that mean that not every employee learns every set of tasks in the restaurant; like, if you're a cook you may not know, like, the cashier position?

A.   That is correct.

Q.   Okay.

A.   Typically.

Q.   Okay.  All right.  So, as we sit here,

is it possible to identify any of the specific tasks that any of those people were doing on the evening of October 1st, 2016 or is that a question, on the other hand, for the -- the local manager?

A.   Are you asking me what a typical cashier does?

Q.   No.  I'm sorry.  So, for instance, if we went down this list, and so it looks like Rajeana Annalis (spelled phonetically).  My -- apol -- my apologies if I'm mispronouncing the names.  But the first person here who's, like, on October 1st, 2016, on the document that you provided, Ms. Annalis clocks in at 4:25 p.m.  Do we know what she was clocking in to do that night?

A.   I would not know that.

Q.   Okay.  Is that more of like a local manager question than -- than a central question for the company?

A.   Typically, yes.

Q.   Okay.  Now, are there personnel files for these employees that say what they've been hired has or what they've been trained to do?

A.   Yes.

Q.   And so do we have --

A.    Well, --

Q.    Go on.

A.    I'm sorry.  It would say that they are a team member or a shift manager or a manager, but, typically, it would not tell you their specific position in the restaurant.

Q.    Okay.  All right.

A.    Or their specific job in the restaurant.

Q.    Okay.  All right.  So in terms of a person -- the contents of a personnel file, is -- what else would be in there aside from -- or what would, I guess, be in a personnel file for one of these employees?

A.    Their hire records, their employment records specific to vacations or raises or disciplinary action if there were some.

Q.    Understood, okay.  Okay.  So it'd be all the things they'd fill out at the beginning, for instance?

A.    Correct.

Q.    The application forms and the I-94 and, you know, all that type of paper -- W2 or W4, that kind of paperwork?

A.    Correct.

Q.   Okay.  And then is there, kind of, a computerized file, then, that has like a record of their hours and wages?

A.   Correct.

Q.   And, then, you said disciplinary things, so, what, is there a record of infractions, I guess, employee infractions?

A.   If there were any.

Q.   All right.  And, so, I think I understand the separate line items for employee training so.  But you had mentioned that the employ -- each employee there'd be training for the specific job they're doing?

A.   Correct.

Q.   And so what, you know, if someone's going to be a cook at the -- the New Orleans East restaurant, who does the training for the cook position there?

A.   Typically, the training is conducted -- a portion of the training is conducted online in the learning system.  There -- then a manager or a certified trainer would conduct the hands-on training portion of it.

Q.   Okay.  And so how -- the online portion first, that's -- is that something they would do

through their own computer after being hired, the employee?

**A.**    When --

MR. KOKEMOR:

Before you answer.

I think you're getting into item number two on the amended notice of corporate deposition.

MR. JURKOVIC:

Oh, yeah.

MR. KOKEMOR:

And I believe that if you are --

MR. JURKOVIC:

Yeah.

MR. KOKEMOR:

-- then she has a document to produce --

MR. JURKOVIC:

Oh, yeah, that's great.  Great, great, great.

MR. KOKEMOR:

-- for you to follow along. Hopefully, it'll go smoother.

MR. JURKOVIC:

Yeah, that's great.  Thank you.  I

appreciate that.

EXAMINATION BY MR. JURKOVIC:

Q.  So you've handed me the company's answer to question number two on the notice.  I appreciate that.  Thank you.

A.  You're welcome.

MR. JURKOVIC:

Okay.  I see that there is a -- a notice about the confidentiality of the documents here and so is this subject of the projective order?

MR. KOKEMOR:

I think it is, yes.

MR. JURKOVIC:

How do you want to handle the transcript on that?  Do you want to have like a separate, sealed component of the transcript?

That's something that can be done, right?

MR. KOKEMOR:

Yes.  I think, rather than attach this to the -- to the record, we'll leave that off.  You'll have a copy. I'll have a copy.  Should we -- should

we need it, we can determine whether or not it, you know, it's volitive of --

MR. JURKOVIC:

Okay.

MR. KOKEMOR:

-- of the projective order.

MR. JURKOVIC:

All right.

MR. KOKEMOR:

But let's keep it out of this record.

MR. JURKOVIC:

Okay.  And what we're going to attach -- I mean, if that's -- if the stacks I'm seeing in front of you guys are indicative, I -- you know, I don't think it's necessary that we attach every single page that we got.

MR. KOKEMOR:

Yeah.

MR. JURKOVIC:

I mean, I don't know.  I mean, we talked about this enough.  I don't know.  Do we need to attach it?  I might.  I'll think about it and figure

34

it out, but -- as far as the first thing.

But, number two.  Okay.  So this says that the company --

MR. KOKEMOR:

This is basically for illustrative purposes of what training --

MR. JURKOVIC:

Right.

MR. KOKEMOR:

-- they provide as -- as we interpret item number two.

MR. JURKOVIC:

No, I understand.  I appreciate that.

COURT REPORTER:

You-all have to let me know if you want me to redact anything out of the transcript or just --

MR. KOKEMOR:

Well, If you're not going to attach item number -- answer to item number one to the transcript, then it's moot, I guess.  And we're not going to attach number two.

MR. JURKOVIC:

Right.

MR. KOKEMOR:

Okay?

MR. JURKOVIC:

Yeah, I -- yeah, I don't know if I'll attach it.  I'll think about whether we attach any of these.  I mean, I don't know that we have to decide right away, but before you -- before we go, you know.

But, yeah, number two I want to keep out.  And I guess it'll be up to you what you -- what pages you think need to be, you know, sealed, if -- if at all.

MR. KOKEMOR:

Well, I think if you have specific questions regarding training, --

MR. JURKOVIC:

Yeah.  Yeah, absolutely.

MR. KOKEMOR:

-- we can do all of that on the record.

MR. JURKOVIC:

                    All right.  Thanks.

EXAMINATION BY MR. JURKOVIC:

    Q.   Okay.  Yeah.  So team member corporate on the learning zone.  I'm looking at page two of the document you just handed me.  So is that the web based component?

    A.   Primarily, the entire program is housed in a web based format.

    Q.   Okay.  All right.  So how -- how -- is, what, if someone's been hired and they have to undergo this training regimen before they're able to work or is it, what, probationary until they finish these things?  How does it -- how does it work?

    A.   I'm not sure what you're asking me.

    Q.   And so -- and, so, for instance, the required training, are you -- you know, if you apply for employment, at this location that's at issue in our case, and this would be something that all employees would have to do go through before they're actually hired or after they're hired before they're allowed to, like, take a shift?  How does it work?

    A.   After they're hired.

    Q.   After they're hired.  And, so, what, is

it -- how intensive, I guess, is this particular internet training?  How many hours does it take to complete?

A.   It varies based on the employee's ability to learn and retain.  The goal is to train within 28 days.

Q.   Understood.  Oh, I see, yeah.  Must complete all the training, as below, within 28 days of hire.  So you have the corporate, then, I see here which is several line items.  One, two, three, four, five, six, seven specific items.

So is there anyway to quantify how much written material has to be read?  Would you know how many pages, basically, the training is?

A.   I couldn't give you a precise answer.

Q.   Okay.  And so the -- the training materials where -- where do they originate?

A.   From the learning zone here.

Q.   And so does that -- does West Quality write the training materials or does that come from, like, KFC corporate in Louisville?

A.   It's corporate training.

Q.   Okay.  All right.  Does West Quality Food Service Incorporated add any additional training to what's in the learning zone items?

A.    In regards to what?

Q.    You know, for instance, so the -- so KFC Corporate has the learning zone and all the internet training, and so does -- I was just -- I guess the question is:  Does West Quality have anything additional that they require employees to do besides these items that are on this list?

A.    For management, no.  Not typically.

Q.    Okay.  And so role specific training that is food production, team members, customer service team members, supervisors.

Okay.  So is this what you were explaining before that there are some people who, like, learn to be cooks, for instance, that doesn't mean they learn how to be a cashier at the same time or separate roles?

A.    That would be correct.

Q.    Okay.  And so the entire learning zone course must be completed.  So are -- is there -- in this document does it have all of the course materials?

A.    It has an outline in there.

Q.    Okay.

A.    Yes, sir.

Q.    Okay.  So the outline, is that -- I'm

looking at a document that says, Customer Service Team Member Training Plan.  Is that kind of an outline of that particular position's training course?

A.    Yes, sir.

Q.    Okay.  So that -- the E-learning components.  So, for instance, I'm looking at this and it says, you know, Shift number two, expectations E-learning, ten minutes; I guess is the estimate that they say that's going to take.  Or is that -- is that the right way to read that?  Is that an estimate that the company has provided?  Or is that --

A.    Yes, sir.

Q.    Okay.  And so the expectations, talking about the E-learning, is there a computer at the actual restaurant that they use for this?

A.    Yes, sir.

Q.    Okay.  So it's not a matter of someone poking around on their own personal computer at their house?

A.    Absolutely not.

Q.    Is that -- you know, I guess, what, you want to be able to supervise the training, I guess, so that the employees understand?  Is that

kind of the --

A.    That and also that they're paid for every second that they work.

Q.    Understood.  That makes sense.  So as far as this is concerned, so the customer service people, so they'll come in for shift number one and there's an orientation video.  Complete the Orientation First Shift Steps and Team Member On-boarding Resource Guide.

Okay.  So the Team Member On-boarding Resource Guide, what exactly is that?

A.    That would be the on-boarding module that is associated with their role specific training.

Q.    So is that like a computer-based instructional?

A.    Yes, sir.

Q.    Okay.  So I see this document says, Assumes up to a four-hour shift.  And so is that -- does mean that when a new employee is hired they're expected to come in for, looks like, seven shifts of four hours each to complete the training; is that --

A.    That varies.

Q.    That varies?

A.   (Nods head.)

Q.   How often are people able to complete it in four hours for each -- you know, four hours for each of the seven training modules?

A.   That would be impossible to know.

Q.   Okay.  Do you -- do you find that some people take a lot longer to finish it?  Like --

A.   I wouldn't be able to --

Q.   Understood.  Okay.  All right.  So I'm looking at shift number two here, Expectations.  E-learning, 10 minutes.  Mission Manual OJT 40 minutes.  So Mission Manual, what's OJT?

A.   On-the-job training.

Q.   Okay.  And so Mission Manual is that an actual document?

A.   It's a document that is produced out of the E-learning.

Q.   Okay.  All right.  And, then, on-the-job training means, okay, you've read these things on the computer and now you're going to go in and someone's going to show you exactly what you're suppose to do?

A.   Yes, sir.

Q.   Does that mean it's just kind of hard to figure out -- like for a customer service

42

person, kind of hard to figure out to use a cash register unless showed how to do it; is that kind of what it means?

A.   No.  It -- no.  That wouldn't be the case.  It's just that we want everyone to receive the same training so that they can provide service excellence to our guests, as it relates to a cashier or a customer service worker.

Q.   And so I -- I've assumed that customer service team member means a cashier.  Is that the only type of customer service or are there -- or is there something else aside from someone who's, like, actually handling the register?

A.   Primarily that -- that would be a cashier.

Q.   Okay.  Now, this is the same thing on the next page that -- that we have in here, that you've handed to us, is Cook Training Plan, same the thing.  This is for the actual food production people, how -- is the outline of their training regimen; is that --

A.   Of the cooks, that is correct.

Q.   Okay.  But it also looks like it's a seven -- seven shift training program; is that -- am I understanding it correctly?

A.    That is an outline, correct.

Q.    Okay.  Now, the amount of training that the employees receive at the New Orleans East site, I mean, I understood you to say that these materials are written by KFC corporate up in Louisville.  Is -- is it, like, I guess, based on the franchise agreement that this has to be provided to the employees?

A.    Can you restate that question?

Q.    Sure.  So, I guess, does KFC corporate require this exact training be provided to West Quality's KFC employees?

A.    Yes.

Q.    Is that, like, a matter of, like, a franchise agreement then?

A.    I have not fully read the franchise agreement.

Q.    Okay.  Understood.  Did I have a line item about the franchise agreement?  I can't remember.  If we -- if I did we'll get to it.

Now, if the -- the E-learning materials, the Mission Manual materials, if these were printed out how many pages would they be for the cook job, for instance?

A.    It would differ for each -- well, the

Mission Manual is printed for each task or each learning --

Q.   Okay.

A.   -- that's there.  So I wouldn't be able to give you an exact number.

Q.   Okay.  But it is something that can be printed out?

A.   Absolutely.

Q.   Okay.  So we're able to make a copy of the -- the training manuals.  Okay.  So after those two outline documents there's a guest -- the last pages are about inquiries for food and illness.  So what -- these particular -- these two pages, it says, "Standards" at the top.  Where does -- where do these come from?

A.   The KFC standards library.

Q.   Okay.  So the standards library is what exactly?

A.   The manual that houses the policies and pro -- or the procedures.

Q.   Now, is that a different set of documents than the training materials that new employees have to review in their orientation?

A.   I don't -- I'm sorry.  I don't understand what you're asking.

Q.   I'm sorry.  And so -- so I'm -- like there's all those orientation materials, training materials, the -- you know, the Mission Manual, the E-Learning that the new employees have to learn, you know, in their first seven days or their first seven shifts, rather, and so standards is -- that are in the KFC library, is that -- are these two different sets of documents?

A.   If I understand what you're asking me, you're asking me -- are you asking me if the standards library is used in conjunction with the training?

Q.   Not quite.  But is -- is that correct? Are the standards library -- are the -- is it used in conjunction with the training?

A.   The training is a -- is built, I'm assuming, from the standards.

Q.   Understood.  Okay.  But the actual standards themselves aren't like printed out and given to the employees?  It's -- it's -- it's like the employee training is derived from the standards, I guess?

A.   Are you -- I don't understand what you're asking me.

Q.   So, for instance, so this -- this

document, Guest inquiries food and illness, is this something that would be printed out and handed to the new employees for -- as part of their training or is this something that's, like, in this -- in the library and anybody can consult it when they need it?

A.    It's in the library and I -- yeah, it's in the library.

Q.    And so how -- the standards library, how -- how many documents is this?  How big a library is it?

A.    Huge.

Q.    Okay.  All right.  Is it all electronic?

A.    It is.

Q.    Okay.  Understood.  All right.  Now, in terms of the on-the-job training, is there any kind of examination that the employees have to take once they've completed the training to make sure they've understood it?

A.    That would be a part of the learning zone.

Q.    Okay.  So the learning zone would provide information and then have, like, a test at the end?

A.   That's correct.

Q.   And if they don't pass the test they have to redo the course?

A.   That's correct.  Typically.

Q.   Okay.  Any information on how many people have to retake these things?

A.   No, sir.

Q.   What's -- what's considered a passing score for the examinations?

A.   It would depend on -- on the -- on module.

Q.   Oh, okay.  They all have their own.

A.   (No response.)

Q.   Now, is the test materials also provided by KFC Corporate?

A.   That is correct.

Q.   Same thing as what counts as a passing score, is that determined by KFC corporate rather West Quality?

A.   That is correct.

Q.   All right.  So it says here on Guest Inquiries Food and Illness, how to handle guests -- how to handle guest inquiries.  It says, use please -- so the word "please" is capitalized with periods in it, does that mean something?

48

A.   Politely listen express apology satisfy with extra.

Q.   Oh, okay.  So is that -- is that a standard kind of restaurant industry abbreviation or is that something that KFC kind of just, you know?

A.   I can't speak to other --

Q.   Okay.

A.   -- to other brands.

Q.   Understood.  But that's how KFC handles employ -- rather, customer complaints?

A.   Correct.

Q.   Okay.  All right.  So -- sorry.  I'm -- I don't meant to waste anybody's time.  I was just reading over this document about the guest complaints.

All right.  Okay.  So other than this particular training that's outlined in the document that you handed us, is there any other training that employees undergo at -- at the restaurant in New Orleans -- at the KFC restaurant in New Orleans East in this time period?

A.   I'm not sure.

Q.   Okay.  Like, for instance, is there -- do they undergo any kind of, like, Louisiana

Restaurant Association training, like LRA trainings or anything like that that the employees would go do?

A.    I'm not aware of that.  I can't answer that question.

Q.    Is -- is this particular restaurant, the New Orleans East KFC, are they an LRA member?

A.    I'm not sure.

Q.    Okay.  What about, does the restaurant's insurance company provide or require any additional training for employees beyond what KFC corporate wants the employees to do?

A.    Does the insurance company?

Q.    Right.  Does the insurance company have, like, here's some training for your employees or -- or, here, we require this kind of training, you know, as part of the insurance package; anything like that?

A.    I'm not aware of that.

Q.    Okay.  Are there -- does -- are you aware of any, I guess, department -- like, Louisiana Department of Health regulations on employee training for safety related matters?

A.    Other than the Gold Seal.

Q.    Okay.  And so what's that?

**A.** That's the certification that a manager must have, the general manager.

**Q.** So the -- so the department of health requires certain --

**A.** I'm not sure if that's Department of Health, but I do know that our general managers in Louisiana are required to have a Gold Seal.

**Q.** Okay. So that would be --

**A.** If I'm not mistaken.

**Q.** No, I understand. I understand. So the general manager at the time was Ms. Williams, Charlene Williams?

**A.** Correct.

**Q.** She's still the general manager out there?

**A.** Correct.

**Q.** Okay. Now, does the general manager actually go and clock-in like a -- like a regular employee?

**A.** They do.

**Q.** Sorry. I'm just looking to see if she actually was on duty that day. The mornings -- Ms. Williams worked the morning shift, apparently, on the first of October. It doesn't look like she worked on the second.

And so do you know if Ms. Williams had gold seal certification at the time of our incident?

A.   I'm not sure.  And, no, I'm not sure that that particular New Orleans East location is required to have that.

Q.   Okay.  Understood.  Do you know who issues that certification?

A.   I don't.

Q.   But it's -- is it not -- it's not a requirement at -- in other states as far as you know?

A.   Not as far as I know.

Q.   Okay.  So I don't want to jump around too much, but since it occurs to me on that night, number nine has to do with, like, the corporate structure and/or organization of West Quality Foods.  How many states does West Quality operate in?

A.   Four.

Q.   So Louisiana, Mississippi?

A.   Alabama and Tennessee.

Q.   Is it -- is it all this, like, KFC style restaurants or they're different things that they operate?

A.   They're different things.

Q.   And what other types of restaurants do they have or what -- which other type restaurants so they have?

A.   Rally's, Checkers.

Q.   Okay.  Anything else aside from those?

A.   Vic's.

Q.   Okay.  I'm familiar with the first two. What's Vic's?

A.   Vic's Biscuits and Burgers.  That is a restaurant that is a private concept.

Q.   Okay.  Understood.  How many KFC locations does West Quality Food Service have?

A.   56.

Q.   56, okay.  So you've already mentioned there's one in Westwego.

A.   That's correct.

Q.   Are there any others in the -- aside from New Orleans East, are there any others in the metro area?

A.   Um, --

MR. JURKOVIC:

          Do we have a set of documents for number nine?

MR. KOKEMOR:

                    Is that number nine you're
referring to?

MR. JURKOVIC:

        Yeah, sorry.

THE WITNESS:

        Number 10, actually.

MR. KOKEMOR:

        Number nine or number ten has the
list?

THE WITNESS:

        Number ten.

MR. JURKOVIC:

        Oh, that's true.  Number ten is
about ownership items.

MR. KOKEMOR:

        So is the question can she provide
a list --

MR. JURKOVIC:

        Yeah.

MR. KOKEMOR:

        -- of all the specific 56
locations?

MR. JURKOVIC:

        I don't think I asked that
question.  I think I was just concerned

54

more about the metro area.  But, I mean, if there's a list of all 56 that's fine.

MR. KOKEMOR:

Do you have that?

THE WITNESS:

Yes, sir.

MR. KOKEMOR:

I think that your question number 11 -- number 11, I think it's attached.

THE WITNESS:

I put it back to number ten.

MR. KOKEMOR:

Okay.

MR. JURKOVIC:

Oh, okay.  Number eleven, property and assets.  Yeah.  I guess they all kind of depend on that.

THE WITNESS:

That lists the KFC restaurants.

MR. JURKOVIC:

Okay.  Yeah, the answer to question number eleven on the notice.

Thank you for that.

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  So continuing in number --
number two.  I mean, aside from the actual
training, I guess the food safety practices and
policies, does -- does the restaurant -- and by
"the restaurant," I mean, the New Orleans East,
you know, franchise that West Quality owns -- as
far as food safety practice and/or policies, is
that like a written set of documents?

A.   If I'm understanding your question
correctly, you're asking me if there are any
written documents surrounding food safety?

Q.   (Nods head.)

A.   In the training food safety is covered.
In each one of the procedures there are food
safety steps that are covered.

Q.   Okay.  So does -- and also there are
standards for food safety in the -- the library,
the standards library?

A.   Within each -- within each pol --
within each procedure that would be correct,
typically.

Q.   All right.  Understood.  So I think --
I think I asked for some of these things in
written discovery.  Okay.  Yeah.  So in written
discovery, our request number 12 is:  "Any and all

documents related to policies, procedures, protocols, safety training employee manuals that may have been in effect at the relevant time that relates to prevention of adulteration or contamination of food items sold at the KFC franchisee location at issue in this matter."

And so the answer to that was these have been requested and will be furnished upon receipt.

So -- and I guess this -- I haven't received those documents yet, other than what's, like, I'm being handed today.  And so I guess I want to identify, you know, what -- what documents -- you know, these -- all the universe of documents that it sounds like that KFC has in the standards library.  I don't want every document in the standards library, but I do want the ones that are very specifically related to food safety and prevention of adulteration, that kind of thing.

So do these documents have a specific name, you know, that -- that we've requested in our discovery request, that, I guess, for ease of identification.

Is there a standard on food safety, a standard, you know -- you know, like food storage,

food preparation, like, these kinds of things?

MR. KOKEMOR:

Can I see the specific request for production --

MR. JURKOVIC:

Sure.

MR. KOKEMOR:

-- that you referred to?

MR. JURKOVIC:

That's number 12.

MR. KOKEMOR:

Thank you.

All right.  I guess the question is, and correct me if I'm wrong:  Are there any other written documents relating to policies, procedures protocols, safety training employee manuals relative to the prevention of adulteration or contamination of food items.  Separate and apart from all the training in the learning center that you've already discussed.

Is that -- is that a fair --

MR. JURKOVIC:

Yeah, I think so.

MR. KOKEMOR:

-- estimation of your -- your inquiry?

MR. JURKOVIC:

Yeah, I think so.  I mean, cause I think we want to review the training materials that the employees have, but we also want to review whatever the actual, you know, actual policies are if they're different, you know.

Because I assume you can have a set of policies but then you can also have a set of training materials that are more user friendly, maybe, than the actual written rules, huh?

I'm not saying that's what it is. I'm just envisioning this.  And so if there is a set of documents, aside from the training materials, I think we would, you know, request those specific standards various by name.

THE WITNESS:

Okay.  Um.  Hum.  The protection of our products is -- is mentioned and trained on with each particular

procedure related to our food.

MR. JURKOVIC:

Right.

THE WITNESS:

As it relates to the flow -- flow through the restaurant, from receiving to serving, there is a safety measure written into the policy or the procedures --

MR. JURKOVIC:

Yeah.

THE WITNESS:

-- for each step of the -- of the flow of food in the restaurant.

EXAMINATION BY MR. JURKOVIC:

Q. Okay. And so the -- these things are recorded? Are they, like, are they part of the standards library, these particular, you know, policies for each step in the procedure?

A. I wouldn't call it a policy, but I would call it critical control points within -- within the procedure.

Q. Okay. And so is there -- is there a written description of how this is -- that these things are supposed to be?

Cause I assume that people can learn all this by hands-on instruction, but is there a writing somewhere that records all of it, all the different safety-related measures for these critical control points?

A.   If I'm understanding you correctly, that would be housed in the standards library and within the learning zone training.

Q.   Okay.  All right.  And so the -- the parts that are in the standards library, is it -- are they -- is it designated anything in particular?

You know, is there a name for those standards, like a -- I don't know what the title -- the name that you gave me earlier was.

You know, the standard here by Guest Inquiries Food and Illness, is there, you know, a separate one for, you know, food storage or food handling or, you know, that -- I don't know what they would title that.  I have no idea.  That's why I'm asking you.

A.   So you're asking for specific titles?

Q.   Yeah, I would -- I guess.  Cause I want to request copies and I don't want to request your entire standards library.  Because, you know, I

don't think we need to burden you-all to, like, give me copies of every, single document, you know, that the restaurant uses and I don't want to read every, single thing.

But as far as, like, food safety is concerned, I think those are ones that might be relevant.  So, yeah, we want to look -- read those.  And so is there -- is there just like a general, like, title of the safety related -- food safety related items; is that --

MR. KOKEMOR:

Could you confine it to the preparation of the Chicken Little sandwich at issue in this case?

MR. JURKOVIC:

Yeah.  That's -- that makes perfect sense cause that's what she ordered.

So that's -- if there's -- if there's a specific group of documents that are related specifically to that that'd be great.  That, plus any ones that, I guess, have general applicability to everything.  But --

MR. KOKEMOR:

Ms. Black, are you able to go

online in the learning center and review the standards for the preparation of the item known the Chicken Little Sandwich?

THE WITNESS:

Yes, sir, I believe I am.

MR. KOKEMOR:

Are you able to print that out?

THE WITNESS:

Yes, sir, I should be able to.

MR. KOKEMOR:

All right.  Subject to the projective order, --

MR. JURKOVIC:

Of course.

MR. KOKEMOR:

-- you know, we'll agree to produce that and provide it to you as a supplementation to today's deposition as well as to answer Interrogatory No. 12.

MR. JURKOVIC:

I appreciate that.  And so --

MR. KOKEMOR:

As opposed to every single food

63

item that they --

MR. JURKOVIC:

Right.

MR. KOKEMOR:

-- that they sell --

MR. JURKOVIC:

Right.

MR. KOKEMOR:

-- in their restaurants.

MR. JURKOVIC:

Yeah.  Those --

MR. KOKEMORE:

You're interested in the Chicken Little sandwich?

MR. JURKOVIC:

Yeah.  Just the specific thing -- the specific stuff for that.  And if there are any generally, you know, restaurant-wide documents.

For, you know, in every single case, you know -- you know, we can't, you know, -- I don't know what a general -- I don't know anything about restaurants.

I assume that, you know, every,

single thing you put in the fridge has to be labeled with a date, say. I would assume that might be a reasonable rule to have in a restaurant. Like if there's general rules that apply to all food handling, you know. Always wash your hands. Is that -- I assume that's a rule, right? I mean, that's a rule of most restaurants, I would guess, right? But it is that kind of stuff, you know, general rules I think I would want to know.

But I'd assume there'd be a list of general, you know, hygiene rules, sanitation rules, whatever, for the restaurant. I would like to have those. And also anything that's specific to the item Ms. Thomas has alleged that she's ordered.

Is that -- is that reasonable, Counsel?

MR. KOKEMOR:

To the extent it exists we'll produce it.

MR. JURKOVIC:

All right.  Sound great.

EXAMINATION BY MR. JURKOVIC:

**Q.**   Okay.  Now, in terms of the on-the-job training that is done at the restaurant, who's -- is there, like, a designated trainer or instructor at the location or is it just the general manager handles that?

**A.**   There is no designated trainer.  The general manager is responsible and accountable for that training.

**Q.**   Okay.  So is there anyone at West Quality, you know, headquarters, for lack of a better term, that would know better than the -- the local manager at the New Orleans East restaurant how the training was conducted there?

**A.**   No.

**Q.**   So, in other words, it's best maybe to talk to the -- the manager of the actual location about how the training was conducted?

**A.**   That is -- would probably be your -- be the best option.

**Q.**   Understood.  All right.  So part of number two also has to do with, not just manuals, but videos, broadsides, pamphlets, and other documents.  And, so, you've discussed the online

component already.

And -- and I think I caught a note in there that there was -- that one document had a note of an on -- is there video, orientation video, seven minute video?  Is that -- what's the contents of the orientation video?

A.    Without having that in front of me I wouldn't be able to give you the full scope of that.

Q.    So it's -- on the cook training plan that's on the first day and it says seven minutes. Is that -- does that -- does this give you any idea of what it might be about?

A.    I wouldn't want to speculate.

Q.    Understood.  Okay.  Are there -- do you know if there's any other videos aside from that orientation video?

A.    Everything that is done online in the learning zone typically has a video component to it.

Q.    Okay.  Yeah, that makes sense.  All right.  I assume this is not something you can get to through, like, KFC's web -- website as just anybody, right?  This is, like, proprietary and internal, I assume?

A.   That is correct.

Q.   Okay.  Do you know how many -- how many minutes of video are part of the training for the cooks during these seven particular shifts of lessons?

A.   No, sir.

Q.   If it's written material it can be printed out, but if it's videos, I guess, is it possible to download it onto a disk; is that something that's -- that can be done?

A.   Are you asking me?

Q.   Oh, yeah.  I guess, first, is it --  I mean, these are things that, I guess, that you have access to them, I assume, right?

A.   I do.  I don't think that I would be able to download them, especially without the permission of KFC corporate.

Q.   Understood. Okay.  I guess we'll figure it out.  I mean, I think I need a copy of, like, the written materials in the training regimen at least.  The videos I guess it depends how much of it is video.  It's -- if the video is incidental is one thing.  If it's intrinsic is another thing.  So we'd have to talk to KFC corporate about that.

68

All right.  We'll take that up after the deposition.  Sorry.  I don't mean to waste your time with it.

And I may have asked this question already, but aside from the training materials we've already discussed, is there -- is there anything else?

You know, I think the question asks about broadsides, pamphlets, all that kind of stuff.  Is -- is it located exclusively in the E-learning center and the on-the-job training during that first seven shifts and then there's nothing else?

**A.**    So if I understand correctly, you're asking me if that is the entirety of the training --

**Q.**    Right.

**A.**    -- that an employee will receive?

**Q.**    Right.  What we've discussed.

**A.**    New promotion training.

**Q.**    Okay.  How does that work?

**A.**    The same way.

**Q.**    Oh, okay.  So if you're -- we're promoting your assistant manager today so you're going to have to go for another --

A.   No, no, no.  For example, if we have a new item that -- that is a --

Q.   Promotion.

A.   -- promotional training.

Q.   Promotional product kind of stuff?

A.   Yes.

Q.   So is that you have to sit everybody in the restaurant down and say, we're unrolling a new product or a feature to an old product, something like that, so everyone needs to learn it; is that kind of how that works?

A.   I -- I don't understand.  You're asking me if everyone is -- is, like, gathered together and the -- I don't -- I don't understand exactly what you're saying.

Q.   Yeah.  Sorry.  And, so, you know, if there's a new product that's coming out, the cooks need to learn how to -- to make it, I assume.  And so does that mean you get, like, all the cooks to come in and complete a new E-learning session; is that --

A.   That's correct.

Q.   Okay.  So I guess that --

A.   It would follow the same format.

Q.   Okay.  Understood.  Is it -- would it

be as many days for a new product or is -- or is the -- the seven-day thing for, like, a new person who needs to learn everything?

A.   It typically would not take seven days.

Q.   Okay.  Understood.  All right.  So aside from new promotion training is there -- is there any other trainings that employees would -- would be expected to complete, while working at the New Orleans East site?

A.   Typically, not.  However, there could've been recertification.  I can't attest to that.

Q.   Understood.  I assume also if they're doing something wrong then the managers can, like, tell them to do it the right way after the training is over; is that pretty normal?

A.   Coach and retrain, that's correct.

Q.   Coach and retrain.  Okay.  If someone messes up a lot would they be sent back to do the E-learning components at the learning center or would that just be a matter of the manager explains it again?

A.   Typically, either could occur, --

Q.   Okay.

A.   -- depending on the frequency and

severity.

Q.   I understand.  Okay.  And so item number three on the notice is the -- about the franchise agreement that West Quality Food Service has with KFC.  I don't think I have a lot of questions about that because, you know, I don't even have the whole thing, so I don't -- you know, it's all -- it's all part of the protective order.

But my understanding of the franchise agreement, and correct me if -- if West Quality has a different understanding.  We let KFC and the Yum Group of restaurants out of the lawsuit because they ex -- they put it to us that the franchise agreement essentially places all liability for complaints made that -- of the type that my client has made, you know, since we bottle them up in the franchisee rather than let -- maybe I -- if -- I guess, I'm trying to phrase it.

So it's our understanding, based on the discussions with counsel for the other entities that are no longer a part of the case, was that all of the liability, if there is to be any, would be -- would go to them, like KFC corporate or the Chinese companies, Yum Group Companies, but it would all be for the franchisee to defend the

case. Is this -- does -- does West Quality have a different understanding of the franchise agreement?

A. No.

Q. Okay. All right. I just wanted to make sure. We didn't want to get in a situation where KFC says it's your fault and West Quality says it's KFC's fault. So now that was specific to that. Thank you for that. I don't think I have to deal with the franchise agreement anymore.

Okay. And so number four is about the supply chain through which West Quality Food Service receive products that are sold or products that were sold to plaintiff in this matter.

And so I think we can localize it to the -- the item that she's alleged that she purchased. But is -- where do the things that she says she bought come from?

A. The bread, condiments and paper come from McLane Food Service.

Q. Okay.

A. And the actual chicken tender comes or came from Butts Foods.

Q. Okay. So these are -- are these, like, wholesale services that West Quality uses to

deliver items; is that --

A.   Wholesale?

Q.   Or, I mean, how is the supply chain then?  Are these companies that -- they just deliver like a whole package of products; is that --

A.   That's correct.  "A package of products," explain that.

Q.   Sorry.  Like they have a whole catalogue, basically, you can order all kinds of different items from them and they make regular deliveries; is that --

A.   Yes.  They're all nationally -- well, not nationally, but McLane is national.  Butts Food is regional.  And they're all certified by KFC Corporation to deliver safe and wholesome food.

Q.   Okay.  And so the -- is -- is that -- does KFC select who West Quality has to use or West Quality can select who they want as long as KFC certifies it?

A.   That -- I'm not sure of the answer to that.

Q.   So are there -- are there -- do you have any documents related to the supply chain?

MR. KOKEMOR:

Yeah. I think we produced the supplier agreement with Butts Foods Incorporated. I didn't see one for McLane. Is there a separate contract with McLane?

THE WITNESS:

I did not bring that.

MR. KOKEMOR:

Okay. Okay. She has a copy of the supplier agreement between West Quality Foods and Butts Foods, Inc.

MR. JURKOVIC:

So that's the -- the meat supplier?

MR. KOKEMOR:

The meat supplier. That she can provide to you there.

MR. JURKOVIC:

And I think that's the one that would be relevant. I think the bread and condiment suppliers, I don't think it is -- I don't think they're as much at issue.

THE WITNESS:

What about this stuff?

MR. KOKEMOR:

Are these invoices for products bought from them?

THE WITNESS:

Yes, sir.

MR. KOKEMOR:

Okay. Yeah. She also has the invoicing from products purchased from Butts Foods, Inc. together in that package.

MR. JURKOVIC:

So the answer to question number four from the notice, is McLane Food Service and Butts Foods Incorporated.

EXAMINATION BY MR. JURKOVIC:

Q. So who signed this on behalf of West Quality, do you know?

A. Brian Wilson.

Q. Executive vice president, okay. Is Mr. Wilson still the vice president over there?

A. He is not.

Q. Yum Brands, KFC approved products, per Yum Brands KFC approved supplier list and shelf-life matrix. Oh, my goodness. Is that a separate -- so the supplier list and shelf-life

matrix are these separate documents?

A.   (No response.)

Q.   I'm sorry.  I'm looking at the terms and conditions on the Butts Supply agreement. That's number three.

A.   That would be a document that Butts Foods would, I assume, obtain from KFC Corporate.

Q.   Understood.  There is an annex to this maybe or those are all invoices?

A.   (No response.)

Q.   Does this require West Quality Foods to buy a certain amount per -- per month?

A.   No, sir, not to my knowledge.

Q.   This is for all -- this agreement applies for all West Quality KFC locales?

A.   Yes, sir.

Q.   Is it the only supply agreement for the -- the chicken supply that West Quality uses or do you have -- or do you, like, have multiple ones, I guess?

A.   Are you asking is this the only supplier that we use for chicken?

Q.   Uh-huh.

A.   That is the -- that is correct.

Q.   Okay.  All right.  So the -- as far as

the Chickel -- Chicken Little is concerned, I mean, that would be something that would be covered by this agreement?

The -- the chicken parts that are used for the Chicken Little sandwiches, this agreement would -- would cover that item?

A.   Are you asking me were the -- was the chicken that was on the Chicken Little received from this company?

Q.   Well, yeah.  I mean, in terms of like the Chicken Little sandwiches that are sold, this is the -- this is the agreement that covers the -- the supply for those sandwiches that West Quality sells; is that --

A.   It would cover the supply of the chicken that was used to produce the Chicken Little sandwich.

Q.   Okay.  All right.  So the -- the invoices that follow the agreement they are specific to the restaurant in New Orleans East?

A.   The invoices that are in the -- what -- what I gave you?

Q.   Yes.

A.   They are specific to the restaurant in New Orleans East.

Q. But these are -- are these McLane? Oh, no, they're different. Okay. Some are Bu -- some are Butts and some are McLane, right?

A. Yes, sir.

Q. All right. So I'm looking at, I think, the -- the first page after the actual agreement. So -- so I can understand what I'm looking at here, there's, you know, one side of it -- so there's a page -- I'm looking at page two out of 23 and so it's -- it looks like this is dated, invoice date of September 20, 2016; is that -- are you with me?

A. Correct.

Q. Okay. And so it's -- there is a description. So there's -- so there's chicken, frozen, eight piece, purple 20. Do you know what this is?

A. I do.

Q. So what is that exactly?

A. That is a case of frozen chicken that was received from Butts Foods.

Q. Okay.

A. Mixed chicken.

Q. Okay. And so what -- so, okay, quantity, one. Is C-S "case"?

A.   Correct.

Q.   And it's got a certain price for the case.  So how -- all right.  And then the next item, chicken, eight, purple, is that something different?

A.   That is a fresh chicken.

Q.   Fresh as opposed to frozen?

A.   Correct.

Q.   Okay.  And on another line is a -- is the third item dark meat?

A.   Correct.

Q.   And that's -- that's fresh also?

A.   Correct.

Q.   And then strips, frozen, after that?

A.   Correct.

Q.   Okay.  And so -- all right.  So these things they come from -- are the -- I assume all this is, what?  This is all uncooked, just one -- some was fresh, some was frozen?

A.   Correct.

Q.   Okay.  So does anything come in that's been already prepared or does everything, like, come in has to be cooked in the restaurant, if you follow me?

A.   As it relates to a Chicken Little?

Q.   As -- yes.

A.   The bread would be precooked.

Q.   Okay.

A.   And the condiments would -- would not be produce in the restaurant.  They would be prepackaged.

Q.   That would be jars of mayonnaise or mustard or whatever?

A.   Not jars.

Q.   Oh.

A.   It would be in a vacuum-sealed pouch.

Q.   Understood.  Are any of these that are on page two of 23, that we've been discussing, are any of those chicken items related to the Chicken Little or are these something different?

A.   The strips, the frozen tenders, are related to the Chicken Little.

Q.   Okay.  And so Butts Foods acquires them from, you know, some farmer somewhere or Chicago Board of Trade or wherever they get them from.  They get them, they're frozen, and then they deliver them to you when you order -- or they deliver them to the location in New Orleans East when -- when they're ordered?

A.   That would be correct.

Q.   And so is there anyway to tell how -- what -- chicken frozen tenders marinated, so does that mean there's -- eight and then in parenthesis, does that mean there's eight in each package or something?

A.   That means that there are eight five-pound bags in each case.

Q.   So there's 40 pounds there in each bag and then there's three cases of these things ordered; is that --

A.   There are 40 pounds in each case and there are three cases ordered.  That is correct.

Q.   Okay.  And so how -- is it one tender per sandwich, is that how they -- is that how they're made?

A.   Typically.

Q.   Okay.  All right.  And, so, I guess -- I think I -- I assume -- okay.  And so they'd be frozen coming in, so they have to -- that particular sandwich, how is it prepared?

I mean, I know that we're probably on a different number by now.  But is there -- what does the cook have to do to prepare that particular food item?

A.   After they are thawed they would bring

them out of the walk-in cooler to the breading table. They would inspect the pieces before they put them in the dip basket. They would dip it a sanitized water bath, flour it, bread it, put it on racks. They would cook it. And once the cooking process is over with they would time that particular product and then take it to the holding e cabinets.

Q. So how -- how many employees, I guess, tasks would it be to -- to do that? Just one person does it or is like a team that's working on what you've just described?

A. It would depend on how many cooks are in the restaurant.

Q. Okay. All right. And so it's -- you said they have to be timed. How long does it take for that particular item to be -- to be prepared?

A. Oh, that would be depend.

Q. On how efficient the cook is?

A. How efficient the cook is.

Q. Okay. Are they done -- are they done one at a time or are they done, like, there's a whole big bag of these things so, well, is it -- I've got a five-pound bag, so do I open the five-pound bag and prepare them all at the same

time or?

A.   It would who depend on what the projections would -- would call for.

Q.   So there's like the lunch hour, for instance, do I prepare all of them for lunch hour?

A.   It would depend.

Q.   Oh, really.  Okay.  Who -- okay.  And, so, who makes the projections; who does that?

A.   There is a projection that is made through the computer system --

Q.   Is --

A.   -- and --

Q.   -- it -- go ahead.

A.   -- and the manager can make adjustments.

Q.   So does the computer kind of try to estimate how busy the restaurant might be for the coming day; is that -- is it like a daily thing?

A.   It's based off of the sales of the restaurant and the sales of a particular product.

Q.   Okay.  And so, what, like, historic sales?  Like normally this time of year we, you know, sell this many during the afternoon or is that kind of how it's based, like, historically?

A.   I guess you could say that.

**Q.**    Okay.

**A.**    To a certain point, yes, it's based off of historical data.

**Q.**    Is that -- is there a specific software that's used for that or is it something that West Quality has developed on its own?

**A.**    No.  That's corporate software.

**Q.**    Oh, KFC's?

**A.**    Uh-huh.

**Q.**    Okay.  Is there -- I guess, is there a record of that kept anywhere; what the projections were at any given point?

**A.**    I don't want to answer incorrectly. That's something I would have to find out.

**Q.**    Okay.  I guess -- all right.  I guess, yeah, I'd just kind of be interested in knowing if it's something that we can hunt down.  It'd be interesting knowing what the projections were for, I guess, the evening of October 1st, 2016.

**A.**    "Evening," meaning what time frame?

**Q.**    I'd have to look at her deposition. I think she -- so the plaintiff testified that she came right before closing on October 1st.  So I can't remember what time that would be; 9 p.m., 10 p.m., 11 p.m., I don't know.  It was definitely

evening.

MR. KOKEMOR:

I mean, obviously, you wouldn't open up an entire bag of chicken tenders and begin to prepare them for one sandwich.

MR. JURKOVIC:

One sandwich at the end of the night.

MR. KOKEMOR:

I think that's what she's saying is that you can't really determine, you know, except based on how many customers you see walking in the store and what time of day.

EXAMINATION BY MR. JURKOVIC:

Q.   So is there -- is there a -- I guess, does the manager keep a log of what things get used as the shift goes on?  Okay, we opened another bag of frozen tenders.  Let me make a note of it so I have to reorder it.  Is that something that happens?

A.   There is no individual log, but based off of sales and inventories that's how we determine our purchases.

Q.   Okay.  So as the cashiers are ringing things up the computer kind of knows what's going out the door, in other words?

A.   Correct.

Q.   And -- and, I guess, what, the manager can review what's in the freezer --

A.   That --

Q.   -- to see how much is left?

A.   That's correct.

Q.   Okay.  All right.  So these invoices, then, cover until about late September.

A.   (No response.)

Q.   Do you have an understanding of -- Okay.  You've explained to me the -- the chicken components come from Butts Foods Incorporated.  Do you have an understanding of Butts Foods practices or where they get their items from?

A.   I don't.

Q.   Okay.  Now, number five has to do with policies of defendant, with respect to training and supervision of its employees as were in place on the date of incident.

So we've already talked about training quite a bit.  I don't necessarily want to work back through that.  But as far as supervision of

employees is concerned, are there any types -- are there any written policies about how the managers are supposed to supervise the -- the team members?

A.   I don't understand specifically what you're asking me.

Q.   Okay.  And so, I guess, is there like a handbook or a manual for the supervisors about how -- how they're supposed to supervise the other employees?

A.   That is done in their learning zone training.

Q.   Okay.  So they -- they have their own E-learning?

A.   Job specific training module.

Q.   All right.  And so as far -- is there a specific standard in the standards library or a specific policy, otherwise, about how closely the managers are supposed to supervise the team members?

A.   Closely, what do you mean by "closely"?

Q.   I guess, how -- I don't know how to quantify it.  But is there -- you know, how -- how much micromanagement is there?

You know, is the supervisor supposed to stay on top of the employees or does the

supervisor do other things; stay in their office and work at a desk all night?  You know what I mean?

A.   I'm not sure that there's anything specific to that question.

Q.   Okay.  Is there -- does West Quality Foods allow some liberty to its managers to -- to develop their own managerial style, then, is that --

A.   When you say "liberty" and "style," quantify that?

Q.   As opposed to, you know, does West Quality tell its managers, Well, we need you really at your desk doing all this, whatever, business paperwork stuff, or, on the other hand, we need you out on the floor, like, modeling the correct behavior for your employees or something in-between?

Is there any kind of, you know, instructions that the managers have from -- you know, the store managers have from West Quality corporate or from KFC corporate about how they're supposed to interact with the staff?

A.   Not that I'm aware of, specifically, no.

Q.   Okay.  Now, in terms of, though, the management training, do -- is there anything -- is there anything in this document that you've already provided about management training?

A.   Not a path of sorts.

Q.   Okay.  But do they have their own type of outline for?

A.   Yes.

Q.   Okay.  So the managers, are they promoted from within?  Like do you have to work the floor as a cook or as customer service before you can manage a restaurant or does it not work like that?

A.   Some are.

Q.   Some are.  Or could you, on the other hand, be like a business school graduate and get hired as a manger directly?

A.   You could get hired, but you would go through the proper training.

Q.   Right.  Right.  And, so, do you know -- since we don't have the outline printed out, do you know how long the man -- the supervisor or manager train -- or, I mean, I guess, the manager training would be for -- to work in the -- this restaurant?

A.    They would complete that training and then there are several modules regarding supervision and -- and management tasks that are associated with that.

Q.    Okay.  So that make sense.  So they would have to learn how to do all the jobs, basically, in the restaurant first?

A.    That is correct.

Q.    And then they would have specific, like, supervisor related?

A.    That is correct.

Q.    Now, do you know how -- as far as the supervisor specific ones, do you know how much, like, how many modules there are for that and how many days?

A.    Oh, goodness.  I wouldn't want to give you an incorrect number.

Q.    Understood.  But it is something that could be printed out, I assume?

A.    The path?

Q.    Yeah.

A.    Their learning track?

Q.    Right.

A.    Yes.

Q.    And as far as the E-learning documents,

I assume those could be printed out also; is that --

A.    Now, you're talking about the E-learning documents or you're talking -- what are you referring to?

Q.    And so -- yeah, my apologies.  So -- so I assume that, you know, for instance, I'm looking back at the customer service, you know, shift two, it's got expectations, safety basics, service basics, food safety, and these have like an E-learning number, ten minutes, say, for E-learning of expectations, but then the Mission Manual on-the-job training four minutes.

So, I assume E-learning has some writing that they to read and videos they have to watch.

A.    That would be correct.

Q.    And so it's -- as far as, like, the written components are concerned, I assume that that's something that can be printed out?

A.    I believe the mission manuals --

Q.    Okay.

A.    -- are available.

Q.    Okay.  Mission Manual, on-the-job training.  Got you.  And is there also a Mission

Manual for the supervisory employees too?

A.   The shift supervisors?

Q.   Right.

A.   I believe so.

Q.   Okay.  Now, the actual, general manager of the whole restaurant, is -- does that person have their own, like, training path, too, that's different from everybody else's?

A.   That is correct.

Q.   And do they do that in the restaurant or do they have to go somewhere else to learn that?

A.   They do that in the restaurant.

Q.   Okay.

A.   Well, let me qualify that.  You're asking me can they do that in the restaurant that they are working in?

Q.   Right.

A.   They could or they could go to another restaurant to be trained and then come to their restaurant fully trained.

Q.   Okay.

A.   It just depends.

Q.   And so do you know how much -- how much training the general manager has to do aside from

the other -- all the other things that -- that are in a restaurant?

A.   How much in terms of time or?

Q.   Right.

A.   I don't know that I could give you an amount of hours.

Q.   Do they have -- is there a -- a form or, like, an outline for the general manager's training also that's similar to this, the customer service on that that we've been talking about?

A.   I think so.

Q.   Is that something that can be printed out?

A.   I think so.

Q.   So number six is, on the notice: Information regarding practices of West Quality Food Service with respect to discipline of employees for violations of policies.

So is there a -- are there a set of disciplinary rules for employees at the New Orleans East site?

A.   Specific to the site?

Q.   That would apply there.

A.   (No response.)

Q.   I mean, it can be something that KFC's

handed down.  It can be something that West Quality has at all of its stores.  It can be something specific that they developed at that particular location.  Is there any set of disciplinary rules there?

A.  Yes, sir.

Q.  Okay.  And do you -- do you know, like, who wrote the rules that apply at the New Orleans East restaurant?

A.  All of the rules?

Q.  Uh-huh.

A.  Rules around safety are in the learning zone and in the -- the manuals associated with -- with the preparation of products.

Q.  Okay.

A.  West Quality also has some written rules --

Q.  Okay.

A.  -- of discipline.

Q.  So is -- are the ones that are part of, like, the -- the training, the manuals, are those all, you know, KFC corporate developed?

A.  In the training and manuals, that is correct.

Q.  And West Quality has its own in

addition?

A.   That would be correct.

Q.   Okay.  So do we have any copies of the -- like the disciplinary rules available now or is this something that would have to be printed out?

MR. KOKEMOR:

I don't know that she can possibly begin to answer that because there must be a myriad of circumstances --

MR. JURKOVIC:

Right.

MR. KOKEMOR:

-- in which a person employed by the company would be disciplined.

MR. JURKOVIC:

So, again, I'm not interested in any rules about untimely arrival or time clock violations or insubordination or, you know, personal hygiene related to their person, you know, like you're our of uniform, that kind of thing.  We're not -- not interested in those things.

But we would be interested in any kind of disciplinary rules related to

actually, like, food handling and safety for those items, you know.  And not safety, like, Oh, you, like, left the door open or something and, you know, or -- or you mopped the floor incorrectly, you know, and that people would slip on it.  Not interested in that.  Just interested in the food handling type items, you know.

EXAMINATION BY MR. JURKOVIC:

Q.   I guess, let me ask it this way:  So those set of regulations that apply to the restaurant in question and that the State has written, through the Department of Health, is that -- do you understand that?

A.   Is there a set of rules that are written by the State?

Q.   Yeah.  Like Department -- the Department of Health has, like, regulations that apply to restaurants?

A.   That is correct.

Q.   And you guys are inspected twice a year by the Department of Health?

A.   Typically.

Q.   And so I assume employees of the

restaurant are -- are they trained on the rules that the State is going to try to enforce?

A.   Typically, yes.  That would be included in their learning zone training.

Q.   Right.  And so I -- I guess the next question is that if an employee violates a rule that the State could, like, you know, fine the restaurant for violating is that something that -- that the restaurant will discipline the employee for violating?

A.   Safe food is our number one practice. So I'm sure that that would be the case.

Q.   So is that -- is that reflected in, like, the -- the written rules that the employees would have to learn, I guess?

Like, if you violate this you could be, you know, terminated or -- or whatever; is that --

A.   Without having all of the rules and documents in front of me, I would not like to answer without having that in front of me.

Q.   Right.  And I imagine the written rules would be the best answer, you know.  And so rather than asking any -- anyone to, like, remember every single rule, right?

And so I guess that would be, you know,

like that's the kind of rules I guess I would want to review.  And what -- and what disciplinary rules for the employees relate to the food safety. Things that the State's going to inspect, you know, and, you know, things are there for the health of customers, basically.  So is -- is there a section of the rules that could be printed out for that, you know?

A.    (No response.)

MR. KOKEMOR:

I think what he's asking is if an employee doesn't wash his or her hands after returning from the restroom, is there a policy written down somewhere that says they can be disciplined for that?

MR. JURKOVIC:

Right.  That's fine.

THE WITNESS:

For violating food safety practices?

MR. JURKOVIC:

Right.

THE WITNESS:

I'm sure there is.  But, like I

said, without having everything --

MR. JURKOVIC:

Right.

THE WITNESS:

-- in front of me, I can't attest that there is a specific rule.

MR. JURKOVIC:

Right.  Okay.

MR. KOKEMOR:

You believe it's covered in the overall E-learning materials?

THE WITNESS:

Absolutely.

MR. JURKOVIC:

Okay.  Yeah.  And so that's -- so that why I'm probably going to need copies of everything.  Copies of books and E-learning materials.  I mean, if there's, like, a published set of clean rules that would be nice for us to read it, too.

And so I -- I imagine what I can do is I can -- yeah, I don't know.  We can do it as a request for production afterward.  But, you know, if you -- if

you want to do it -- some people like to have a clean written request for production. That's one way to do it. Or, you know, I mean, I can call for production of these things on the record, too. Whichever way you want to handle it.

MR. KOKEMOR:

I would prefer you provide us with a --

MR. JURKOVIC:

Written.

MR. KOKEMOR:

-- specifically drafted, written request for production.

MR. JURKOVIC:

Right. Right.

And after the ones already sent it might be -- some of them might be in there already. But the --

EXAMINATION BY MR. JURKOVIC:

Q. And so the -- as far as disciplining employees for violations of safety policies, is that something that would go in a personnel record?

A.   Yes.  Typically, yes.

Q.   Okay.  So shifting gears a little bit. So number seven, accident reports, investigative, analysis or other inquiries, written or verbal, including underlying data, photographs, notes, statements, et cetera, into the facts or causes of the alleged incident made subject of this litigation.

So, I guess, I think I asked for incident reports and investigative reports and all that kind of thing.  Are there any incident reports for what the plaintiff has alleged in this case?

Did -- did the company create any kind of incident report or investigative report?

A.   There is a first report of injury.

MR. JURKOVIC:

All right.  Is that -- do we have a copy of that?

MR. KOKEMOR:

That would be the guest hotline call in?

THE WITNESS:

That would be that (indicating) and the guest hotline.

MR. KOKEMOR:

She has brought with her the KFC guest line, hotline -- Guest Hotline Call-in Incident Report, dated Thursday, October 6, 2016 at 2:03 p.m. Eastern. And she's also provided a copy of the First Notice of Claim to Liberty Mutual Insurance Company, --

MR. JURKOVIC:

Right.

MR. KOKEMOR:

-- dated 10/7/2016.

EXAMINATION BY MR. JURKOVIC:

**Q.** So there's no incident reports from 1st or 2nd October? These are from the 6th, that looks like. Sixth and seventh, I'm sorry.

**A.** We received notification on the 6th, at which time it was called in to Liberty Mutual --

**Q.** Okay.

**A.** -- on the 7th.

**Q.** Guest hotline, so who runs this?

**A.** That is a third-party vendor that's employed by KFC.

**Q.** Okay.

**A.** Service check.

Q.   Okay.  So the -- she alleged that she returned to the restaurant on October 2nd.  Are -- there are no documents from October 2nd?

A.   No, sir.

Q.   Would that be the policy of the restaurant if someone were to return back on a complaint to create a -- a writing regarding it?

A.   Absolutely.

Q.   Okay.  So aside from these two documents, are there any other documents that would, I guess, we could fairly describe as an incident report or investigative report or accident report?

A.   (No response.)

MR. KOKEMOR:

Other than internal items, e-mails between different people, there's nothing else other than that?

THE WITNESS:

No, sir.

MR. KOKEMOR:

Okay.  You can just tell him that.

THE WITNESS:

No, sir.

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  And so if you're talking about internal e-mails and so that -- is that internal to the company or?

A.   Yes, sir.

Q.   Is that correspondence with counsel or correspondence to just among company employees?

MR. KOKEMOR:

For the purposes of the record here today, I'm just going to object to any internal e-mails that may be available on the basis of privilege. I'd like an opportunity to examine those --

MR. JURKOVIC:

Of course.

MR. KOKEMOR:

-- and provide those to you at a later date.

MR. JURKOVIC:

Of course.

MR. KOKEMOR:

If you're asking specifically for accident or incident reports, that's -- those two documents are the two that -- that are responsive.

MR. JURKOVIC:

Right.  Yeah.  I don't think that internal e-mails would probably be counting as incident reports.  That would be more like a company discussing things.

MR. KOKEMOR:

What -- what different employees did or said to one another may be privileged, and I don't think -- actually, I think they're much broader than item number seven on the --

MR. JURKOVIC:

I think that's fair enough, yeah.

MR. KOKEMOR:

All right?

MR. JURKOVIC:

Yeah.  Fair enough.

EXAMINATION BY MR. JURKOVIC:

Q.  Now, these are the reports, do these -- are these reports the -- are there any, I guess, investigations that accompany the reports or are these simply the reports that the complaint had come in?

A.  Once the complaint came in it was

called directly into Liberty.  And I'm not privy to any additional reports that they may have made.

Q.   Right.  So that's -- I guess that'd be something we need to take up with the claims adjuster, but.  Understood.

So, let's be perfectly clear, what -- if the carrier, if the insurance company has done any type of investigation, that's not communicated back to West Quality Food Service?

A.   Not to my knowledge.

Q.   Understood.  And so does that mean that West Quality did not undertake any investigation of the complaint; it was just turned over to the insurance company and let them investigate it?

A.   That's our practice, is to -- for alleged claims of that sort to turn it over to them and allow them to -- to represent us.

Q.   Understood.  And so that means -- I guess, so for number eight, is any information about the name, address, telephone number of -- a whole bunch of other stuff regarding persons who took part in any investigation or root cause analysis, and as well as anyone who prepared any reports, written, verbal regarding the alleged incident made subject of this litigation.

So do you have any information responsive to number eight?

MR. KOKEMOR:

You want to give him that list of them?

THE WITNESS:

We can.  I mean, but there really was -- was not -- other than this, I -- I did provide a list of -- of anybody who made have received the -- the initial complaint.

MR. JURKOVIC:

Okay.

THE WITNESS:

And -- but I don't think -- what else is on the back side of that?  Oh, okay.  That can come off of that one.

MR. KOKEMOR:

Yeah.  I think it is responsive to question number eight.  Why don't you provide this list of employees.

Take a break for just a second and grab some water.  You-all need anything?

(Whereupon a break in proceedings was held.)

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  And so you've handed me a list of persons in answer to question eight on the notice.  And so I see there's four people listed here.  You're listed first.  So you were involved in investigating the plaintiff's allegations?

A.   I was involved in preparation of the documents.  The primary investigation was done by Liberty.

Q.   Okay.  And, so, do you know what the role of Mr. Servolini or Mr. Estes or Ms. Williams was?

A.   With the exception of Ms. Williams, Mr. Servolini and Mr. Estes received the initial complaint.

Q.   Okay.  And, then, Ms. Williams do you know what her role was in investigating the complaint?

A.   I -- I'm not sure.  I put her down because she was the restaurant general manager.

Q.   Understood.  Thank you.  And so, otherwise, if the -- if -- if there was investigation done it would've been done by the insurance carrier?

A.   Primarily.

Q.   Okay.  I think I asked this about number nine, corporate structure.  I don't think we need to get too far into it.

THE WITNESS:

Can we take a break for just a second, please?

MR. KOKEMOR:

Sure.

MR. JURKOVIC:

Of course.

(Whereupon a break in proceedings was held.)

EXAMINATION BY MR. JURKOVIC:

Q.   So I think we've already talked about nine.  I don't want to get into that stuff.  I don't think we need to know that stuff, the -- the rest of the corporate organization charts.

Maybe if you have a handy chart (sic) I'll take it from you, but, you know, I don't need it I don't think.

Ten, ownership of West Quality Foods all properties.  I don't think we need to know that now.

Photographs, videos, films, digital impressions -- number 12 -- or other types of recordings which relate.

So does the restaurant -- other than the photographs that the plaintiff has provided as part of the discovery, does the restaurant have any photographs, videos, films, et cetera, as in -- as in number 12?

A.    Of the day in question?

Q.    That'd be nice.  Yeah.  Is there -- is there surveillance inside the -- the restaurant or at the -- at the drive-thru lane or at the restaurant the next day?

A.    There is none available.

Q.    Okay.  Does the restaurant actually -- at the time did it actually have, like, internal cameras for security purposes?

A.    To my knowledge, yes.

Q.    Do we not have, like, the films from those days?  Cause -- I ask because she's alleged that she returned to the restaurant on the morning of the 2nd October 2016 and, like, talked to someone inside the restaurant.

A.    No, sir.  Unfortunately, we do not.

Q.    Okay.  Is -- does the restaurant have a policy about security film retention, like, how long they keep these things?

A.    No, sir, not a written policy.

Q.   Do you know what the practice of that particular branch was at the time with regard to the security footage?

A.   If I'm not mistaken, I believe the video is maintained to the capacity of the -- of the DVR or the storage system.

Q.   Okay.  Does it continuously overwrite then?

A.   Yes, sir.

Q.   Okay.  And so just after a passage of time some things would have fallen off?

A.   Yes, sir.  To my knowledge, yes.

Q.   Okay.  Understood.  Is there not a policy for once a written complaint comes in to go look at the films on something like that?

A.   (No response.)

Q.   Let's see.  So we have -- I mean, backing the thing up to the KFC Guest Hotline Call-in Incident Report from October 6, 2016.

So this says that she -- here she's called in to complain about it.  Does -- is there any policy at the restaurant that once one of these type of calls comes in to go back and, you know, review the films to see if they can find the person who's making the complaint?

A.   Not to my knowledge.

Q.   Okay.  Do you know if anyone actually did go look at the films after this complaint was received?

A.   Not to my knowledge.

Q.   Okay.  And far as these complaints work, so is it -- you told me of a third party company that fielded this complaint on October 6, 2016, right?

A.   That is correct.

Q.   And so, then, they -- the third party company sends it to where?  Where does it go?

A.   Those listed on the e-mail.

Q.   Oh, is this essentially an e-mail that's been printed out?

A.   Yes, sir.

Q.   Okay.  I'm sorry.  I didn't understand that.  Okay.  So -- and so there's a line at the top "attention" that's got a whole bunch of peoples' names?

A.   Yes, sir.

Q.   And so those are all the people who received this document; is that --

A.   That is correct.

Q.   Okay.  All right.  And then once -- so

-- okay.  So this would've been delivered to everybody's box, e-mail box, on October 6th or thereabout, somewhere in there?

A.   Yes, sir.  Whatever date is --

Q.   Whatever date's on there?

A.   Yes, sir.

Q.   Okay.  And then the restaurant, then, makes the claim with the insurance carrier the next business day?

A.   Not in that case.  It was requested that -- if I'm not mistaken, that the restaurant not be made privy to the report.  So in this case Mr. Estes is the one that made the report, if I'm not mistaken.

Q.   So the restaurant was requesting "not to be made privy."  What does that mean exactly?

A.   That means that the guest requested -- right next to the report number, "do not send restaurant per customer's request."

Q.   So what is that about?  What does that mean?

A.   I wouldn't know.  That the guest requested that the restaurant not be sent a copy of this notice.

Q.   Weird, okay.  Is that kind of, what,

like, that's the -- how the third party company handles these things, I guess, is that --

A.   No.   That was at the request of the customer.

Q.   Okay.

A.   "Per customer's request."

Q.   I don't know what that means.   Okay. All right.   Thank you for that.

Okay.   And, so -- so there are no -- no internal surveillance that survived from October 2nd, 2016?

A.   Not to my knowledge.

Q.   So as far as is there any recordings made of the drive-thru lane, either video or audio?

A.   Only on the video and it's all housed in the same storage.

Q.   So that is the -- October 2nd is gone, October 1st is also probably gone in terms of this?

A.   Correct.

Q.   Okay.  All right.  So aside from like security footage are there any other types of, like, video recordings that the restaurant makes in the normal course of business?

A.   I don't understand what you're asking.

Q.   Sorry.  Does that mean that -- okay. So does -- I assume that the security recordings in -- at the New Orleans East restaurant are like the little cameras that are up on the ceiling and that kind of thing?

A.   That is correct.

Q.   So aside from those type of recordings does that -- does that restaurant make any other types of video recordings?

A.   Not to my knowledge.

Q.   Okay.  Understood.  And so I don't know if I -- I don't know if I asked in general or not.

Does the restaurant possess any videos or photographs related to the -- the incident that she's alleged, aside from the ones that she provided?

A.   No to my knowledge.

Q.   Understood.

A.   I mean.

MR. KOKEMOR:

Well, I don't think the plaintiff provided any videos.

MR. JURKOVIC:

No.  Just the photographs.  That's

all she provided.

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  I think I have a separate line item about surveillance.  So that would be something separate.  Yeah, so, number 20, just since we're talking about, like, recordings.  And I -- I asked it in discovery and I think they said there was no surveillance that had been conducted.

But as of today has been -- has there been any surveillance of the plaintiff that the employer has conducted?

A.   I'm not aware of any.

Q.   Okay.  Are you aware of the insurance carrier hiring a private investigator in any capacity to surveil the plaintiff?

A.   Not to my knowledge.

Q.   Okay.  So number 13 has to do with individuals from whom statements were taken.  So were there -- were any -- were statements taken from any person in connection with the plaintiff's complaint?

A.   Only a verbal statement from the general manager regarding her knowledge of the alleged incident.

Q.   Okay.  Was that produced to, like, a

writing or a recording in any way?

A.    No.

Q.    Do you know who took the statement?

A.    I did, if I'm not mistaken.

Q.    So do you recall, though, what she had to say?

A.    She said she had no knowledge.

Q.    Understood.  Okay.  Do you recall the date that that statement was taken?

A.    I don't.

Q.    Okay.  Would it be close to the time that the -- the guest hotline call was made in October of 2016?

A.    I wouldn't want to speculate.

Q.    Got you.  Okay.  I was going to say, if we could ballpark a year, you know, like, 2016, 2019, but if you don't know, you don't know.  But okay.

So 14, any and all information regarding, reports, letters, forms generated by or on behalf of West Quality Foods to insurance carriers, agents, adjusters, risk managers, as well as any government agencies, regarding the alleged incident.

And so I think you -- the company's

produced the claim form that Liberty Mutual has, I guess, acknowledged the claim coming in.  Are there any other documents that go the other direction?

A.    I'm not sure what you're asking.

Q.    Okay.  Well, let me get straight on this.  So this one from October 7th that you provided, that's a Liberty Mutual document?

A.    Correct.

Q.    Is this the form that West Quality completed or is this a form that West Quality received from Liberty Mutual?

A.    I believe that is a recap of the call to Liberty Mutual.

Q.    Okay.  And so -- all right.  Yeah.  It says it's the Claim Acknowledgement Report.  So I'm assuming -- so the carrier is acknowledging that they received the claim; is that --

A.    I believe that to be true.

Q.    Do you know who called Liberty Mutual to say, We've got this thing that came in?

A.    I believe it was Lawrence Estes or.

Q.    Okay.  Understood.  So are there any -- aside from that call, are there any letters, reports or other forms, as described in number 14,

that West Quality sent to Liberty Mutual regarding the claim?

A.   In regards to what?

Q.   I mean, just anything saying, you know, here's -- here's this complaint that came in, you know.  Or is that -- is that phone call enough to, you know, get the insurance company involved?

A.   The phone call is enough to -- to -- to report the claim.

Q.   Okay.  And so as -- aside from that phone call, any other letters that were sent to Liberty Mutual about, here's this complaint?

A.   I'm not sure.

Q.   Okay.  And as far as -- it should be in the claim file, though, so that might be for the insurance company to answer, I would think.

As far as, though, the other half of that, number 14 is about governmental agencies.  So was -- if a complaint like this comes in do you have to, like, report to the Department of Health that we got somebody saying this about us?

A.   No.

Q.   No?

A.   Not to my knowledge we're not required to do that.

Q.   Okay.   And so do you know if anyone actually made that kind of complaint to the Department of Health regarding the incident?

A.   I don't think -- I don't know.

Q.   Okay.   Now, Department of Health, do they keep track of -- I mean, if someone makes a complaint about the restaurant to the Department of Health, is that something that's publically available or something that gets served on the restaurant saying, hey, this complaint came in; do you know?

A.   I'm not sure of their practices.

Q.   Understood.   Aside from the inspectors that come through routinely from the Department of Health is there any other type of Department of Health involvement with the restaurant?

A.   Not unless a complaint is made.

Q.   Okay.   And so is -- thinking about that -- okay.   I'm not going to get into 15. That's about regulations that apply to the restaurant.

Okay.   So 16.   Measures taken by West Quality Food Service and agents -- its agents to prevent adulterants from entering into the products offered to the public.

So, I guess, is that -- is there a written description somewhere of like the, you know, aside from all the training documents and standards documents that we discussed already, are there any separate documents about the -- that describe practices that the restaurant has to use to prevent contamination or adulteration of products?

MR. KOKEMOR:

I think you stated these items.

THE WITNESS:

You can go through those with him.

THE WITNESS:

All right.  Obviously, this is not inclusive, but the employee training, the management supervision, above restaurant management visits, monthly inspections and service by federal pest services, and food safety evaluations from a third-party vendor.

MR. JURKOVIC:

Okay.  So is there, like, a written list of those that I could look at?

MR. KOKEMOR:

With respect to what?  To --

MR. JURKOVIC:

All the things that she just rattled off.  Things like that I want to look at.  I mean, I don't know if there's underlying documents or not.

MR. KOKEMOR:

You gave those five items, basically, from your knowledge of -- of restaurant operations?

THE WITNESS:

Correct.

MR. KOKEMOR:

Okay.  So I guess what he wants to know is, are there any written policies or procedures that you referred to for that or is that just --

THE WITNESS:

That's --

MR. KOKEMOR:

-- standard operating practice?

THE WITNESS:

Standard operating practice.

MR. JURKOVIC:

Could I see the list?

MR. KOKEMOR:

This what she prepared as she prepared to the give the deposition.

MR. JURKOVIC:

Right. Right.

EXAMINATION BY MR. JURKOVIC:

Q. Yeah. And so, I guess, that's the -- I mean, Quality's documents you've provided to me they have like a typed cover sheet, it looks like. And so those -- did you prepare those typed cover sheets; is that --

A. That is correct.

Q. Okay. Thank you for that.

Measures taken include, but not limited to. And so the employee training we talked about. Management supervision I think we've talked about. And, so, above restaurant management visits. So what does -- what does that mean, "above management restaurant management visit"?

A. The supervisor, who in this case would be Bernard Estes, routinely visits the restaurant.

Q. To make sure its complying with all the rules, basically; is that --

A. Correct.

Q. Okay. Four: Monthly inspections and service by Federal Pest Services. So -- so tell

me about that.  What is that?

A.    That is a licensed pest control operator who manages our -- our pest services.

Q.    Okay.  And so what -- what do they do exactly?  And, so, Federal Pest Services, first, that's the name of the company?

A.    Correct.

Q.    Okay.  So they come in once a month to inspect and do, like, whatever it is they -- what do they do?

A.    I've not been on a routine or visit to -- to know their -- the entirety of their visit. But they inspect for any type of infestation.

Q.    Okay.  Bugs, rodents, and all that normal things?

A.    Correct.  And -- and I also believe they do preventative spraying.

Q.    Okay.  So do they -- do you know what -- the dates when they -- when their visits are exactly?  Do they come first of the month, mid month, do you know?

A.    It would depend on the restaurant.

MR. KOKEMOR:

Is that something you could research for a one year period prior to

this incident?

THE WITNESS:

Yes.

MR. KOKEMORE:

Could you -- could you provide their --

THE WITNESS:

Their dates?

MR. KOKEMOR:

-- the dates of service?

THE WITNESS:

Yes, sir.

MR. KOKEMOR:

Would that --

MR. JURKOVIC:

Yeah, that'd be good.

MR. KOKEMOR:

-- be fine?

MR. JURKOVIC:

That'd be -- that'd be nice to know the dates.  And, then, I guess if they have the invoices where they say what they did, too.  You know, like, do they said, oh, we laid, you know, we laid this much toxins for cockroaches.  We,

you know, put down rat traps around the garbage.  Whatever.  I don't even know.  That's why I'm asking cause I don't know.  But, I assume, that those would be the usual suspects, but -- for pest control.

MR. KOKEMOR:

How far would you like me to go back?

MR. JURKOVIC:

I don't know if it needs to be a year, but, you know, --

MR. KOKEMOR:

Six months?

MR. JURKOVIC:

-- six months, you know.  Like, so I guess, you know, September, you know.  And, then, include October if there's one on October 1st, I guess, you know, but.

MR. KOKEMOR:

Any and all service records from Federal Pest Services to the Bullard Avenue restaurant for the period of six months prior to October 1, 2016.

MR. JURKOVIC:

That'd be --

MR. KOKEMOR:

We can -- to the extent she can locate those we'll produce.

MR. JURKOVIC:

And then -- and if -- and, I guess, if you guys can't find them I guess I can try to, like, get them from Federal Pest, like, subpoena them or something maybe but.  All right.  And so -- thank you for that.

EXAMINATION BY MR. JURKOVIC:

Q.   And so the number five, quarterly food safety evaluation.  So who does -- who cares for the quarterly food safety evaluation?

A.   Steritech.

Q.   And so that's another third party?

A.   Correct.

Q.   So what do they do exactly?

A.   They inspect the restaurants or restaurant for standards and adherence to the -- to the procedures.

Q.   Okay.  Do they generate a written report?

A.   They do.

Q.   Is -- is it possible to get the most recent report prior to our alleged incident date?

A.   I'm sure I can find that.

Q.   Okay.  I appreciate that.  And, similarly, number three, the above management, above restaurant management, does somebody author a written report for that?  Like the West Quality big shot come down and sit and tell the local restaurant, here's my -- my findings of my visit?

A.   At times.

Q.   Do you think that's something that'd be able to be located, if one were written, for the recent visit before our alleged incident date?

A.   I'm not sure.

Q.   I guess that's -- well, I mean, if you got one that would be great to have.

MR. KOKEMOR:

Would Bernard Estes be the best person to obtain that from?

THE WITNESS:

He's no longer employed with us, so --

MR. KOKEMOR:

He's not?

THE WITNESS:

-- I'm not sure that he has access to that, those documents.

EXAMINATION BY MR. JURKOVIC:

Q. Do you know how the company organizes -- does it, like, have a, like, an inspection file for each one of its locations or something; like here's the history of the inspections at this locale?

A. I'm not sure.

Q. Irrespective of who authored it, you know?

A. I'm not sure.

Q. Okay. Number 17 has to do with policies of insurance. I think you-all provided --

MR. KOKEMOR:

I think we've produced that.

MR. JURKOVIC:

Yeah. And so I don't know if it was a certified copy or not. I don't know, people insist on certified copies. I don't know, you know, if we necessarily need it and I don't know who's going pick fight over it, but.

MR. KOKEMOR:

I mean, I'm willing to state that Liberty Mutual would stipulate that they provide adequate insurance to cover the events and the incidents sued upon in this case.

EXAMINATION BY MR. JURKOVIC:

Q.   So the -- is that the only policy of insurance that the restaurant has to cover, you know, incidents such as this alleged in this case?

A.   To my knowledge.

Q.   Okay.  So 18.  I've asked that -- you to be prepared to answer for any and all actions of employees on the date of incident related to the alleged incident at issue in this matter.

Okay.  So is -- is that a set of questions to be asked of the individual employees of the particular restaurant rather than of the corporation directly?

A.   I would -- I would think so.  Any and all is -- is -- is a huge ask.

Q.   And so -- yeah.  And so in terms of the things that are, like, directly related to her -- the plaintiff's allegations of who prepared the sandwich.  You know, who -- who prepared it, who

wrapped it, who handed it to her out the window, those kind of things.

Are those -- are those not the kind of things the corporation is going to know, like, centrally?

A.   No, sir.

Q.   Understood.  Okay.  I asked you about surveillance, recordings on the premises, surveillance of the plaintiff.

So 21 is:  All information regarding lawsuits, claims or accidents involving defendant West Quality Food Services five years preceding the alleged incident, wherein a person was allegedly injured and West Quality was made defendant.

And so are there -- are you aware in the five years, going back, so back to October 2011, is the company aware of any incidents where a customer was injured and lawsuit was filed, other than ours of course?

MR. KOKEMOR:

I'm just going to object to the -- to the broad nature of that point of inquiry.

MR. JURKOVIC:

Yeah.

MR. KOKEMOR:

Obviously, slip and falls and --

MR. JURKOVIC:

So --

MR. KOKEMOR:

-- parking lot incidents and all would have no bearing on this case.

MR. JURKOVIC:

And so, yeah, I'm not interested in slips --

MR. KOKEMOR:

Yeah.

MR. JURKOVIC:

-- and falls.

MR. KOKEMOR:

So if you want to confine it to whether or not they have any other lawsuits arising out of --

MR. JURKOVIC:

Adulterated -- claims -- rather, claims of adulterated food products, yeah.

MR. KOKEMOR:

Right.

MR. JURKOVIC:

That's what being asked there.

MR. KOKEMOR:

To that extent you -- you can answer.

THE WITNESS:

Not to my knowledge.

EXAMINATION BY MR. JURKOVIC:

Q. Okay. All right. Now, so as far as number 22 is concerned. Any and all information regarding whether defendant West Quality Food Service or any other person or entity, had any right or duty to direct, control, supervise or manage the conduct or operations of any person at the scene of the incident.

And so is West Quality Food, I guess, the -- the only entity who is in control of the premises on October 1st, 2016?

A. That is correct.

Q. So there's, like, no other entity working there at the same time or any -- nothing like that?

A. No, sir, not to my knowledge.

Q. Now, is that site a dual restaurant location? Is there like a Taco Bell there also or

something?

A.   A multi-brand, yes, sir.

Q.   That's how -- that's multi-brand.

MR. JURKOVIC:

All right.  So.  Okay.  That's like the cram course of my notes.

Do you mind taking a quick break so I can review my notes?

MR. KOKEMOR:

No problem.

(Whereupon a break in proceedings was held.)

MR. JURKOVIC:

Back on the record.

EXAMINATION BY MR. JURKOVIC:

Q.   Okay.  A couple things in the written discovery I wanted to ask about.  So one of the things, we asked in another request for admission about the alleged adulterated food item that the plaintiff bought, and we asked if it was -- if defendant was -- West Quality was in possession of it, because, apparently, the issue is she brought it back.  Right?  And that it was taken by whatever employee with whom she spoke.

So that was admitted and so does -- so did West Quality ever possess the item after --

she said she brought it back -- did -- is there any awareness of this item that she brought back?

A. Not to my knowledge.

Q. I was just curious if that -- if the answer was, you know, we gave it to our lab to test it or something like that. Is there -- you follow me?

A. I follow you, but I'm not -- I don't -- I don't know nor have I been told that we ever possessed that item.

Q. All right. Well, is it West Quality's contention or West Quality Food Service's contention that she never brought an item back?

A. Not to my knowledge.

Q. Not to your knowledge -- sorry. Not to your knowledge that she didn't bring it back to your knowledge or that not to your knowledge that's the contention?

A. Ask your question again, please.

Q. Yeah. I was just -- I was asking does West Quality contend that Ms. Thomas never brought an item back or it doesn't have to be "never brought it back. Does West Quality Food Service contend that it's unaware of Ms. Thomas bringing an item back?

A.   You're asking if West Quality Food Services is aware --

Q.   Well, is -- well, yeah, that -- well, she says that she brought something back.  And so does West Quality, I guess, agree that she brought an item back or not?

A.   We're not aware of that.

Q.   Not aware of it, okay.  Understood. Okay.  All right.  So there's a -- I have a list of employees, too, from the written discovery response.  I think we've gone through it.

MR. JURKOVIC:

And, Counsel, I think, you know, I'll probably want to have some depositions of some of the employees.

EXAMINATION BY MR. JURKOVIC:

Q.   Is there anyway that, sitting here today with either the list of employees that was provided earlier in discovery or the list that you just provided me this morning, is there anyway to know from these lists at all who was the cook that day on October 1st?

A.   I'm not aware of a way to make that distinction.

Q.   All right.  I can just save that for

the manager.  Do you think the manager would be the best person to know who was, like, the cook out of the list?

A.   On the evening of?

Q.   October 1st, 2016.

A.   Can I see the list again?

Q.   (Complies.)

A.   I wouldn't be able to identify that here today.

Q.   Thank you.  Now, we had some discovery asked, standard lawyer question about what documents are going to be introduced at trial. And so that's -- and one of the things that was in the answer was investigative reports related to the subject accident.  And so I think we already talked about investigative reports.

So I just want to confirm:  Are there any actual investigative reports that are in existence at this --

A.   I wouldn't know what Liberty has.

Q.   Okay.  So as far as West Quality Foods is concerned that there is none that West Quality Food Service did; the --

A.   What we --

Q.   -- the carrier might have done that?

A.    We provided you with --

Q.    With the documents?

A.    -- what I believe to be the full extent of that.

Q.    Okay.  Understood.  All right.  So we asked the question, interrogatory 13, about: Describe the quality control process of food items sold.  And so the answer to the interrogatory was that; Defendant provides all food items are purchased from a licensed supplier.  Which I think you described all that.  And the Butts and McLane, you know, supply chain.

And, also, number two:  All food is prepared and held in accordance with KFC procedures.  So KFC procedures are -- that's, like, what's been described already as far as the standards is concerned and the mission manuals and whatnot?

A.    That is correct.

Q.    Are there any other is KFC procedures that are written down and called something other than those terms we've already discussed?

A.    As it relates to --

Q.    The item --

A.    -- Chicken Little?

Q.   Right.

A.   What a Chicken Little would be -- sir, that I understand what you're asking me.  You're asking me:  Are there any other procedures written that would rel -- that specifically mentions a Chicken Little?

Q.   Well, that -- I think that would be included, but I don't think it exhausts it.  So it just -- all food is prepared and held in accordance with KFC procedures.

I'm -- I'm envisioning that you can have a general set of procedures that apply to anything and a specific set of procedures that apply to that item insofar as it's specific, right?

And, so, I was just curious if there was any other documents out there that are called a different title than the ones we've already discussed.  That's all.

You know, I want to avoid a situation where it's like, well, yeah, you asked me about the standards, but you didn't ask me about the, you know, the -- the corporate policy manual or something, you know, whatever the specific name is, you know.

And so I don't want to -- I don't want to get into a situation where there's like titles of documents that I've overlooked.

And so that's why I'm asking if there's all the procedures that relate to the food item at issue in our case. You know, is there -- have we -- are they in the standards library and that's the collection of documents or is there another collection of documents out there?

A.   Everything related to that particular item would be located in the standards library, to the best of my knowledge.

Q.   I understand. I understand that. I appreciate that.

And as far as safety is concerned in the -- in the year prior to our incident date, were there any Department of Health violations noted or issued? I don't know what the right language would be.

I mean, there's Department of Health inspections in 2016, I assume?

A.   Yes.

Q.   So, did those -- to your knowledge did those inspections result in the finding of any violations?

A.   Not to my knowledge.

Q.   Do the -- does the Department of Health issue an inspection report?

A.   They do.

Q.   Is that something that the restaurant keeps?

A.   To my knowledge.

Q.   Is that something that we could get copies of for 2016 and 2017?

A.   2016 and 2017?

MR. KOKEMOR:

         I mean, I don't think 2017 is relative to this case, but 2016, prior to incident, if there were any inspection report --

MR. JURKOVIC:

         Well, I just --

MR. KOKEMOR:

         -- we'd be happy to produce.

MR. JURKOVIC:

         The only thing with, like, maybe the first one in 2017 if it's -- you know, if it were to fall in January that could be, conceivably, the closest one.

MR. KOKEMOR:

If we have them.

MR. JURKOVIC:

I think it might be easier, you know, maybe just to, like, call Baton Rouge and say, hey, can I get a copy. I think they're public record and this is not confidential stuff.

MR. KOKEMOR:

(No response.)

EXAMINATION BY MR. JURKOVIC:

Q. All right. Sorry. You haven't been a copy (sic) -- you haven't been given any copies of, like, the claim adjuster's file or anything in this case?

A. I have not.

Q. Pardon?

A. I have not, to my knowledge, no.

Q. Okay.

MR. JURKOVIC:

All right. I don't think I have -- let me make a survey of my notes real quick and make sure there's nothing else.

EXAMINATION BY MR. JURKOVIC:

Q.   And so you've described for me, I guess, the -- the process the cook would use to prepare the Chicken Little sandwich earlier.

And, you know, from -- do you know that that -- is that the, I guess, what you described for me is that, like, how the restaurant has trained the cook to do these things?

A.   What I described for you was the procedure, the abridged procedure, to cook the -- the chicken tender that went on the Chicken Little sandwich.

Q.   Okay.

A.   I did not describe the process in its entirety --

Q.   Okay.

A.   -- because I don't have that in front of me.

Q.   Understood.  And so the -- but, yeah, the process that you described regarding just the -- the meat component of it?

A.   Correct.

Q.   And so that -- is -- it's an abridged process.  So is there a more elaborate description of it?

A.   That would be in the procedure,

correct. That is within the training in the standards library.

Q. Okay. All right. So, yeah, I guess -- I guess I would need to see that. I can't really ask you questions about it without seeing it.

So, now, in terms of what the cook actually did, on the other hand, that'd be a question, you think, for the cook rather than for the company?

A. I'm sure it would be.

Q. I know. So, I mean, do you have any knowledge of the evening of October 1st, 2016, you know, how the sandwiches were prepared?

A. Do I have any knowledge about the specific way that the --

Q. Right.

A. -- sandwich was prepared?

Q. Correct.

A. No.

Q. All right.

A. The only thing that I would have would be the procedure.

Q. Right. Okay. Now, is there a -- is there a process in place to, I guess, test the cooks on whether they're following the procedures

after they've been trained?

A.   To test them?

Q.   Just to, I guess, to make sure that they're doing what they're supposed to be doing?

A.   I can't re -- recall the specific process at this point, nor could I attest to the practice at the restaurant.

Q.   Okay.  Understood.  Is there -- is part of the process -- and you said you -- you didn't describe the whole process for the sandwich.

Is there is any kind of -- and I don't know -- I don't know if I need the whole process described, but is there at any point, like a quality control moment where someone in the restaurant is supposed to review the sandwich to make sure it's fit to go out the door?

A.   During cooking and during assembly of the sandwich, that is correct.

Q.   Oh, okay.  So that's -- the employees are supposed to make sure that it's fit for consumption, basically?

A.   Correct.

Q.   Okay.  Understood.  Is that, like, part of the training regimen that they're supposed to do that?

A.   I'm not sure what you're asking me.

Q.   Oh, I'm sorry.  So is, like the -- the training that the employees receive that we talked about it earlier in the deposition, is that, like, their -- the quality control functions is that part of that training?

A.   I don't know that it's -- the terminology is as such.

Q.   Right.

A.   But -- I don't know that the terminology is as such.

Q.   Okay.  Are the employees taught, I guess, otherwise, to inspect the items that they're putting together to make sure they're okay, you know, is that --

A.   To the best of my knowledge, yes.

MR. JURKOVIC:

Okay.  I think that's all I've got.  So thank you very kindly.  I appreciate your time and thanks for coming down.

THE WITNESS:

Thank you.

MR. KOKEMOR:

You have the right to read and sign

the deposition.  I'm going to recommend that you waive it.  Is that okay with you?

THE WITNESS:

Yes, sir.

MR. KOKEMOR:

She'll waive reading and signing.

(Whereupon deposition was concluded at 3:55 p.m.)

REPORTER'S PAGE

I, Terri Weber Wenning, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicated pauses, changes in thought, and/or talk over;

That same is the proper method for a court reporter's transcription of proceeding and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "spelled phonetically."

Terri W. Wenning, RPR, CCR

Certified Court Reporter

149

C E R T I F I C A T E

        This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

        I, TERRI WEBER WENNING, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that HILARY M. BLACK, on the 11th day of March, 2019, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 147 pages;

        That this testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

        That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services;

        That I have acted in compliance with the prohibition on contractural relationships as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractural relationship, direct or indirect, between a court reporting firm and party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter;

        I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

                        Terri W. Wenning, RPR, CCR
                        Certified Court Reporter #98006